IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | CASE NO. 18-30849 |
| BENDCO, INC. | § | (Chapter 11) |
| DEBTOR | § | |

## OMNIPOTECH LTD'S MOTION FOR
## RELIEF FROM THE STAY
## REGARDING NONEXEMPT PROPERTY

---

**THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST 7 DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE A HEAIRNG ON THIS MATTER ON MAY 31, 2018 AT 2:00 P.M. IN COURTROOM 400, UNITED STATES COURT HOUSE, 515 RUSK AVENUE, HOUSTON, TEXAS 77002**

---

1.  This motion requests an order from the Bankruptcy Court authorizing OMNIPOTECH, Ltd ("OMNIPOTECH") filing this to repossess certain equipment purchased by Bendco which is subject to Omnipotech's purchase money security agreement as set forth in Paragraph 3 below. OMNIPOTECH also seeks relief to pick up certain equipment that Debtor is using in connection with its computer infrastructure that OMNIPOTECH owns as set forth in Paragraph 4 below. OMNIPOTECH also seeks relief from stay to terminate the master services agreement, and the Network Service Level Agreement as further set forth in Paragraph 5 below.

2.  Movant is OMNIPOTECH, Ltd.

3.  Movant, directly or as agent for the holder, holds a purchase money security interest in certain personal property consisting of:

INFRASTRUCTURE:

1 NETGEAR GS748TP 48 pt GB Smart Switch w/PoE (power over Ethernet)
1 Dell T430 server with 5YR 24x7 Warranty, 4x1TB SSD drives with hot spare and Vmware vSphere Essentials kit
1 EATON PW9130L1500T-XL 1500VA/1350W Tower UPS 120V NEMA 5-15EATON PW9130L1500T-XL 1500VA/1350W Tower UPS 120V NEMA 5-15
1 Double Conversion Online UPS for Phone Systems, Firewalls, Switches and Servers

PHONE EQUIPMENT:

15 Polycom VVX 410 PoE speakerphone without power adapter
  - 12-line HD voice business media phone with a 3.5" color LCD display and dual Gigabit RJ45 ports
1 Polycom VVX Color Expansion Module for receptionist's VVX 410
3 Polycom power supplies for models VVX 300, 310, 400, 410 (5 pack)

These items are more particularly describe in the On Premises Infrastructure Project and Services Order Form between Bendco and OMNIPOTECH (the " Infrastructure Services Order Form") and the Project and Services Order Form for Bendco ("Services Order Form"). True and correct copies of the Infrastructure Services Order Form and the Service Order Form are attached hereto as Exhibit "A" and "B".

4. Additionally, Debtor is in possession of certain equipment that is owned by OMNIPOTECH that has been being used in connection with its infrastructure needs.   These items consist of:

5.

  1 OMNIPOTECH Backup Appliance
  Phone System Server
  Spermicro Phone server hardware

Pursuant to the Services Order Form, these pieces of equipment remained in the ownership of OMNIPOTECH.   See Ex. B.

6. Bendco also executed a Master Services Agreement ("MSA") with OMNIPOTECH which granted to Bendco a non-exclusive, license to use OMNIPOTECH's technology solely for the purposes of using the services provided under the MSA.   A true and correct copy of the MSA is attached hereto as Exhibit "C".   Bendco also executed the Network Service Level Agreement for Bendco, Inc. (The "Network Agreement") under which OMNIPOTECH provides Bendco with service which consists of management and service of E-mail, Local Area Networks, telephone systems, and Wireless Area Networks.   Further, OMNIPOTECH provides service for  these Networks including but not limited to data service, back-up, and security services to the network environment. Bendco is required to pay the monthly charges for the use of these licenses, network, back-up services, and security.   A true and correct copy of the Network Agreement is attached hereto as Exhibit "D."   Bendco has not paid

OMNIPOTECH under the MSA and Network Agreement since January 2017 and has not made any post petition payments as is required.

6.      Movant has reviewed the schedules filed in this case.  The property described in Paragraph 3 is not claimed as exempt by the debtor.

7.      Type of collateral: Personal Property

8.      Debtor's value of the property: $900.00[1]

9.      Movant's estimated value of property: $    16,692.83

10.     Total amount owed to Movant:        a.      $19,741.00 (for Equipment under Paragraph 3 above)

                                           b.      $61,710.51 as of 4/4/18 (for monthly services under Paragraph 4 above)

11.     Estimated equity: None

12.     Total pre and post petition arrearage:

        a.      $16,624.00 (for Equipment under Paragraph 3 above from Jan. 10, 2017 - April 28, 2018)
        b.      $61,710.51 as of 4/4/18 (for monthly services under Paragraph 4 above from January 10, 2017 to April 10, 2018

13.     Total post-petition arrearage:

        a.      $2,078.00  (for Equipment under Paragraph 3 above for March 10, 2018 through April 10, 2018)
        b.      $8,189.96 (for monthly services under Paragraph 4 above from March 10, 2018 to April 10, 2018)

14.     Amount of unpaid, past due property taxes: Not applicable

15.     Debtor's payment histories are attached as Exhibit "C" in the form required by Local Rule 4001(a)(6).

16.     Cause exists for the listing of the automatic stay for several reasons as shown below:

---

[1]Debtors schedules only listed the 15 Polycom phones.   Movant's estimate value of the phones is $3,125.10.

a.  Debtor has not made post petition payments for either the Equipment or the Licenses and Infrastructure support.  OMNIPOTECH must still pay its suppliers for such licenses and is continuing to accrue more expenses. Defendant's were seriously past due when the Chapter 11 was filed.   Debtor has not accepted or rejected the executory contract which would allow OMNIPOTECH to cancel the licenses, security, back-up services, and infrastructure.   Debtor has not made adequate provisions in his proposed budget under the Order to Use Cash Collateral to provide for payment to OMNIPOTECH.

b.  The Property and services are not necessary for an effective reorganization.

17.  Based on the foregoing, Movant seeks termination of the automatic stay and co-debtor stay, if applicable, to allow Movant to repossess the property set forth in Paragraph 3 and 4 and to terminate the MSA and Network Agreement.

18.  Movant certifies that prior to filing this Motion, I had spoken to Debtor's counsel at the creditors meeting and over the telephone regarding his issue, and send him an email on April 27, 2018 at 2:45 p.m. enclosing a draft of the Motion and asking him if he was opposed.   Debtor's counsel has never responded to the email; therefore, Movant assumes that Debtor is opposed to this Motion.

Date:   May 3, 2018

Respectfully submitted;

LAW OFFICE OF MYNDE S. EISEN, P.C.

By: /s/ Mynde S. Eisen

Mynde S. Eisen
State Bar No. 06503950
Derek Loetzerich
State Bar No. 24102105
6546 Greatwood Parkway, Suite C
Sugar Land, Texas 77479
(281) 545-8600
(281) 631-3101 (facsimile)
Email: mynde@eisenlawoffice.com

ATTORNEYS FOR CREDITOR
OMNIPOTECH, LTD.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion for Relief From The Stay has been served on all parties in interest as listed below by depositing the same in the U.S. mail, regular mail, postage prepaid on this 3rd day of May, 2018.

*Mynde S. Eisen*
/s/ Mynde S. Eisen
Mynde S. Eisen

**DEBTOR**

Bendco, Inc.
801 Houston Ave.
Pasadena, TX 77502

**DEBTOR'S ATTORNEY**

Richard L. Fuqua
Fuqua & Associates, PC
5005 Riverway, Suite 250
Houston, TX 77056

**US TRUSTEE**

U.S. Trustee
515 Rusk Ave., Ste. 3516
Houston, TX 77002

**SECURED CREDITORS**

Ascentium Capital, LLC
23970 Highway 59 N.
Kingwood, TX 77339-1535

Bank of America, N.A.
P.O Box 660576
Dallas, Texas 75266-0576

Bank of America, N.A.
800 Market Street
St. Louis, MO 63101-2510

Citibank, N.A,
388 Greenwich Street
New York, NY 10013

Corporation Service Co. Of America
P.O. Box 2576
Springfield, IL 62708

Konica Minolta
21146 Network Place
Chicago, IL 60673

Leaf Capital Funding, LLC
2005 Market Street, 14th Floor
Philadelphia, PA 19103

Susquehanna Comm Finance
2 County View Road, Ste 300
Malvern, PA 19355

TCF Equipment Finance
P.O. Box 77077
Minneapolis, MN 55480-7777

US Bancorp Equipment Finance
P.O. Box 790413
St Louis, MO 63179-0413

Wells Fargo Bank, N.A.
300 Tri-State International #400
Lincolnshire, IL 60069

**UNSECURED CREDITORS:**

TXU Energy
PO Box 650638
Dallas, TX 75265

CAN Capital Asset Servicing, Inc.
Fora Financial
242 W. 36th St.
New York, NY 10018

Bank of America
PO Box 660576
Dallas, TX 75266-0576

Knight Capital Funding II
9 East Lockerman St #3A-543
Dover, DE 19001

G&A Partners
17220 Katy Fwy #350
Houston, TX 77094

Tech Induction
13129 23 Mile Road
Shelby Township, MI 48315

Team Industrial Services Inc.
PO Box 842233
Dallas, TX 75284-2233

TUV Rheinland Ind Solutions
PO Box 417532
Boston, MA 02241-7532

LB Foster Ball Winch
PO Box 643343
Pittsburgh, PA 15264-3343

Ball Winch
15786 Hwy 75 North, #110948
Willis, TX 77378

Herc Rentals, Inc.
PO Box 650280
Dallas, TX 75265-0280

Great Western Metals
14121 Gulf Freeway
Houston, TX 77034

IRIS NDT, Inc
1115 W. 41st St.
Tulsa, OK 74107

Accutest Labs
7821 Pinemont
Houston, TX 77040

Adobe Equipment
7607 Wallisville Rd
Houston, TX 77020

Dixie Pipe Sales, LP
Dept #372
PO Box 4346
Houston, TX 77210-4346

Praxair
10 Riverview Dr.
Danbury, CT 06810

Omnipotech LTD
11422A Craighead Dr
Houston, TX 77025

Texas Pipe & Supply Co.
PO Box 301052
Dallas, TX 75303-1052

Fastway Freight Systems
PO Box 87644
Houston, TX 77287-7644

-6-

**PARTIES REQUESTING NOTICE:**

Mynde S. Eisen
Law Office of Mynde S. Eisen, P.C.
6546 Greatwood Parkway, Suite C
Sugar Land, Texas 77479

Hector Duran
Office of the US Trustee
515 Rusk Ave., Ste. 3516
Houston, TX 77002

Harris County
c/o Tara L. Grundemeier
Linebarger Goggan Blair et al
PO Box 3064
Houston, TX 77002

Jay W. Hurst, Asst. Attorney General
c/o Sherri K. Simpson, Paralegal
Bankruptcy & Collections Div.
PO Box 12548
Austin, TX 78711-2548

BB&T Commercial Equipment Capital
c/o Alan B. Padfield
421 W. Third St., Ste. 910
Fort Worth, TX 76102

Susquehanna Commercial Finance, Inc.
c/o Alan B. Padfield
421 W. Third St., Ste. 910
Fort Worth, TX 76102

TCF Equipment c/o Teri H. Kelley
6750 West Loop S., Ste. 920
Bellaire, TX 77401

Richard A. Kincheloe
Assistant United States Attorney
1000 Louisiana, Ste. 2300
Houston, TX 77002

Palladian Publications
c/o William T. Peckham
1104 Nueces St., Ste. 104
Austin, TX 78701-2106

AmTrust Insurance Co of Kansas
Maurice Witscher, LLP
c/o Alan C. Hochheiser
2000 Auburn Drive, Ste. 200
Beachwood, OH 44122

San Jacinto Community College District
c/o Daniel J. Snooks
11550 Fuqua, Suite 370
Houston, TX 77034

Jeremy M. Jones
Lam, Lynn & Phillip, P.C.
6213 Drive, Suite 2100
Houston, Texas 77057

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

# On-Premises Infrastructure Project & Services Order Form  

## CLIENT: BENDCO INC

July 27, 2015 (Revision 1.4)

**NOTE: This order form will replace all other order forms upon execution.**

### Bendco On-Premises Local Network and Phone System with Onsite Backup & Business Continuity with Offsite Disaster Recovery and Failover Phone System   6/19/2015
Domain: bendco.com    DHCP Scope: 192.168.0.0.0 / 255.255.255.0



## Project Summary

1) Replace on-premises infrastructure for server and telecom environment with a scalable, resilient architecture which allows the organization to grow, operate remotely, and secures data and telecommunications for disaster purposes.

2) **Telecom/Internet Circuit:** The current Birch circuit for $1042/month (including taxes) will be cancelled by Client (after new system is installed) and replaced with an AT&T/ACC Business 10Mbps fiber (baseband internet) connection for $647 per month plus taxes on a thirty-six (36) month agreement payable to AT&T. ACC is the small business division of AT&T created to compete directly with Comcast and Birch. ACC had the lowest cost 10Mbps fiber of any provider which can service the Client's location. The AT&T/ACC fiber circuit will be used in coordination with the Comcast (broadband internet) service. This combination of Comcast broadband (high speed/low reliability) with AT&T/ACC Business baseband (low speed/high reliability) provides internet access from two major telecom providers on vastly different service platforms combined with redundant bandwidth. (See "**Firewall**" below for use of each circuit).

3) **Phone Lines, plus Fax and Other Analog Lines:** The analog lines for the fax machine and alarm system (and any other analog lines) will be ported to either Comcast or AT&T – Client's choice. Phone lines will be provided by Bandwidth.com. We estimate the Bandwidth.com invoice will be $225 per month plus taxes. (See "**Phone System Summary**" below).

4) **Virtualization:** The server computing environment will be virtualized using VMware – the largest virtualization platform in the world. Virtualization allows for a single piece of hardware to contain one or more operating systems. The environment will contain three (3) virtual servers on a Dell server designed to run VMware.

5) **Server Hardware:** The current server will be replaced. The new server hardware will be a single-node VMware server on Dell hardware. Dell will provide the server with a five year 24 x 7 x 4 hour warranty with an optional two year extension (listed below). The Dell server will have five (5) OEM 1TB solid state drives (SSD) in a RAID5+1 design that allows for the failure of one drive with a hot-spare already

in the server. The SSD drives are warranted directly by Samsung for five years. The Dell server also has redundant power supplies and supports boot-level remote access to allow troubleshooting and power-up by OMNIPOTECH without waiting for a technician to arrive onsite (i.e., weekend or night time). The Dell server will have 64GB of RAM (maximum server capacity of 384GB) and sixteen (16) 2.5 inch hard drive bays allowing for future expandability without replacing the chassis. The server has two CPUs each with 8 cores of processing for a total of 16 cores using Intel E-2630 series of processors.

6) **Virtual Machine Servers:** The three virtual servers will have the following names and roles:

    a.   BEN-DC1: This server will be the local domain controller providing Active Directory, DNS, DHCP, print server, and file sharing for the entire company. Shared drives can have individual folders assigned to specific groups for secure access. The server will support group policies intended to automate workstation and user setup according to the organization's business policies. This server is backed-up hourly to the OMNI-Backup Appliance using full disk imaging software with incremental copies between the hours of 6AM – 9PM daily. The final nightly copy of the backup is sent offsite to our datacenter for disaster recovery purposes each day.

    b.   BEN-SQL: This server will contain Microsoft SQL Server which is required to run JobBOSS database. This server will perform no other role thereby ensuring its resources are dedicated to the JobBOSS database. Access to this server will be thru the JobBOSS application only and no users will access this server directly to ensure data protection. This server is backed-up hourly to the OMNI-Backup Appliance using full disk imaging software with incremental copies between the hours of 6AM – 9PM daily. The final nightly copy of the backup is sent offsite to our datacenter for disaster recovery purposes each day.

    c.   BEN-TS1: This server will be a terminal server only. A terminal server centralizes the installation and administration of all applications for an organization. A terminal server only contains applications and does not contain any of the Client's data. This server is backed-up after-hours nightly to the OMNI-Backup Appliance. The final weekly copy of the backup is sent offsite to our datacenter for disaster recovery purposes weekly.

7) **Computers:** After the cut-over to the new terminal server and computing environment, each computer will be backed-up to the OMNI-Backup Appliance, then reformatted with a new installation of Windows. We will use the same operating system version the PC currently had before the reformatting. By reformatting each computer, we will eliminate any PC specific variables which could either impact performance or compromise security. Each system will be setup identically and modified for the user's job role (specifically Donna, CAD, and Kelly). Join all Windows Pro computers in each location to the domain to allow centralized group policy management for permissions, files, folders, and printer access. This pricing reflects a maximum of fifteen (15) total desktop or laptop computers.

8) **Backup Appliance:** The OMNI-Backup Appliance will continue to protect the current server through-out the project, as well as, backup the new virtual servers. Once the new environment goes live, the backup of the current server will stop, but its backup image will remain on the OMNI-Backup Appliance indefinitely or as space allows (not expected to be an issue). OMNIPOTECH will keep the final copy of the current server's backup in our datacenter free of charge until January 1, 2016. The backup image of the current server can also be copied to USB media provided by the Client to be taken offsite according to their needs. The Appliance is owned by OMNIPOTECH and all maintenance of the appliance's hardware and software, plus monitoring of all backups of corresponding servers is included each month in the current rates herein for the one SERVER. Disaster recovery testing can be performed according the Client's needs according to the Rate Schedule Agreement, but an initial test is included herein prior to hurricane season as part of this project.

9) **Backup:** Backup the server hourly to the OMNI-Backup Appliance. The Appliance can support up to four server operating systems in a disaster recovery situation. Backup solution uses full disk imaging software which also provides incremental hourly copies. A Windows 8 virtual machine running on the Appliance will be the backup management server named "BENDCO-BU. This backup methodology allows for the recovery of the entire server, a single folder, file, or the JobBOSS database.

10) **Business Continuity:** In the event the primary server fails, a backup image of the SERVER can be restored from the backups located on the OMNI-Backup Appliance providing business continuity to the Company using a clone of the failed system.

11) **Offsite Disaster Recovery:** Each night, the daily SERVER backup will be copied to OMNIPOTECH's Aurora Colorado datacenter. This design allows for the failure of both the primary and OMNI-Backup Appliance servers and still allows the SERVER to be restored to new hardware in the event another failure occurs. This backup methodology allows for the recovery of the entire server, a single folder, file, or the JobBOSS database from the offsite backup location. The datacenter facility is owned by SunGard and is certified SSAE16. The SSAE16 certification documents will be provided to the Client upon completion of the project for their compliance audits

12) **Email:** Email will be provided by a private Microsoft Exchange server on BEN-DC1 with third-party email filtering with business continuity. Microsoft Exchange is the largest email platform in the world and allows for the sharing of contacts and calendars, if desired, for teams or between individuals. It will allow for automatic archiving of email based upon company policy and the archive is available online from Outlook on any PC or via a browser. Exchange integrates with Apple, Android and Windows smart phones for complete synchronization of a user's calendar, contacts, and email.

13) **Email Security:** OMNI-Email Security is provided outside the environment to prevent spam from entering BEN-DC1 and consuming space or risking infection from malware or viruses. This design also protects the organization's bandwidth and allows secure outbound email relaying to ensure the Exchange server is not blacklisted for sending email. OMNI-Email Security also allows for up to 60 days of caching of email in the event the Exchange server is unavailable for any reason – power loss at site, down server, tropical storm, or email. Users can send/receive email via OMNI-Email Security portal when the server is offline to allow communication with customers, prospects

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

and vendors. When the Exchange server returns to operation, all cached email will be sent to the Exchange server automatically ensuring a complete business continuity and security solution for the company's email.

14) **Firewall:** Unless explicitly stated all inbound traffic from the Internet to the network and outbound to the Internet will be explicitly denied except the following:

Inbound ports will only be opened to allow:
   a. Email access only from email security service
   b. Remote access to view the cameras
   c. Phone calls to the phone system
   d. Terminal server access
   e. OMNI-Care Pro-Active Maintenance, OMNI-Care Monitoring Systems and remote management by OMNIPOTECH.

Outbound ports will be opened to allow:
   a. outbound email only from the mail server to the email security service
   b. web browsing
   c. OMNI-Care Pro-Active Maintenance & OMNI-Care Monitoring Systems
   d. Phone calls from the phone system

The firewall will be configured to support two circuits to operate simultaneously:
   1. AT&T/ACC 10Mbps Fiber Circuit Primary role will be inbound email, SIP trunking for phone system and access to the terminal server. Secondary role will be web browsing and cameras.
   2. Comcast Coax 150/20Mbps Circuit: Primary role will be web browsing and cameras. Secondary role will be inbound email, SIP trunking for phone system and access to the terminal server.

15) **Monitoring:** Monitor the servers, firewall, and internet circuits' availability to notify OMNIPTOECH and Client so that all parties can respond accordingly. The OMNI-Care agents will automatically open service tickets if any of the critical computing components are not responding allowing for the Client and OMNIPOTECH employees to be alerted to potential issues.

16) **Pro-Active Maintenance:** Maintain each system with current Microsoft software security patches and enhancements, plus monitor devices logs to ensure adequate resources using OMNI-Care agents on each computing device to proactive maintenance thru an annual subscription. The agents perform scheduled maintenance of each system to ensure optimal health, plus they provide an inventory of the computing environment allowing for better asset management and tracking. The agents also allow for immediate remote support by an OMNIPOTECH engineer speeding remediation of system or user issues. The patch status for systems ranges from missing 3-45 security updates.

17) **Uninterruptible Power Supply (UPS) – Battery Backup:** It has been mentioned on multiple occasions that the facility has power issues. Fluctuating electricity level stresses electronic devices and destroys data. We will use an Eaton Online Double Conversion UPS device to protect the server, switch, firewall, and telecom router located in the server room. Online double conversion UPS devices take the alternating current (AC) power from the wall and convert it to direct current (DC) before reconverting it to pure sinusoidal AC current which is always at the correct voltage and amperage.

18) **Switches:** The network switch located in the server room will be replaced with a 48 port smart switch capable of intelligent prioritization of data. The switch also supports power-over-Ethernet (PoE) to provide electricity to wireless access points and all desktop Polycom telephones.

19) **Security:** Protect the servers and PCs with a singular security solution to prevent viruses, malware, spyware, and limit internet browsing (by device) to websites authorized by the company's security policy. This security subscription protects the data, but it also protects the company by enforcing HR policy and ensuring a consistent, safe computing environment. The URL browsing will be stricter in the terminal servers than on the desktops to ensure quality of service and protect the datacenter assets.

20) **OMNI-Care Pro-Active Maintenance:** Maintain each system with current Microsoft software security patches and enhancements, plus monitor devices logs to ensure adequate resources using OMNI-Care agents on each computing device to proactive maintenance thru an annual subscription. The agents perform scheduled maintenance of each system to ensure optimal health, plus they provide an inventory of the computing environment allowing for better asset management and tracking. The agents also allow for immediate remote support by an OMNIPOTECH engineer speeding remediation of system or user issues.

21) **Cell Phone and Tablets:** Configure each user's cell phone and other Client authorized mobile devices to receive Client email

22) **Documentation:** Document the final network design. Prepare template for annual "Data Protection and Availability Summary". Document to be completed upon request for internal and external compliance auditors.

## Phone System Summary

1) The phone system will be replaced providing SIP session-initiation protocol (SIP) trunking capability which is the term for telecom voice-over-IP (VoIP).

2) The current Birch invoice is currently $1042/month (including taxes) and will be cancelled by the Client upon project completion as it will no longer be needed.

3) The primary phone system will be located at Client's corporate offices with a failover unit located in the OMNIPTOECH datacenter. Client will own the Polycom handsets located on the desks. OMNIPOTECH owns the software and the phone system "brains" located at the office and in the datacenter.

4) The current Birch bill has nineteen (19) analog telephone lines which is an unusually high number of incoming lines (trunks) for a company with only 15 administrative staff members in a non-call center environment. We recommend the Client begin with no more than eight (8) SIP telephone lines because more can be added within three business days, if needed. Fax and alarm lines will be ported to the Comcast service and will remain analog in nature. FYI: OMNIPOTECH has 13 employees and has six (6) Bandwidth.com trunk lines.

5) This specific quote assumes SIP trunks from Bandwidth.com that supports multi-site phone system (PBX) failover. SIP phone lines will be provided by Bandwidth.com for $25/month per trunk and includes long-distance. Client will pay Bandwidth.com directly for phone lines.

6) Due to the capability of Bandwidth.com SIP trunks, the on-premise phone system will have a failover system in the OMNIPOTECH datacenter within our PBX cluster providing telephone redundancy in the event of a power disruption, hardware failure, internet failure or tropical storm/hurricane causes the onsite phone system to not be available. Once an interruption is detected, the primary PBX will be unavailable and Bandwidth.com will route the calls to the failover PBX in our datacenter automatically (no user intervention required). The phone numbers will automatically roll-over to the datacenter phone system allowing for important customer calls to be handled remotely using the Polycom phones or roll-over to employee cell phones as well. Each employee will have a Polycom phone with voicemail to email capability and follow-me feature to their cell phone which can be toggled by the user. Once the primary system returns to operation, the phone lines fail-back automatically to the phone system located at the Client's offices.

7) Client acknowledges that call quality for SIP is dependent upon voice packets traversing the public internet which is not controlled by OMNIPOTECH. Client is responsible for providing adequate bandwidth, internet connectivity, class of service (CoS) or quality of service (QoS) as needed for each user and/or location in order to ensure sufficient call quality levels. For this reason, we are recommending the AT&T/ACC Business 10Mbps fiber circuit.

8) Fax lines are not managed under this proposal because fax lines do not run through a phone system. Fax lines are a direct hand-off from the telecom provider to the fax machine or other analog device. The fax numbers will remain analog. We will port the analog lines to Comcast or other vendor of the Client's choosing.

9) Client may use dedicated CAT5e or higher network drops for each phone connection to the switch located in the server room. The quality of the network cabling will affect the sound quality in the same manner than poor CAT3 cabling will affect the call quality of an analog phone. We will troubleshoot the network cabling, but a specialist may need to be engaged at Client's expense, if needed.

10) If dedicated CAT5e or higher network drops for each phone are used, then a network smart switch (not a hub) capable of 100Mb/s data transfer with at least 48 ports will be required. The switch can provide PoE (Power-over-Ethernet) to provide electricity to the phones without using the included A/C power adapters for the phones or they can purchase a non-PoE switch. A switch meeting these specifications is quoted herein.

11) Phones can be powered by the included A/C power adapters for the phones if taken offsite or in the event the PoE switch fails and is temporarily replaced with a non-PoE unit until a replacement arrives.

12) Client will pre-authorize OMNIPOTECH as a technical resource with their all telecom providers for installation and future support assistance.

13) Support for the telephones after the initial project period will be invoiced on a time and materials basis.

14) The OMNI-PBX service does not include telecom circuit services or internet services. Client will be invoiced directly from their telecom provider for the phone or internet services. Client will pay for their telephone service directly to the telecom provider providing those services.

**Anticipatory Project Schedule**
The project has two components – computing infrastructure and telecom infrastructure. The computing infrastructure is more complex and requires a greater amount of testing, so it will be the primary focus initially. The phone system will use the new A&T/ACC Business fiber circuits for their primary pathway for SIP trunking, but can also use the Comcast lines if the fiber is unavailable. Since a new fiber circuit would be installed, the phone system cut-over can occur either slightly before or shortly after the computing cut-over depending upon timing and schedules.

**Computing Project:**
Assuming timely delivery of the hardware and completion of testing by Client, the computing infrastructure project should go live in mid-September. The whole project is expected to take 5-7 weeks, but overall, the speed of the project is dependent upon three (3) factors:
1. the timely delivery of the hardware
2. the port timing of the phone lines by Bandwidth.com to allow cut-over to the new phone system, and
3. the methodical and timely completion of testing of the new computing environment by the Client

OMNIPOTECH will deliver the computing environment by August 28 to Exact for the installation of the JobBOSS software. Exact will complete their installation by July 31. Client agrees to undergo a minimum of four (4) weeks for testing of the new system with an expected ending date of September 14. Of course, the Client can shorten or extend this testing period at their discretion, but the cut-over will not be scheduled until the Client accepts the new environment. OMNIPOTECH will make any change required during the testing of the new system.

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

The testing will focus on JobBOSS, the accuracy of its reports, data access, security, printing, permissions, user setup, and integration of existing systems. Once the Client affirms in writing that they have tested the computing environment and all issues have been resolved to their satisfaction, the cut-over will be scheduled with the Client. This timeline does not need to coincide with the Bandwidth.com porting of the phone lines.

1) Execute OMNIPOTECH agreements
2) Pay first payment according to payment option selected via ACH
3) Execute any new telecom agreements, if any.
4) OMNIPOTECH will loan Client a provisioning server. This server will allow OMNIPOTECH to provision the virtual machines while we are waiting for the Dell hardware to arrive. We will migrate the virtual machines to the new Dell server after it has been configured for virtualization.
5) OMNIPOTECH will purchase all of the equipment and begin construction of the computing and telephone system environment once the hardware arrives.
6) Server BEN-DC1 will be constructed first and serve as the Active Directory FSMO master for the entire infrastructure. Due to its role, this server has no access from outside the office.
7) Server BEN-SQL will be constructed and the identical version of JobBOSS currently being used will be installed to ensure identical systems for testing. Upgrade to the next version of JobBOSS will occur as part of this project after the cut-over to the new servers has been completed. The JobBOSS upgrade will be scheduled with Kelly and Exact. Exact will perform the software installation of the new environment and the upgrade under the existing JobBOSS maintenance agreement. Due to its role, this server has no access from outside the office.
8) Server BEN-TS1 will be created and all Client applications installed. This server will be configured for remote access outside the office.
9) Backups for all servers will be initiated.
10) Client data will be copied from current server to new environment
11) The current JobBOSS software will be installed by Exact support and we will migrate a copy of the existing database(s) to BEN-SQL server for testing.
12) A NOTE ABOUT JobBOSS Upgrade: The ultimate goal is to have the Client working on the latest version of JobBOSS, but we must first ensure the creation of the new environment has been tested and migrated before we begin the JobBOSS upgrade. The goal is to first create the new computing infrastructure, and then after the cut-over to the new infrastructure, perform the migration to the latest version of JobBOSS. The purpose of the testing phase is to test the infrastructure – not the new version of JobBOSS. The primary purpose of this two-step process is to ensure we (OMNIPOTECH and Client) are troubleshooting issues that may be related to the new infrastructure design during the testing phase. All new software upgrades require a learning curve and can come with some issues, so we don't want to be simultaneously troubleshooting the new infrastructure AND a new version of JobBOSS. The labor cost to upgrade to the next version of JobBOSS is included in the project labor and will be scheduled with the Client within one week after the full completion of the infrastructure project.
13) Initial mailbox seeding will occur followed by a final synchronization the night of the cut-over to the new Exchange server.
14) As each server is constructed, it will be monitored and managed by OMNI-Care agents. We will move all existing OMNI-Care agents to a new organizational unit within the OMNI-Care management console to easily identify which machines remain on the current infrastructure. After the cut-over to the new datacenter environment, each PC will be backed-up, wiped, and reinstalled with Windows (assuming it is not being replaced). A new instance of OMNI-Care will be installed on the new system in the permanent organizational unit along with OMNI-Managed Security.
15) Once the server infrastructure has been provisioned and ready for testing, a terminal server icon will be setup on each PC. This icon will be live and used for testing as well as the initial cutover. PCs will not be reformatted and joined to the new domain until *after the cut-over to the new infrastructure.*
16) Thirty (30) days after the cutover to the new environment, the existing server will have a final backup taken using StorageCraft. Client will provide at least two (2) 1TB drives (or more) to contain the final backup images. Once the final backup images have been tested, the backup will remain in our datacenter until January 1, 2016 and the final image will remain on the local OMNI-Backup Appliance indefinitely.

**Phone System**
1) The phone system will be built, programmed and ready for delivery no later than September 14.
2) Once delivered, prior to delivery onsite training will be scheduled with each Client to occur within 48 hours of the phone system delivery to allow users to "try" their new phones.
3) Fax lines will be migrated prior to the port request for the phone numbers because telecom providers will only support one port request at a time. The fax lines will be ported first, then the phone lines to Bandwidth.com.
4) Cut-over from existing phones system to the OMNIPOTECH phone system will be scheduled after Bandwidth.com provides a delivery date for porting of the phone numbers from one service to another.

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

This proposal contains a one-time project cost to acquire new hardware combined with labor.
This proposal also has a monthly component which will wholly replace the current monthly recurring services.

| Project and Equipment for On-Premises Server | Qty | Amount | Total |
|---|---|---|---|
| **INFRASTRUCTURE:** | | | |
| NETGEAR GS748TP 48 pt GB Smart Switch w/PoE (power over Ethernet) | 1 | 769.81 | 769.81 |
| Dell T430 server with 5YR 24x7 Warranty, 4x1TB SSD drives with hot spare and VMware vSphere Essentials kit | 1 | 11,272.77 | 11,272.77 |
| EATON PW9130L1500T-XL 1500VA/1350W Tower UPS 120V NEMA 5-15 Double Conversion Online UPS for Phone Systems and Switches | 1 | 1092.66 | 1092.66 |
| **PHONE EQUIPMENT:** | | | |
| Labor for PBX configuration for SIP phone lines (Client pays telecom vendor for phone lines) | 1 | 2,100.00 | 2,100.00 |
| Polycom VVX 410 PoE speakerphone without power adapter<br>- 12 line HD voice business media phone with a 3.5" color LCD display and dual Gigabit RJ45 ports | 15 | 208.34 | 3,125.10 |
| Polycom VVX Color Expansion Module for receptionist's VVX 410 | 1 | 219.50 | 219.50 |
| Polycom power supplies for models VVX 300, 310, 400, 410 (5 pack) | 3 | 71.00 | 213.00 |
| Panasonic KX-TGP500 SIP DECT Cordless Base Bundle with 1 Handsets<br>- Bundle includes 1 wireless handsets and a charger for each<br>- Base station can support up to six cordless handsets | 0 | 157.08 | 0.00 |
| Panasonic KX-TPA50 Cordless Handset (requires KX-TGP500) | 0 | 91.17 | 0.00 |
| Panasonic KX-TGA405B Range Extender for DECT 6.0 Plus Cordless Phone Systems | 0 | 52.33 | 0.00 |
| Polycom SoundStation IP 5000 conference phone | 0 | 458.99 | 0.00 |
| Estimated shipping for all units | 19 | 16.25 | 308.75 |
| **Project Labor:**<br>- Described herein with all onsite travel charges included thru the project cutover date, plus five additional calendar days for simultaneous onsite support in corporate office for project cutover. Includes 21 calendar days post project remote support (no additional T&M for items related to the project). | 1 | 16253.00 | 16253.00 |
| Discount for Combining Phone System Project | 1 | -1,500.00 | -1,500.00 |
| **MISCELLANEOUS:** | | | |
| Shipping for all items - will invoice customer the "as-billed" amount. This amount is an estimate only | 1 | 225.00 | 425.00 |
| 3YR UCC SSL Certificate for multi-site, Exchange server auto-discover and phone syncing | 1 | 360.40 | 360.40 |
| **Project and Equipment (taxes additional)** | | | **34439.98** |

**Payment Options:**
Three ("Project Payment") options exist with sales taxes for the Project Payment due with each payment.
1) Fund the project upon order execution – full Project Payment and taxes
2) Make three Project Payments of $11,479.99 as follows:
   a. First payment of $11,479.99, plus all sales taxes due upon order execution
   b. Second payment of $11,479.99 due in 28 calendar days from order execution
   c. Third payment of $11,480.00 in 56 calendar days from order execution
   d. Note: Project payments are not based upon milestones nor coordinated with project cut-over as project may be delayed due to Client testing, telecom porting, circuit installation or other reasons
3) Amortized over thirty-six monthly payments:
   a. Down payment of $3500 plus all sales taxes due upon order execution
   b. Thirty-six (36) monthly project payments of $1,039.09, plus the monthly recurring services amount and associated taxes for those services
   c. Monthly recurring services cannot be cancelled until completion of initial term thru September 30, 2019. If Client chooses to terminate this Order Form or the Master Services Agreement for any reason including termination for convenience, then the remaining project payments will be due according to the Master Services Agreement within 10 calendar days of notice to terminate along with outstanding term for services.

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

| Monthly Recurring Services | Qty | Amt | Total |
|---|---|---|---|
| **USER WITH TERMINAL SERVER ACCESS** | | | |
| - Microsoft Windows Server Standard R2 SPLA SAL | | | |
| - Microsoft Remote Desktop Services SPLA SAL | | | |
| - Microsoft Office Standard SAL (Word, Excel, PowerPoint & Outlook) | 14 | 51.95 | 727.27 |
| - Microsoft Exchange Standard | | | |
| - Microsoft SQL Server SAL (Required for JobBOSS) | | | |
| - Terminal Works TSPrint - terminal server printing, file transfer, and PDF creation (per terminal server) | | | |
| | | | |
| **Proactive Maintenance and Security** | | | |
| OMNI-Desktop Care for Windows-based desktops and laptops | 14 | 20.00 | 280.00 |
| OMNI-Managed Security per user - manage anti-virus, anti-malware, anti-spyware and URL filtering per device | 14 | 5.00 | 70.00 |
| OMNI-Server Care Remote Server Watch for Windows-based servers | 3 | 59.00 | 177.00 |
| OMNI-Managed Security Server - manage anti-virus, anti-malware, anti-spyware and URL filtering | 3 | 20.00 | 60.00 |
| OMNI-Firewall Monitoring (free with combined OMNI-Care Desktop & Server services) | 2 | Included | Included |
| | | | |
| **Email Security** | | | |
| OMNI-Email Security Services for Exchange Server with secure outbound relay | | | |
| - 1 mailbox per Exchange mailbox with up to 2 aliases; i.e., cgarcia, carlos.garcia, etc. | | | |
| - 1 distribution list (up to 2 aliases each) | | | |
| - Individual spam filtering, antivirus and antimalware for email | 15 | 6.50 | 97.50 |
| - 60 days rolling email retention for email continuity and online access | | | |
| - Secure outbound relay to prevent Exchange server blacklisting | | | |
| | | | |
| **Backup, Business Continuity, and Offsite Disaster Recovery** | | | |
| OMNI-Backup Appliance for physical or virtual servers and up to 4 host servers protected | 1 | 375.00 | 375.00 |
| OMNI-Backup Storage billed in 10GB increments (ESTIMATED) | 650 | 1.00 | 650.00 |
| - No storage commitment required. Invoiced at $1/Gb for total data stored offsite | | | |
| OMNI-Backup license per SBS server with ImageManager Intelligent Transfer & HSR | 0 | 75.25 | 0.00 |
| OMNI-Backup license per non-SBS server with ImageManager Intelligent Transfer & HSR | 3 | 75.25 | 225.75 |
| OMNI-Backup license per desktop - CAD, HR, Kelly | 3 | 15.00 | 45.00 |
| | | | |
| **Other Hosting Services** | | | |
| OMNI-Shared Hosting for Websites (Hosting for up to one static, non-database driven website) | 1 | Included | Included |
| OMNI-DNS Services (Hosting for all domain names) | 1 | Included | Included |
| - bendco.com | | | |
| | | | |
| **OMNI-PBX (PBX-as-a-Service)** | | | |
| - One On-Premises Phone System with Datacenter Failover to Hosted PBX | | | |
| - Datacenter PBX located in SSAE16 datacenter | | | |
| - Datacenter failover system on dedicated virtual phone system on clustered servers | 1 | 221.00 | 221.00 |
| - Datacenter Bandwidth dedicated to VoIP traffic | | | |
| - Client owns Polycom handsets and OMNIPOTECH owns the phone system servers | | | |
| - Client pays telecom provider directly for phone lines and internet | | | |
| OMNI-PBX Extensions (any Polycom, virtual cell phones, softphones, etc) - estimated quantity | 15 | 4.00 | 60.00 |
| | | | |
| **Remediation** | | | |
| Business Period Remediation Block time agreement prepaid hours Mon-Fri 8:00AM-5:00PM support | 6 | 125.00 | 750.00 |
| - with one month roll-over allowance for unused hours | | | |
| Additional Hours Beyond the Allotted Block time or Non-Business Period or Emergency/Recovery Remediation Per Rate Schedule Agreement herein | | | |

| Monthly Total (taxes additional) | | | 3738.52 |
|---|---|---|---|

1. The quantities listed for monthly recurring services will adjust lower or higher automatically each month based upon actual quantities.

2. The quantities listed above are estimates. The actual quantities will be billed monthly.

----------------------- Please see the appendix for more detailed description of services. -----------------------

**Licenses**
This agreement is based upon Provider-owned licensing for the following products:
- OMNI-DNS Services (Global DNS hosting for one domain name)
- OMNI-Care Managed Security – hosted managed anti-virus, anti-malware, anti-spyware and URL filtering (one license computer)
- OMNI-Care Desktop / Server – one license per desktop and/or server
- OMNI-Email Security Services for Exchange Server
- OMNI-Backup Appliance licenses
- Microsoft Server, Office, Remote Desktop Services, and SQL licensing

Client-owned licensing may also be used and the Client will provide the installation media, license keys, and access to the third-party software technical support for installation and support assistance, if needed.

**License Parity and Costs**
The OMNI-Cloud service provides one license for each of the licenses listed above unless otherwise stated. In the event, Client installs, activates, or uses more licenses than the highest monthly user account recorded for the calendar month, then Provider will invoice Client independently for that license using Provider's then current rate. The licensing provided herein is subject to change by the manufacturer. Provider will review price changes as they occur and reserves the right to increase the cost of the licensing herein upon notice to Client.

**Invoicing and Payment**
The quantity of authorized resources (users, servers, licensing) can increase or decrease monthly. Client will be invoiced monthly for all allocated resources or instances of the infrastructure or use of software directly or indirectly, regardless of actual access or use of the infrastructure or software within a calendar month. Any server resources, whether in use or not, along with all authorized users are charged for the whole month because licenses can only be purchased from the Provider's vendors in monthly increments. The highest monthly resource count will be invoiced to Client.

It is recommended that Client purge any inactive user accounts or resources by the last day of the month to ensure that the user license or resource is not active on the first day of the following month or it will be considered active for the following month without exception. **It is the responsibility of the Client to inform Provider that a user should no longer be active. Client must submit a stand-alone ticket requesting the explicit de-authorization of services for that user account along with an explanation regarding the disposition of the user's data files and mailbox, if any, along with the redirection of email addresses, if desired. Provider will not infer from tickets that a user should be de-authorized nor infer the disposition of files.**

Client will receive an itemized invoice each month for all charges. Payments will be drawn via Automated Clearing House direct debit (ACH) by the fifth calendar day of each month. OMNIPOTECH reserves the right to request pre-payment for all services via ACH if Client has a chronic issue of untimely remittance as deemed by OMNIPOTECH. Any costs for labor, equipment, or software not included within this Order Form will be invoiced separately and payment is due with the next ACH without exception. *If payment for any product or service is not received within 5 business days of the due date, then all services will be programmatically disabled until full payment for all outstanding invoices - including those invoices created, but not yet due - are received in full.*

**Multiplexing or Pooling**
Any hardware or software used to pool connections, reroute information, reduce the number of devices or users that directly access or use the product, or reduce the number of operating system environments, devices or users the product directly manages, (sometimes referred to as "multiplexing" or "pooling"), does not reduce the number of licenses of any type that client is authorized to access. Users cannot share accounts and the infrastructure will only allow one connection at a time to the infrastructure per user account. Provider is bound by the Microsoft Service Provider Licensing Agreement (SPLA) and other vendor's license reporting and fee structure requirements and this order form, nor the Client's purchase order, nor any verbal or written agreement can modify our reporting requirements nor the definition of an authorized user.

**Server Capacities**
The specifications for memory, CPU and disk space "Components" listed are assigned for each server upon setup. Disk capacity is allocated to the server when the server is setup and the equivalent amount of primary, secondary, and backup storage is also allocated at the same time to ensure that the disk resources are never over-subscribed. Each server is imaged according to its policy listed herein. If a server requires additional resources for any one of the three Components, then the cost of the server will be affected. Disk resources can be increased, but cannot shrink in size. CPU and RAM can increase or decrease. Microsoft SQL servers cannot have less than four (4) vCPU per Microsoft's licensing agreement if using per CPU licensing.

**Project, Travel for Project, and User Setup Costs**
Total setup costs are fixed and are based upon the design and configuration of the monthly services listed herein. Travel related expenses are included in the setup costs until five days after cutover to the new computing environment; whereupon, additional travel related expenses will be invoiced based upon the Rate Schedule for Supplement Services. Any changes to the setup costs will be noted and may change the amount of the Project Payment. Total amount of labor costs are due upon execution of this order form based upon the estimated number of OMNI-Cloud users and the items listed herein. Client has the option to finance the Project Payment according to the options herein. The estimated number of users is based upon the Client's list of authorized users given to Provider for setup and the costs will change if the number of users or the number of applications changes after execution of this order form.

Construction of the new environment will begin upon order execution. The first invoice will be created no later than August 30 and be received via ACH no later than September 10, 2015. The existing services and the new services will be not be invoiced concurrently, but will be merged to

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

ensure that an overlap of services is not charged to Client. Upon cut-over to the new environment, the final month of billing for the existing and new services will terminate at the end of the calendar month in which the cut-over occurs and the next monthly invoice will only reflect the new services. All payments are due via ACH hereafter. Client acknowledges that the cut-over date is dependent upon their testing, installation of any telecom circuits, and the porting of the phone numbers and acknowledges that OMNIPOTECH does not have control over the timing of any of these events.

**Cabling**
Cabling services will be provided by the Client or a qualified third-party cabling company specializing in low voltage infrastructure. Client will pay cabling provider directly as their services, if any, are not included herein.

**Third-Party Support Agreements**
Client must have a current support contract with any third-party software, service, or equipment provider used by client. The support for that application within our server environment will be charged according to the Rate Schedule. A third-party application is any software or service not provided under this Order Form. Third-party provider software examples are Microsoft Great Plains Dynamics, VMS, Act, Oracle, QuickBooks, PeachTree, Salesforce.com, JobBOSS, Epicor, Sage or equipment like network copiers, scanners, or internet service providers. All telecom and data circuits payable to any provider other than OMNIPOTECH are considered third-party services. The list of third-party software, service, or equipment providers used herein is not intended to be exhaustive or all inclusive.

**Initial Term**
After the initial non-cancellable term expiring on September 30, 2019, either party can provide notice of cancellation to have the agreement terminate no earlier than the last day of month following three full calendar months since the date of cancellation notification. For instance, if notice to cancel is provided on any day in March, then the final date for services will be June 30. The service will terminate at 4:00PM Central Standard Time, on the nearest weekday, five calendar days before the final day of the cancellation period to allow for licensing cancellations to be reflected in the manufacturer's systems and to avoid an additional month of licensing costs. Federal holidays will not be counted as business days for the purposes of this clause unless such holiday would cause the agreement to extend to another calendar month; whereupon, the services would terminate before the Federal holiday. Any Provider-owned equipment or software loaned to the Client or used for the purposes of providing any service, even if such service is not listed herein, will be returned to the Provider or retrieved by the Provider at 12:00PM five business days before the final day of the cancellation period without exception unless new terms have been agreed upon in writing to extend the services.

----------------------- This space intentionally left blank. -----------------------

## Exclusions

The following "Supplemental Services" are not included in this Order Form, but can be performed by Provider for an additional fee as defined in the Rate Schedule below, if requested.

1. Technical support or trouble-shooting beyond the subscribed hours within the block-of-time provided herein, if any
2. Technical support for any hardware, software, operating system, beyond the scope of the chosen service
3. Technical support for any telecom service for which the Client pays a telecom provider directly including, but not limited to, data circuits, long-distance, dial-tone, analog lines, PRI, MPLS, T1, or any terrestrial or wireless baseband or broadband services
4. Onsite technical support for any reason
5. Third-party application or operating system upgrades
6. Hardware replacements, including but not limited to servers, workstation, PC, Mac, laptop, tablet, iPad, Droid, or Apple
7. Support of mobile/cellular phones or support of employee owned home computers
8. Installation/repair/maintenance of computer cabling systems and components, electrical systems and components, environmental control systems and components, media systems, televisions and projectors, building access control system, printers, faxes and copiers, telecom circuits for voice, data, or fax services or physical cleaning of end-user computers
9. Installation/repair/maintenance of the phone system unless explicitly provided herein
10. Office moves, expansions, down-sizing, or relocation to a new facility
11. End-user training
12. Data consolidation and integration between existing business systems
13. Implementation of a redundant disaster recovery site
14. Software application or website development or modification
15. Implementation of any hardware or software not directly compatible with the network currently in use
16. Website, DNS, or registrar migration or hosting services unless the service is explicitly provided herein
17. Recovery from system outages caused by any person or any factor, such as fire, flood, lightning, sabotage, virus, malware, spyware, theft, natural disaster, or environmental conditions
18. Any work involved with legal discovery, regulatory compliance, or audits
19. Server collocation in Provider's datacenter facility
20. Disaster recovery or restoring data
21. Site-to-site VPN services
22. Gateway services for internet-of-last-resort services for MPLS, AVPN or similar services
23. Any support for Client owned servers located outside the datacenter

| Rate Schedule for Supplemental Services | |
| --- | --- |
| **Base Rate** – Hourly rate, per technician/engineer, for any work performed during the Business Period calculated in 15 minute increments with a 1 hour minimum charge for on-site service visits. Base rate is determined by personnel used: $185/hr – Partner | $145/hr – Architect | $125/hr – Engineer | $95/hr - Analyst | Determined by Personnel Used |
| **Business Period** – 8:00AM to 5:00PM Central Standard Time, Monday-Friday (excluding holidays) | Base Rate |
| **After-Hours Period** – 5:01PM to 7:59AM Central Standard Time, Monday-Friday (excluding holidays). Two (2) hour minimum calculated portal-to-portal. | Base Rate multiplied by 1.25 |
| **Weekend Period** – Any Saturday or Sunday (excluding holidays). Four (4) hour minimum calculated portal-to-portal. | Base Rate multiplied by 1.75 |
| **Holiday Period** – Holidays (includes New Year's Eve Day and New Year's Day, Easter, Memorial Day, Independence Day, Labor Day, Thanksgiving and the day after, Christmas Eve and Christmas Day). Eight (8) hour minimum calculated portal-to-portal. | Base Rate multiplied by 3.00 |
| **Travel Surcharge** – Any on-site visit for any service plan will result in a per technician travel surcharge which will be adjusted to reflect transportation costs and travel time. Parking fees will be reimbursed by Client. Travel to locations outside the greater Houston area will be billed using the business period rate for that personnel. | $95 |

The undersigned affirms that they have the authority to enter into this agreement on behalf of the Client and agrees that the OMNIPOTECH Rate Schedule, Master Services Agreement, Network Service Level Agreement, Order Form(s), Rate Schedule for Supplemental Services, and Acceptable Use Policy are incorporated herein. Authorized representatives of Client and OMNIPOTECH have read the documents listed above and agree and accept such terms effective as of the date first referenced below.

**CLIENT:**   BENDCO INC

Signature: *Kelly Hatcher*
          —DocuSigned by: Kelly Hatcher
          391586DC1FF84C6...

Print Name:   Kelly Hatcher

Title:   CONTROLLER

Date:   7/28/2015  |  11:12:26 CT

**OMNIPOTECH, Ltd.**

Signature: *Robert D Kyslinger*
          —DocuSigned by: Robert D Kyslinger
          27C0D4093562411...

Print Name:   Robert D. Kyslinger

Title:   Managing General Partner

Date:   7/28/2015  |  11:15:21 CT

# We understand that a new phone system has a learning curve.

Don't worry about getting all the features setup perfectly from the beginning.
We will make any configuration change to your system you request for the first 30 days free of charge.

# OMNI-PBX Phone System Features

**Auto-Attendant (IVR)**
The Asterisk  Auto-Attendant lets callers "Press 1 for Support" or "Press 2 for Sales." The Auto-Attendant feature is easy to use and powerful. With simple clicks of the mouse you can manage call flow, build scheduled responses, forward calls off-site, and more.

**Voicemail**
- Asterisk  offers four easy ways to retrieve messages:
- Press a single button on your office phone.
- Dial in remotely from any outside phone.
- Receive attached .wav files in your email.
- Listen via your Web control panel.

**Voicemail-to-Email**
Receive your voicemails as emails! Asterisk comes pre-configured to send each employee an email whenever they get a voicemail. You can even have the audio attached to your email so that you can listen to the voicemail right from your Inbox.
No POP3, SMTP, IMAP, or Exchange configuration required!

**FindMe®**
Allow callers to find you wherever you are: on your cell phone, at home, or at a branch office based on rules you create. Make FindMe work for you with various features such as: a scheduler, simultaneous ringing, and privileged lists. Not only can this be used for individual extensions, it's also a way to create small rings groups. This can be used, for example, to have a secretary's phone ring at the same time as the boss' phone.

**Music-on-Hold (Unlimited)**
Music-on-Hold (MOH) is as simple as uploading MP3 files. Asterisk comes with unlimited playlists, giving you the ability to play different audio tracks for calls coming into different departments or queues. Use MOH creatively to highlight motions to new customers, up sell current customers, or assuage angry customers calling your support team.

**Night Mode**
Have a small office that opens when your first employee arrives and closes when your last employee leaves? Night mode is a feature for companies that want to "turn on" their phone system in the morning with a few key presses and put it to night mode and the end of the day with a few key presses or setup a speed dial button on your phones for one-touch switching of mode.

**Ring-all (Blast Group)**
A Blast Group takes one inbound call and rings all phones; the first to pick up gets the call. This feature, on other phone systems, is sometimes called "Simultaneous Ring".

**Call Forwarding**
Users can employ their personal Web Control Panel to enable call forwarding to either an internal extension or to an external number.

**Name Directory**
Asterisk comes pre-configured with a professional "spell-by-name" directory. Callers are simply prompted to "spell the first three letters of the party's first or last name." They are then automatically connected to the requested extension. Don't want to be in the Name Directory? The Asterisk administrator can easily exclude certain extensions from the Name Directory.

**DIDs (Direct Inward dialing)**
Have more employees than phone numbers? With one click of the mouse, you can assign an inbound phone number to an employee.

**Branch Office Support**
Deploy a low-cost Asterisk server in each office. Then, with a few clicks in your control panel, link your servers to take advantage of the following features:
- Free office-to-office calling via VoIP.
- Call forwarding to any extension in your linked Asterisk  server network
- Converged Name Directories (spell-by-name)
- Converged Internal Employee Directories
- Shared agents and queues

**Conference Bridges**
Conference bridges were once thought to be unaffordable for many companies, but Asterisk comes pre-configured with conference bridges for free! A Asterisk conference bridge supports an unlimited number of internal participants and as many external participants as you have phone lines.

**Extension Groups**
Your organization may not be flat - meaning that some employees have communication responsibilities that others do not. Asterisk includes a powerful "groups" feature that allows you to build extension groups and assign permissions to those groups.

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

Examples of Asterisk permissions are:

- Zone Paging/Intercom
- Automatic Call Distribution (ACD) - Record other's queue calls
- ACD - View queue reports
- ACD - Agent login / logout
- Call Forwarding
- Check Voicemail
- Dozens more!
- Routing by DIDs

Your business may have several numbers for different departments. With Asterisk's ability to route by DIDs, you can direct calls to a different call menu based on the inbound number.

**Paging / Zone Paging**
Want to page everyone in the whole company or just a certain set of employees? Simply build a "group", assign that group an extension number and begin paging them through telephone speakers! Note: Cisco phones cannot receive pages.

**Intercom / Zone Intercom**
Many telephony ducts offer an intercom feature, but do you know of any that offer Zone Intercom? Asterisk does! With Asterisk you can dial a zone to setup an ad-hoc conference with everyone in that zone! Note: Cisco phones cannot receive pages.

**Voicemail Groups**
Want to send a voice message to multiple people? Use the Voicemail Group feature to easily build groups (such as your sales team). Then dial the number of your group, just as you would normally dial an extension, and leave a message. Seconds later, everyone in the group gets your new message!

**Advanced Call Forwarding**
With a few clicks of your mouse you can forward an extension to another extension, a cell phone, or even to another part of your Auto-Attendant. This lets you build very creative IVR trees to meet the needs of your business.

**Call Return**
When listening to their voicemail, your employees will be able to press a key to call the person back. You can enable or disable this feature on a per-employee basis.

**Custom Caller IDs**
Asterisk lets you customize the inbound Caller ID name/number for each department and it lets you change your outbound Caller ID on a per-extension basis, allowing you to block, reveal, or change the Caller ID of every extension in your office! Note: Asterisk cannot change your outbound Caller ID if you are using POTS lines. For 911 reasons, POTS outbound Caller IDs are always controlled by your carrier.

**IVR Authentication**
With a click of the mouse, you can password-protect any part of your Auto-attendant. Use this feature to protect your Conference Bridge or your priority queues.

**SMS/Pager Voicemail Notify**
This feature gives you the ability to enter an SMS or Pager email address in order to receive voicemail notifications on that device. These notifications are short and do not include the actual audio attachments. This feature can be used in conjunction with the Voicemail-to-Email feature. Thus you can receive email alerts (including optional audio attachments) at one email address and simultaneously receive SMS/pager notifications at another address.

**Real-Time System Resource Graphs**
Asterisk offers highly detailed graphs of system resources (CPU, RAM, HD, Swap), server activity (Calls, Recordings, Conferences), and network activity (upstream, downstream).

**Call Screening**
Call screening allows you to talk to who you want, when you want. When you enable FindMe on your extension, optionally use call screening to screen the calls that are forwarded to your mobile, home, or other phone numbers. Before the call is forwarded, the voice prompt will ask the caller to record their name, and that recording will be played to you before you accept the incoming call. Asterisk takes call screening to the next level!

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

A description of all our computing services is listed below. Please note that all services may not be included on this order form. We will only deliver the services listed above.

**OMNI-Cloud LaaS (Licensing-as-a-Service)**
OMNIPOTECH has contractual relationships various software vendors including Microsoft, VMware, Citrix, Veeam, StorageCraft, Trend Micro, Citrix, Scorpion Software, and others to provide software on a month-to-month basis on provider owned infrastructure. The client is invoiced only for the maximum number of users, instances, or resources authorized each calendar month. The software is licensed to OMNIPOTECH and is the responsibility of OMNIPOTECH. OMNIPOTECH pays the software vendor automatically on the 5th of each month for all authorized instances. The client has no ownership interest in the licensing. The licensing includes version upgrades at no additional cost as provided by the software vendor. Pricing will be automatically adjusted based upon price changes made by the various providers and will be reflected on the next monthly invoice. Many of our services include provider owned licensing in order to deliver the service to the client; i.e., OMNI-Backup Appliance.

**OMNI-Cloud IaaS (Infrastructure-as-a-Service)**
OMNIPOTECH provides redundant SSAE16 datacenter infrastructure for hosting any operating system.
1. Multi-provider redundant bandwidth, high-availability firewalls and switches, physical or virtual servers, clustered high-availability and fault-tolerant virtual server environment, redundant SAN storage, and redundant SAN network
2. Backup, business continuity, monitoring, and security services
3. Business-hours support is included for all issues related to the OMNIPOTECH infrastructure and services listed in 1 & 2 above
4. Client has an administrative account to the hosted infrastructure and is responsible for remediating issues relating to the hosted operating system and applications
5. Client is responsible for all desktop issues and infrastructure issues located outside the datacenter
6. Client can request time and materials support for any service or issue regardless of location based upon the rate schedule agreement

**OMNI-Cloud PaaS (Platform-as-a-Service)**
Includes all the features of OMNI-Cloud IaaS (Infrastructure-as-a-Service)
1. Business-hours support is extended to cover the operating system and any software provided by OMNIPOTECH under OMNI-Cloud LaaS located in the datacenter environment
2. Client has limited administrative rights to the hosted infrastructure and is responsible for issues relating to all applications not provided by OMNIPOTECH.
3. Client is responsible for all desktop issues and infrastructure issues located outside the datacenter
4. Client can request time and materials support for any service or issue regardless of location based upon the rate schedule agreement

**OMNI-Cloud DaaS (Datacenter-as-a-Service)**
Includes all the features of OMNI-Cloud PaaS (Platform-as-a-Service)
1. Business-hours support is extended to cover the operating system, software provided by OMNIPOTECH under OMNI-Cloud LaaS and third-party applications located in the datacenter environment
2. Client has (typically) no administrative rights and relies upon OMNIPOTECH for remediation of the hosted environment
3. Client is responsible for all desktop issues and infrastructure issues located outside the datacenter
4. Client can request time and materials support for any service or issue regardless of location based upon the rate schedule agreement

**OMNI-Backup Appliance**
We feel that the protection of a client's data is our greatest responsibility. The quantities listed for monthly recurring services will adjust lower or higher automatically each month based upon actual quantities. The OMNI-Backup Appliances are the property of OMNIPOTECH and must be returned if the services for OMNI-Backup Appliance or OMNI-Backup Storage are canceled. The OMNI-Backup Appliance provides a fully-monitored backup and business continuity solution. The OMNI-Backup Offsite Storage option can be added to the OMNI-Backup Appliance to collect and transfer your critical data offsite for a complete disaster recovery solution.

**OMNI-Backup Offsite Storage**
The OMNI-Backup Offsite Storage option transfers your critical data offsite.

**OMNI-Care Desktop**
Agent performs the following proactive maintenance and monitoring tasks which are setup on a recurring basis:
1. agent automatically generates a hardware and software inventory for each system
2. analyzes the hard disk to determine free/used space
3. performs a night-time scandisk to check the file system for issues
4. S.M.A.R.T – self monitoring and reporting technology which provides predictive failure notifications from the computer's BIOS to the OMNI-Care Agent
5. performs a S.M.A.R.T. scan to determine if the hard disks have any physical damage
6. performs a disk defragmentation
7. purges all temporary files from the computer
8. installs the latest Microsoft updates on schedule defined in writing by Client
9. automatically restarts failed Microsoft services
10. automatically creates a ticket in the event the system has an error
11. Updates Adobe Acrobat Reader, Adobe Flash, Adobe Shockwave, Adobe Air, iTunes, QuickTime, Java and other popular programs to the latest security patches
12. Provides a system tray icon to allow the user to initiate a ticket and includes an option to add a screenshot of the error message to ensure accurate communication of the error message and desktop settings at time of error
13. OMNI-Care agent can also perform many other security features like denying users the ability to copy data to USB drives
14. OMNI-Care Managed Desktop Security is installed and configured according to management's security policy

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

**OMNI-Care Server**
Agent performs the following proactive maintenance and monitoring tasks which are setup on a recurring basis:
1. Same features as the OMNI-Care Desktop agent, plus
2. Enumerates all active Microsoft-based system services and generates automatic alert notifications to monitor these services for failures
3. External monitoring is enabled on the existing internet circuits to monitor the availability of the internet service providers equipment

**OMNI-Care Managed Desktop Security:**
1. Antivirus protection
2. Anti-malware protection
3. Anti-spyware protection
4. Behavior monitoring of disk activities
5. Managed firewall policy with automatic security policy elevation when the computer is removed from the client's network
6. URL filtering to control internet access by time of day or deny all together. For instance, only allow laptops to access Facebook after 5 PM Mon-Fri and on weekends.
7. All security policies are not dependent upon the system residing at the client's office. Systems can be managed as groups and each group can have unique policies to provide owners, managers, or shareholders less restrictive policies.

**OMNI-Shared Hosting for Websites**
1. Windows 2008 server hosting
2. SMTP relay
3. FTP access
4. Virus protection
5. Up to 50Gb free space
6. Unlimited domain aliases
7. Unlimited monthly data transfers

**OMNI-DNS Services**
1. Managed DNS hosting by OMNIPOTECH engineers
2. Guaranteed 100% uptime
3. Global IP Anycast clusters spread around the world
4. Redundancy built upon Cisco and Juniper equipment
5. DNS defense to prevent DDoS, remote traffic black-holing and bandwidth capacity agreements with upstream providers
6. Automated zone comparison on all DNS servers globally
7. Supports IPv6, Service Records, weighted load balancing
8. Optional automatic DNS record change for specific IP for disaster recovery hot-sites

**OMNI-Email Security Services for Exchange Server**
1. Cloud-based spam, virus, malware and spyware protection
2. Guaranteed 99.9% uptime
3. User managed spam filter – doesn't require assistance from OMNIPOTECH to whitelist email addresses
4. Global whitelist to ensure deliver of email from clients and vendors
5. 200Mb maximum message size
6. Industry heuristics available
7. Attachment and content filtering
8. Secure outbound relay preventing your company from being blacklisted by others
9. Decreases bandwidth usage on the internet circuit used by your Exchange server
10. Caches your email if your circuit is down or Exchange server is unavailable for any reason, i.e., power failure

**OMNI-Monitoring Services**
1. Monitoring of client's telecom provider router for up/down status
2. Monitoring of client's internal firewall for up/down status
3. Monitoring of client's internal server for up/down status and other open ports, i.e., RDP, SMTP, HTTP/HTTPS, etc.

**OMNI-Drive**
Provides online file sharing for teams, employees who need access to files offline, keeping geographically separate servers in sync, file sharing with third-parties, and emailing attachments too large for email:
1. Unlimited number of agents for Windows, Apple OSX, and Linux agents – install it at work and home PC for no additional cost
2. 256-bit AES encryption, on device and in-transit
3. Centrally administered from web browser with comprehensive usage reports
4. Managed file sharing for internal/external parties
5. Granular user-access and security controls
6. Universal file access; sync across stationary and mobile devices
7. Remotely wipe computers and devices for inactive employees to protect company data
8. Active Directory integration
9. Client controlled revision history
10. Custom deleted file retention periods
11. Smart alerting system for data usage

**Project and Services Order Form for Bendco**





June 3, 2015 (Revision 1.0)

**Project to Address Current Issues:**

1) **Backup Appliance:** Prior to any other work being performed at the server level, an OMNI-Backup Appliance will be installed. The appliance is owned by OMNIPOTECH and all maintenance of the appliance's hardware and software, plus monitoring of all backups of corresponding servers is included each month in the current rates herein for the one SERVER. Disaster recovery testing can be performed according to the Client's needs according to the Rate Schedule Agreement, but an initial test is included herein prior to hurricane season as part of this project.

2) **Backup:** Backup the server hourly to the OMNI-Backup Appliance. The Appliance can support up to four server operating systems in a disaster recovery situation. Backup solution uses full disk imaging software which also provides incremental hourly copies. A Windows 8 virtual machine running on the Appliance will be the backup management server named "BENDCO-BUThis backup methodology allows for the recovery of the entire server, a single folder, file, or the JobBoss database.

3) **Business Continuity:** In the event the primary server fails, a backup image of the SERVER can be restored from the backups located on the OMNI-Backup Appliance providing business continuity to the Company using a clone of the failed system.

4) **Offsite Disaster Recovery:** Each night, the daily SERVER backup will be copied to OMNIPOTECH's Aurora Colorado datacenter. This design allows for the failure of both the primary and OMNI-Backup Appliance servers and still allow the SERVER to be restored to new hardware in the event another failure occurs. This backup methodology allows for the recovery of the entire server, a single folder, file, or the JobBoss database from the offsite backup location. The datacenter facility is owned by SunGard is certified SSAE16. The SSAE16 certification documents will be provided to the Client upon completion of the project for their compliance audits

5) **Backup of Specific Workstations:** Certain workstations (Kelly, HR, CAD) contain applications or data which cannot be easily restored or recovered. We recommend using the OMNI-Backup license for desktops to image these systems (at least daily) to the OMNI-Backup Appliance. When one of these workstations fails, we will be able to restore the image to a new hard disk. If the machines are replaced, the machines GUID (unique ID) will change and the software will need to be setup on the new GUID.

6) **Active Directory:** Active Directory (AD) is the "heart" of a Windows Server environment. Everything in the network is an object to AD including users, computers, groups, files, folders, printers, and databases. Many Active Directory clean-up tasks need to be performed including:

   a. Remove inactive users who have not logged into the system in more than 30 days (totals 13)
   b. Remove disabled user accounts (totals 6)
   c. Simplify user groups (current total 67)
   d. Remove inactive computers who have not logged into the system in more than 30 days (totals 25)

7) **Domain Administrators:** A Domain Administrator account is like a "God" in a network. An account with this level of permission can literally change anything in the Active Directory environment including changing passwords and viewing other's data. Moreover, any virus, malware, Trojan or process initiated from a user's session that has Domain Administrator credentials can wreak havoc, destroy data, and change the system. More than 30% of the active accounts in the SERVER are domain administrators. We will eliminate all but two Domain Administrator accounts. One account will be used solely by Client authorized personnel (if any) and another will be used solely by OMNIPOTECH.

8) **Windows Operating System:** The current Windows Small Business Server 2008 (SBS 2008) is built upon the Microsoft Windows Vista code base. This server uses Windows Server 2008 Release 1. This code base is three generations behind and over seven (7) calendar years old. The current Windows Server platform is Windows Server 2012 Release 2. The current environment does not include any upgrade path from SBS 2008 to the current version. We will discuss infrastructure modernization.

9) **Microsoft Office:** Multiple versions of Microsoft Office exist. We would recommend standardizing on the current release of Microsoft Office 2013 Standard or Professional.

10) **Disk Space for SERVER:** The current SERVER is almost out of hard disk space for its operating system partition (drive letter "c:\"). The resolution to this problem will be discussed.

11) **SERVER Disk Clean-up:** The server is consuming over 1.2TB of data on three separate partitions. This quantity of data seems highly unusual given the number of users even when the age of the Company is taken into consideration. We suggest that a Bendco authorized person be assigned to assist us with identifying items which can be archived to USB drives (not included) to reduce the SERVER's cost of offsite backup and speed backup processes. A budgetary amount of offsite backup storage has been estimated herein based upon these clean-up efforts.

12) **Dynamic Host Control Protocol (DHCP):** DHCP services will be setup in Active Directory as suggested by Microsoft network designs since Windows Server 2000 to current Windows Server 2012. An exclusion IP range will be provided ensuring that the server, firewall, wireless access points, printers and the Konica Minolta IP addresses are not used by desktops, laptops, phones or other network devices.

13) **Domain Name Service (DNS):** Windows Servers require the proper configuration of DNS. The SERVER and DHCP scope will be properly configured for DNS services according to Microsoft's design for Active Directory environments.

14) **Firewall:** Install a new firewall capable of active content and security filtering of viruses and malware providing a tiered security design when combined with OMNI-Managed Security for Desktops and Servers. This firewall unit allows for the aggregation of up to four internet circuits to be used simultaneously. Currently, the Birch (Cheyond) internet circuit is not visible to devices. This device removes the Comcast firewall's role as DHCP server which provides IP addresses to the network.

15) **Wireless:** Wireless availability will be addressed after the firewall is installed. Currently, the wireless has no security required to access the network according to my discussions with Kelly.

16) **Desktop and Server Antivirus:** Protect the servers and computers with OMNI-Managed Security for Desktops and Servers. This solution is a singular security solution to prevent viruses, malware, spyware, and limit internet browsing (by device) to websites authorized by the company's security policy. This security subscription protects the data, but it also protects the company by enforcing HR policy and ensuring a consistent, safe computing environment. This subscription is month-to-month based upon active quantities and does not require LAN-based network management tools.

17) **Email:** Email will remain temporarily with current provider. Client will be provided options for centralizing email using Microsoft Exchange in either an on-premises or hosted design in future discussion. Currently, no backups of emails occur and management of Outlook PST files is unknown.

18) **Computers:** Join all Windows Pro computers in each location to the domain to allow centralized group policy management for permissions, files, folders, and printer access

19) **Duplicate Names:** Resolve the duplicate computer names on the network (Andrea and Vanessa). Both systems will be renamed to ensure destruction of the corrupted security identification within Active Directly

20) **Monitoring:** Monitor the servers, firewall, and internet circuits availability to notify OMNIPTOECH and Client so that all parties can respond accordingly. The OMNI-Care agents will automatically open service tickets if any of the critical computing components are not responding allowing for the Client and OMNIPOTECH employees to be alerted to potential issues.

21) **Pro-Active Maintenance:** Maintain each system with current Microsoft software security patches and enhancements, plus monitor devices logs to ensure adequate resources using OMNI-Care agents on each computing device to proactive maintenance thru an annual subscription. The agents perform scheduled maintenance of each system to ensure optimal health, plus they provide an inventory of the computing environment allowing for better asset management and tracking. The agents also allow for immediate remote support by an OMNIPOTECH engineer speeding remediation of system or user issues. The patch status for systems ranges from missing 3-45 security updates.

22) **Uninterruptible Power Supply (UPS) – Battery Backup:** Fluctuating electricity level stresses electronic devices and destroys data. Three types of UPS devices exist.
   a. Stand-by UPS: The most common are stand-by units which can be purchased at Office Depot, Fry's or other local retailers and only provide battery backup when a complete power loss occurs.
   b. Line interactive UPS: The next level of UPS is line interactive which monitors the incoming electricity and engages the battery if the current is +/-10% above expected levels. Line interactive units allow the UPS to protect the server and network equipment from low voltage (brown-out) conditions which are most prevalent than black-outs (loss of power).
   c. Online Double Conversion: Servers and network equipment should be protected by online double conversion UPS devices which take the alternating current (AC) power from the wall and convert it to direct current (DC) before reconverting it to pure sinusoidal AC current which is always at the correct voltage and amperage. In the next project phase, we will make a recommendation on a properly sized online double conversion UPS unit to protect the server and network equipment.

23) **Switches:** The network switches are unmanaged consumer level models. Recommendations to replace the two consumer switches with one business class device will be made in the future network modernization project.

24) **JobBoss Updates:** No JobBoss updates should be applied until the current environment is protected, backed-up, and stabilized. Once this process has been completed, a modern design based upon the Client's needs will be designed allowing for the update of JobBoss to its latest version.

25) **Phone System and Birch Costs:** The Birch invoice is currently $1042/month (including taxes). For less than this monthly amount, a new phone system, with failover capability to another offsite phone system, plus another telecom provider can be obtained allowing greater phone system capability (i.e., voicemail to email) and even remote workers (if desired). This topic can be explored in the future network modernization project.

26) **Policy Template:** Provide Client an editable network and computer use policy template for employees as required by compliance. Client will modify the template according to their specific policies.

27) **Documentation:** Document the final network design. Prepare template for annual "Data Protection and Availability Summary". Document to be completed upon request for internal and external compliance auditors.

| Monthly Recurring Services | Qty | Amt | Total |
|---|---|---|---|
| **Proactive Maintenance and Security** | | | |
| OMNI-Desktop Care for Windows-based desktops and laptops | 14 | 20.00 | 280.00 |
| OMNI-Managed Security per user - manage anti-virus, anti-malware, anti-spyware and URL filtering per device | 14 | 5.00 | 70.00 |
| OMNI-Server Care Remote Server Watch for Windows-based servers | 1 | 59.00 | 59.00 |
| OMNI-Managed Security Server - manage anti-virus, anti-malware, anti-spyware and URL filtering | 2 | 20.00 | 40.00 |
| OMNI-Firewall Monitoring (free with combined OMNI-Care Desktop & Server services) | 2 | Included | Included |
| **Backup, Business Continuity, and Offsite Disaster Recovery** | | | |
| OMNI-Backup Appliance for physical or virtual servers and up to 4 host servers protected | 1 | 375.00 | 375.00 |
| OMNI-Backup Storage billed in 10GB increments (ESTIMATED) - No storage commitment required. Invoiced at $1/Gb for total data stored offsite | 650 | 1.00 | 650.00 |
| OMNI-Backup license per SBS server with ImageManager Intelligent Transfer & HSR | 1 | 75.25 | 75.25 |
| OMNI-Backup license per non-SBS server with ImageManager Intelligent Transfer & HSR | 0 | 75.25 | 0.00 |
| OMNI-Backup license per desktop - CAD, HR, Kelly | 3 | 15.00 | 45.00 |
| **Other Hosting Services** | | | |
| OMNI-Shared Hosting for Websites (Hosting for up to one static, non-database driven website) | 1 | Included | Included |
| OMNI-DNS Services (Hosting for all domain names) - bendco.com | 1 | Included | Included |
| **Remediation** | | | |
| Business Period Remediation Block time agreement prepaid hours Mon-Fri 8:00AM-5:00PM support - with one month roll-over allowance for unused hours | 10 | 125.00 | 1250.00 |
| Additional Hours Beyond the Allotted Block time or Non-Business Period or Emergency/Recovery Remediation Per Rate Schedule Agreement herein | | | |

| | 2844.25 |
|---|---|
| **Monthly Total (taxes additional)** | |

1. The quantities listed for monthly recurring services will adjust lower or higher automatically each month based upon actual quantities.
2. The quantities listed above are estimates. The actual quantities will be billed monthly.

---------------------- Please see the appendix for more detailed description of services. ----------------------

**Exclusions**
The following "Supplemental Services" are not included in this Order Form, but can be performed by Provider for an additional fee as defined in the Rate Schedule below, if requested.
1. Technical support or trouble-shooting beyond the subscribed hours within the block-of-time provided herein, if any
2. Technical support for any hardware, software, operating system, beyond the scope of the chosen service
3. Technical support for any telecom service for which the Client pays a telecom provider directly including, but not limited to, data circuits, long-distance, dial-tone, analog lines, PRI, MPLS, T1, or any terrestrial or wireless baseband or broadband services
4. Onsite technical support for any reason
5. Third-party application or operating system upgrades
6. Hardware replacements, including but not limited to servers, workstation, PC, Mac, laptop, tablet, iPad, Droid, or Apple
7. Support of mobile/cellular phones or support of employee owned home computers
8. Installation/repair/maintenance of computer cabling systems and components, electrical systems and components, environmental control systems and components, media systems, televisions and projectors, building access control system, printers, faxes and copiers, telecom circuits for voice, data, or fax services or physical cleaning of end-user computers
9. Installation/repair/maintenance of the phone system unless explicitly provided herein
10. Office moves, expansions, down-sizing, or relocation to a new facility
11. End-user training
12. Data consolidation and integration between existing business systems
13. Implementation of a redundant disaster recovery site
14. Software application or website development or modification
15. Implementation of any hardware or software not directly compatible with the network currently in use
16. Website, DNS, or registrar migration or hosting services unless the service is explicitly provided herein
17. Recovery from system outages caused by any person or any factor, such as fire, flood, lightning, sabotage, virus, malware, spyware, theft, natural disaster, or environmental conditions
18. Any work involved with legal discovery, regulatory compliance, or audits

19. Server collocation in Provider's datacenter facility
20. Disaster recovery or restoring data
21. Site-to-site VPN services
22. Gateway services for internet-of-last-resort services for MPLS, AVPN or similar services
23. Any support for Client owned servers located outside the datacenter

### Rate Schedule for Supplemental Services

| | |
|---|---|
| **Base Rate** – Hourly rate, per technician/engineer, for any work performed during the Business Period calculated in 15 minute increments with a 1 hour minimum charge for on-site service visits.  Base rate is determined  by personnel used: $185/hr – Partner | $145/hr – Architect | $125/hr – Engineer | $95/hr - Analyst | Determined by Personnel Used |
| **Business Period** – 8:00AM to 5:00PM Central Standard Time, Monday-Friday (excluding holidays) | Base Rate |
| **After-Hours Period** – 5:01PM to 7:59AM Central Standard Time, Monday-Friday (excluding holidays). Two (2) hour minimum calculated portal-to-portal. | Base Rate multiplied by 1.25 |
| **Weekend Period** – Any Saturday or Sunday (excluding holidays).  Four (4) hour minimum calculated portal-to-portal. | Base Rate multiplied by 1.75 |
| **Holiday Period** – Holidays (includes New Year's Eve Day and New Year's Day, Easter, Memorial Day, Independence Day, Labor Day, Thanksgiving and the day after, Christmas Eve and Christmas Day).  Eight (8) hour minimum calculated portal-to-portal. | Base Rate multiplied by 3.00 |
| **Travel Surcharge** – Any on-site visit for any service plan will result in a per technician travel surcharge which will be adjusted to reflect transportation costs and travel time. Parking fees will be reimbursed by Client. Travel to locations outside the greater Houston area will be billed using the business period rate for that personnel. | $95 |

### One-Time Project and Equipment

| | Qty | Amount | Total |
|---|---|---|---|
| SonicWALL tz400 non-wireless with 1yrs Comprehensive Gateway Support Services | 1 | 1,220.71 | 1,220.71 |
| - Optional 2 additional years of Comprehensive Gateway Support Services | 1 | 634.09 | 634.09 |
| Assessment Project Labor on ticket #153052 | 1 | 1,000.00 | 1,000.00 |
| Assessment Project Labor Discount for Recurring | 1 | -500.00 | -500.00 |
| **Project Labor:** | | | |
| - Described herein with up to 6 onsite travel charges during project | 1 | 5,400.00 | 5,400.00 |

| Project and Equipment (taxes additional) | |
|---|---|
| Price discounts are dependent on quantities of items listed and all items must be ordered at the same time. | 7754.80 |

The undersigned affirms that they have the authority to enter into this agreement on behalf of the Client and agrees that the OMNIPOTECH Rate Schedule is incorporated herein.  Authorized representatives of Client and OMNIPOTECH have read the documents listed above and agree and accept such terms effective as of the date first referenced below.

CLIENT: BENDCO INC

Signature: _____

Print Name: JOHN THARP

Title: PRESIDENT

Date: 6/3/15

OMNIPOTECH, Ltd.

Signature: _____

Print Name:  Robert D. Kyslinger

Title:  Managing General Partner

Date: 6/3/2015

A description of all our services is listed below. Please note that all services may not be included on this order form. We will only deliver the services listed above.

**OMNI-Cloud LaaS (Licensing-as-a-Service)**
OMNIPOTECH has contractual relationships various software vendors including Microsoft, VMware, Citrix, Veeam, StorageCraft, Trend Micro, Citrix, Scorpion Software, and others to provide software on a month-to-month basis on provider owned infrastructure. The client is invoiced only for the maximum number of users, instances, or resources authorized each calendar month. The software is licensed to OMNIPOTECH and is the responsibility of OMNIPOTECH. OMNIPOTECH pays the software vendor automatically on the 5th of each month for all authorized instances. The client has no ownership interest in the licensing. The licensing includes version upgrades at no additional cost as provided by the software vendor. Pricing will be automatically adjusted based upon price changes made by the various providers and will be reflected on the next monthly invoice. Many of our services include provider owned licensing in order to deliver the service to the client; i.e., OMNI-Backup Appliance.

**OMNI-Cloud IaaS (Infrastructure-as-a-Service)**
OMNIPOTECH provides redundant SSAE16 datacenter infrastructure for hosting any operating system.
1. Multi-provider redundant bandwidth, high-availability firewalls and switches, physical or virtual servers, clustered high-availability and fault-tolerant virtual server environment, redundant SAN storage, and redundant SAN network
2. Backup, business continuity, monitoring, and security services
3. Business-hours support is included for all issues related to the OMNIPOTECH infrastructure and services listed in 1 & 2 above
4. Client has an administrative account to the hosted infrastructure and is responsible for remediating issues relating to the hosted operating system and applications
5. Client is responsible for all desktop issues and infrastructure issues located outside the datacenter
6. Client can request time and materials support for any service or issue regardless of location based upon the rate schedule agreement

**OMNI-Cloud PaaS (Platform-as-a-Service)**
Includes all the features of OMNI-Cloud IaaS (Infrastructure-as-a-Service)
1. Business-hours support is extended to cover the operating system and any software provided by OMNIPOTECH under OMNI-Cloud LaaS located in the datacenter environment
2. Client has limited administrative rights to the hosted infrastructure and is responsible for issues relating to all applications not provided by OMNIPOTECH.
3. Client is responsible for all desktop issues and infrastructure issues located outside the datacenter
4. Client can request time and materials support for any service or issue regardless of location based upon the rate schedule agreement

**OMNI-Cloud DaaS (Datacenter-as-a-Service)**
Includes all the features of OMNI-Cloud PaaS (Platform-as-a-Service)
1. Business-hours support is extended to cover the operating system, software provided by OMNIPOTECH under OMNI-Cloud LaaS and third-party applications located in the datacenter environment
2. Client has (typically) no administrative rights and relies upon OMNIPOTECH for remediation of the hosted environment
3. Client is responsible for all desktop issues and infrastructure issues located outside the datacenter
4. Client can request time and materials support for any service or issue regardless of location based upon the rate schedule agreement

**OMNI-Backup Appliance**
We feel that the protection of a client's data is our greatest responsibility. The quantities listed for monthly recurring services will adjust lower or higher automatically each month based upon actual quantities. The OMNI-Backup Appliances are the property of OMNIPOTECH and must be returned if the services for OMNI-Backup Appliance or OMNI-Backup Storage are canceled. The OMNI-Backup Appliance provides a fully-monitored backup and business continuity solution. The OMNI-Backup Offsite Storage option can be added to the OMNI-Backup Appliance to collect and transfer your critical data offsite for a complete disaster recovery solution.

**OMNI-Backup Offsite Storage**
The OMNI-Backup Offsite Storage option transfers your critical data offsite.

**OMNI-Care Desktop**
Agent performs the following proactive maintenance and monitoring tasks which are setup on a recurring basis:
1. agent automatically generates a hardware and software inventory for each system
2. analyzes the hard disk to determine free/used space
3. performs a night-time scandisk to check the file system for issues
4. S.M.A.R.T – self monitoring and reporting technology which provides predictive failure notifications from the computer's BIOS to the OMNI-Care Agent
5. performs a S.M.A.R.T. scan to determine if the hard disks have any physical damage
6. performs a disk defragmentation
7. purges all temporary files from the computer
8. installs the latest Microsoft updates
9. automatically restarts failed Microsoft services
10. automatically creates a ticket in the event the system has an error
11. Updates Adobe Acrobat Reader, Adobe Flash, Adobe Shockwave, Adobe Air, iTunes, QuickTime, Java and other popular programs to the latest security patches
12. Provides a system tray icon to allow the user to initiate a ticket and includes an option to add a screenshot of the error message to ensure accurate communication of the error message and desktop settings at time of error
13. OMNI-Care agent can also perform many other security features like denying users the ability to copy data to USB drives
14. OMNI-Care Managed Desktop Security is installed and configured according to management's security policy

**OMNI-Care Server**

Agent performs the following proactive maintenance and monitoring tasks which are setup on a recurring basis:
1. Same features as the OMNI-Care Desktop agent, plus
2. Enumerates all active Microsoft-based system services and generates automatic alert notifications to monitor these services for failures
3. External monitoring is enabled on the existing internet circuits to monitor the availability of the internet service providers equipment

**OMNI-Care Managed Desktop Security:**
1. Antivirus protection
2. Anti-malware protection
3. Anti-spyware protection
4. Behavior monitoring of disk activities
5. Managed firewall policy with automatic security policy elevation when the computer is removed from the client's network
6. URL filtering to control internet access by time of day or deny all together. For instance, only allow laptops to access Facebook after 5 PM Mon-Fri and on weekends.
7. All security policies are not dependent upon the system residing at the client's office. Systems can be managed as groups and each group can have unique policies to provide owners, managers, or shareholders less restrictive policies.

**OMNI-Shared Hosting for Websites**
1. Windows 2008 server hosting
2. SMTP relay
3. FTP access
4. Virus protection
5. Up to 50Gb free space
6. Unlimited domain aliases
7. Unlimited monthly data transfers

**OMNI-DNS Services**
1. Managed DNS hosting by OMNIPOTECH engineers
2. Guaranteed 100% uptime
3. Global IP Anycast clusters spread around the world
4. Redundancy built upon Cisco and Juniper equipment
5. DNS defense to prevent DDoS, remote traffic black-holing and bandwidth capacity agreements with upstream providers
6. Automated zone comparison on all DNS servers globally
7. Supports IPv6, Service Records, weighted load balancing
8. Optional automatic DNS record change for specific IP for disaster recovery hot-sites

**OMNI-Email Security Services for Exchange Server**
1. Cloud-based spam, virus, malware and spyware protection
2. Guaranteed 99.9% uptime
3. User managed spam filter – doesn't require assistance from OMNIPOTECH to whitelist email addresses
4. Global whitelist to ensure deliver of email from clients and vendors
5. 200Mb maximum message size
6. Industry heuristics available
7. Attachment and content filtering
8. Secure outbound relay preventing your company from being blacklisted by others
9. Decreases bandwidth usage on the internet circuit used by your Exchange server
10. Caches your email if your circuit is down or Exchange server is unavailable for any reason, i.e., power failure

**OMNI-Monitoring Services**
1. Monitoring of client's telecom provider router for up/down status
2. Monitoring of client's internal firewall for up/down status
3. Monitoring of client's internal server for up/down status and other open ports, i.e., RDP, SMTP, HTTP/HTTPS, etc.

**OMNI-Drive**

Provides online file sharing for teams, employees who need access to files offline, keeping geographically separate servers in sync, file sharing with third-parties, and emailing attachments too large for email:
1. Unlimited number of agents for Windows, Apple OSX, and Linux agents – install it at work and home PC for no additional cost
2. 256-bit AES encryption, on device and in-transit
3. Centrally administered from web browser with comprehensive usage reports
4. Managed file sharing for internal/external parties
5. Granular user-access and security controls
6. Universal file access; sync across stationary and mobile devices
7. Remotely wipe computers and devices for inactive employees to protect company data
8. Active Directory integration
9. Client controlled revision history
10. Custom deleted file retention periods
11. Smart alerting system for data usage

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

# Master Services Agreement for

**CLIENT:** BENDCO INC





⌐OMNIPOTECH

---

THIS MASTER SERVICES AGREEMENT (the "*MSA*") between OMNIPOTECH, Ltd. ("*OMNIPOTECH*") and ("*Client*") is made effective as of the date indicated below the Client signature on the initial Order Form submitted by Client and accepted by OMNIPOTECH.

## ARTICLE 1 – INTRODUCTION

1.1 *General.* This MSA sets forth the terms and conditions of OMNIPOTECH's delivery and Client's receipt of any or all of the services provided by OMNIPOTECH, including Professional Services. The specific Services to be provided under this MSA are identified in the Order Forms submitted by Client and accepted by OMNIPOTECH and described in detail in the Order Forms and/or Statements of Work attached to each Order Form. The service levels OMNIPOTECH will provide to Client for each Service ordered, other than Professional Services, are defined in detail in the Service Level Agreements. Each Service Level Agreement and Order Form submitted, accepted and executed by both parties is hereby incorporated by reference into this MSA. This MSA is intended to cover any and all Services ordered by Client and provided by OMNIPOTECH. Any terms set forth in this MSA which apply specifically to a service not ordered by Client, will not apply to Client.

1.2 *Definitions.* Capitalized terms used and not elsewhere defined in this MSA, have the meanings given them in "Schedule 1.0 – Definitions" to this MSA.

## ARTICLE 2 – DELIVERY OF SERVICES AND TERM

2.1 *Delivery of Services.*

(a) *General.* By submitting an Order Form, Client agrees to take and pay for, and, by accepting the Order Form, OMNIPOTECH agrees to provide, the Services specified on the Order Forms during the Initial Term and for any Renewal Term, as specified in Section 2.2(b).

(b) *Delivery of Supplemental Services.* The purpose of this provision is to enable OMNIPOTECH to provide Client with certain limited services and equipment needed by Client on a "one-off" or emergency basis ("*Supplemental Services*") where such services are not included within the scope of the Services as described in the Order Form and/or Statements of Work. Supplemental Services may include, as an example, a request from Client to OMNIPOTECH via ticket or telephone that OMNIPOTECH replace Client-owned hardware with OMNIPOTECH hardware for a temporary period of time. Client agrees to pay OMNIPOTECH the approved fees charged by OMNIPOTECH for Supplemental Services as listed in the Rate Schedule. OMNIPOTECH will use commercially reasonable efforts to provide Supplemental Services, provided that OMNIPOTECH has no obligation to determine the need for or provide Supplemental Services. All Supplemental Services provided pursuant to this Section 2.1(b) and/or Section 2.1(c) are provided on an "as-is" basis and exclude warranties of any kind, whether express or implied.

(c) *Delivery of Supplemental Services on an Emergency Basis.* In the event OMNIPOTECH reasonably determines that Supplemental Services are required on an emergency basis, OMNIPOTECH may provide such services without the consent of Client, thereafter provide notice of the services to Client and bill Client a reasonable fee for such services. Client agrees to pay OMNIPOTECH the fees charged by OMNIPOTECH for Supplemental Services required on an emergency basis. Client indicates its acceptance or rejection of this Section 2.1(c) by initialing the applicable response below. If rejected, the provisions of this Section 2.1(c) relating to delivery of Supplemental Services on an emergency basis shall not constitute a part of this MSA. Client acknowledges that if this Section 2.1(c) is rejected, Client's consent will be required before the provision of any Supplemental Services. By initialing the rejection response below, Client agrees to

(i) waive all causes of action against OMNIPOTECH, and

(ii) forever hold OMNIPOTECH harmless,

for any and all damages arising out of OMNIPOTECH's failure to act during any delay period required to obtain Client's consent to provision of Supplemental Services.    Accept

Accept _____        Reject _____

(d) *Billing for Supplemental Services.* Client will be charged for Supplemental Services in the invoice issued the month following delivery of the Supplemental Services.

2.2 *Term of Services.*

(a) *Commencement of Initial Term.* The term for each Service will commence on the Service Commencement Date indicated in the Notice of Service Commencement delivered by OMNIPOTECH to Client when OMNIPOTECH begins providing each Service to Client and continue for the Initial Term.

(b) *Renewal Terms.* Each Service will continue automatically for additional terms equal to the Initial Term ("*Renewal Term*") unless Client notifies OMNIPOTECH in writing at least thirty calendar (30) days prior to the end of the Initial Term or a Renewal Term, as applicable, that it has elected to terminate such Service, in which case such Service shall terminate at the end of such term. The termination of one Service will not affect Client's obligations to pay for other Services even within the same order form. Notwithstanding the foregoing, OMNIPOTECH may change the term or change or increase the prices it charges Client for any Service at any time after the order execution effective thirty calendar (30) days after providing written notice to Client. Except as otherwise expressly provided in this MSA, OMNIPOTECH is obligated to provide and Client is obligated to pay for each Service through its Initial Term and any Renewal Term.

## ARTICLE 3 – PAYMENT TERMS FOR FEES, EXPENSES, MERCHANDISE

3.1 *Fees and Expenses.* Client will pay all fees and expenses due according to the prices and terms listed in the Order Forms. The prices listed in the Order Forms will remain in effect during the Initial Term indicated in the Order Forms and will continue thereafter, unless modified in accordance with Section 2.2(b).

3.2 *Payment Terms.* On the Service Commencement Date for each Service, Client will be billed an amount equal to all non-recurring charges indicated in the Order Form and the monthly recurring charges for the first month of the term. Monthly recurring charges for all other months will be billed in advance of the provision of Services. Monthly recurring charges must be paid via ACH on or before the payment due date. All other charges for Services and expenses incurred during a month (e.g., time and materials billing fees, travel expenses, etc.) will be billed at the end of the month in which the Services were provided. Payment for all fees and expenses is due upon the invoice due date of

---

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

each OMNIPOTECH invoice and will be paid via ACH. Rejected ACH attempts will be charged seventy-nine dollars ($79.00), plus Late Payments, if applicable. All payments will be made in the United States, from a United States bank and delivered solely in U.S. dollars.

3.3   *Late Payments.* Any payment not received upon the due date will accrue interest at a rate of one percent (1%) per month, or the highest rate allowed by applicable law, whichever is higher. If Client is ever delinquent in its payments, OMNIPOTECH may, upon written notice to Client, modify the payment terms to require full payment before the provision of all Services or require other assurances to secure Client's payment obligations under this MSA. OMNIPOTECH has the right to deny services until payment has been received.

3.4   *Taxes.* All fees charged by OMNIPOTECH for Services are exclusive of all taxes and similar fees now in force or enacted in the future imposed on the transaction or the delivery of Services, all of which Client will be responsible for and will pay in full, except for franchise taxes and taxes based on OMNIPOTECH's net income.

3.5   *Cash Discounts.* All pricing reflects a three percent (3%) cash discount. Client agrees that OMNIPOTECH may charge any invoice at least five (5) days past due, plus accrued interest charges, to a Client credit card and Client hereby agrees to pay a credit card fee equal to three percent (3%) of the total amount charged.

3.6   *Collection Costs.* Cost of collection, including reasonable attorney's fees, shall be borne by Client. Client agrees merchandise remains the property of Provider until paid in full.

3.7   *Merchandise Purchases.* OMNIPOTECH does not guarantee the availability of products quoted. OMNIPOTECH may offer for sale items that are demonstration units, refurbished, or used and Client agrees that all such items are sold AS-IS and cannot be returned. All unopened hardware may be returned within 30 days. There is a ten percent (10%) restocking fee on all items except special-order items. There is a twenty percent (20%) restocking fee on special-order items. Software cannot be returned. All hardware is sold with a manufacturer's warranty only; no additional warranty is offered by OMNIPOTECH.

ARTICLE 4 – CONFIDENTIAL INFORMATION; INTELLECTUAL PROPERTY OWNERSHIP; LICENSE GRANTS

4.1   *Confidential Information.*

(a)   *Nondisclosure of Confidential Information.* Each party acknowledges that it will have access to certain confidential information of the other party concerning the other party's business, plans, Clients, technology, and products, and other information held in confidence by the other party ("*Confidential Information*"). Confidential Information will include all information in tangible or intangible form that is marked or designated as confidential or that, under the circumstances of its disclosure, should be considered confidential. Confidential Information will also include, but not be limited to, OMNIPOTECH technology, Client technology, and the terms and conditions of this MSA and all documents incorporated by reference into this MSA. Each party agrees that it will not use in any way, for its own account or the account of any third party, except as expressly permitted by, or required to achieve the purposes of, this MSA, nor disclose to any third party (except as required by law or to that party's attorneys, accountants and other advisors as reasonably necessary), any of the other party's Confidential Information. Each party also agrees that it will take reasonable precautions to protect the confidentiality of the other party's Confidential Information, at least as stringent as it takes to protect its own Confidential Information.

(b)   *Exceptions.* Information will not be deemed Confidential Information under this MSA if such information: (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be secret or confidential, except through a breach of this MSA by the receiving party; or (iv) is independently developed by the receiving party. The receiving party may disclose Confidential Information pursuant to the requirements of a governmental agency or by operation of law, provided that it gives the disclosing party reasonable prior written notice sufficient to permit the disclosing party to contest such disclosure.

4.2   *Intellectual Property.*

(a)   *Ownership.* Except for the rights expressly granted in this MSA, this MSA does not transfer from OMNIPOTECH to Client any OMNIPOTECH technology, and all right, title and interest in and to OMNIPOTECH Technology will remain solely with OMNIPOTECH. Except for the rights expressly granted in this MSA, this MSA does not transfer from Client to OMNIPOTECH any Client technology, and all right, title and interest in and to Client technology will remain solely with Client. OMNIPOTECH and Client each agree that it will not, directly or indirectly, reverse engineer, decompile, disassemble or otherwise attempt to derive source code or other trade secrets from the other party.

(b)   *General Skills and Knowledge.* Notwithstanding anything to the contrary in this MSA, OMNIPOTECH will not be prohibited or enjoined at any time by Client from utilizing any skills or knowledge of a general nature acquired during the course of providing the Services, including, without limitation, information publicly known or available or that could reasonably be acquired in similar work performed for another Client of OMNIPOTECH.

4.3   *License Grants.*

(a)   *By OMNIPOTECH.* OMNIPOTECH hereby grants to Client a nonexclusive, royalty-free license, during the term of this MSA, to use the OMNIPOTECH technology solely for purposes of using the Services. Client shall have no right to use the OMNIPOTECH technology for any purpose other than using the Services.

(b)   *By Client.* Client agrees that if, in the course of performing the Services, it is necessary for OMNIPOTECH to use Client technology, OMNIPOTECH is hereby granted and shall have a nonexclusive, royalty-free license, during the term of this MSA, to use the Client Technology solely for the purposes of delivering the Services to Client. OMNIPOTECH shall have no right to use the Client Technology for any purpose other than providing the Services.

ARTICLE 5 – OMNIPOTECH REPRESENTATIONS AND WARRANTIES

5.1   *General.*

(a)   *Authority and Performance of OMNIPOTECH.* OMNIPOTECH represents and warrants that (i) it has the legal right and authority to enter into this MSA and perform its obligations under this MSA, and (ii) the performance of its obligations and delivery of the Services to Client will not violate any applicable U.S. laws or regulations, including OSHA requirements, or cause a breach of any agreements with any third parties. In the event of a breach of the warranties set forth in this Section 5.1(a), Client's sole remedy is termination pursuant to Article 10.

(b) *Date Compliance.* OMNIPOTECH warrants that none of the computer hardware and software systems and equipment incorporated into or utilized in the delivery of the Services contains any date dependent routines or logic which will fail to operate correctly by reason of such date dependence; provided, however, that no representation or warranty is made as to the adequacy of any Client or third party service provider hardware or software used in connection with the Services. In the event of any breach of the warranties under this Section 5.1(b), Client's sole remedy is termination pursuant to Article 10 of this MSA.

5.2 *Service Warranties.*

(a) *Service Level Warranty.* Subject to the exceptions set forth in the Service Level Agreement applicable to a specific Service, OMNIPOTECH warrants that it will provide each Service at or above the service levels defined in the applicable Service Level Agreement (the "*Service Level Warranty*").

(b) *Remedies.* In the event that OMNIPOTECH fails to provide a Service at the level required by the Service Level Warranty, Client's only remedies are those set forth in the Service Level Agreement applicable to that Service (the "*Remedies*").

(c) *Client Must Request Remedies.* In order to receive any of the Remedies, Client must notify OMNIPOTECH in writing within seven (7) days from the time Client becomes eligible to receive such Remedies. Failure to comply with this requirement will forfeit Client's right to receive such Remedies.

(d) *Remedies Shall Not Be Cumulative; Maximum Remedy.* The Remedies set forth in each Service Level Agreement are not cumulative. The aggregate maximum Remedy for any and all failures to provide Services at the level required by a particular Service Level Agreement that occur in a single calendar month shall not exceed the maximum set forth in such Service Level Agreement.

(e) *Termination Option for Chronic Problems.* Client may terminate the Service Level Agreement for a specific Service if the Client experiences Chronic Problems (as defined in the applicable Service Level Agreement) with such Service. If the Service Level Agreement for a specific Service so provides, Client may terminate this MSA if Client experiences Chronic Problems with such Service. Client must provide OMNIPOTECH written notice of termination for Chronic Problems as specified in the Service Level Agreement and such termination will be effective as provided in the Service Level Agreement.

(f) THE SERVICE LEVEL WARRANTY SET FORTH IN THIS SECTION 5.2 DOES NOT APPLY TO (I) ANY PROFESSIONAL SERVICES; (II) ANY SUPPLEMENTAL SERVICES; OR (III) ANY SERVICES THAT EXPRESSLY EXCLUDE THIS SERVICE LEVEL WARRANTY (AS STATED IN THE SERVICE LEVEL AGREEMENTS FOR SUCH SERVICES).

5.3 *Service Performance Warranty.* OMNIPOTECH warrants that it will perform the Services in a manner consistent with industry standards reasonably applicable to the performance thereof.

5.4 *No Other Warranty.* EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN ARTICLE 5, THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, AND CLIENT'S USE OF THE SERVICES IS AT ITS OWN RISK. OMNIPOTECH DOES NOT MAKE, AND HEREBY DISCLAIMS, ANY AND ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT AND TITLE, AND ANY WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. OMNIPOTECH DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE.

5.5 *Disclaimer of Actions Caused by or Under the Control of Third Parties.* OMNIPOTECH DOES NOT AND CANNOT CONTROL THE FLOW OF DATA TO OR FROM OMNIPOTECH'S NETWORK AND OTHER PORTIONS OF THE INTERNET. SUCH FLOW DEPENDS IN LARGE PART ON THE PERFORMANCE OF INTERNET SERVICES PROVIDED OR CONTROLLED BY THIRD PARTIES. AT TIMES, ACTIONS OR INACTIONS OF SUCH THIRD PARTIES CAN IMPAIR OR DISRUPT CLIENT'S CONNECTIONS TO THE INTERNET (OR PORTIONS THEREOF). ALTHOUGH OMNIPOTECH WILL USE COMMERCIALLY REASONABLE EFFORTS TO TAKE ALL ACTIONS IT DEEMS APPROPRIATE TO REMEDY AND AVOID SUCH EVENTS, OMNIPOTECH CANNOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR. ACCORDINGLY, OMNIPOTECH DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.

ARTICLE 6 – CLIENT REPRESENTATIONS, WARRANTIES AND
OBLIGATIONS

6.1 *Representations and Warranties of Client.*

(a) *Authority and Performance.* Client represents and warrants that (i) it has the legal right and authority to enter into this MSA and perform its obligations under this MSA, and (ii) the performance of its obligations and use of the Services (by Client, its Clients and users) will not violate any applicable laws, regulations or the Acceptable Use Policy or cause a breach of any agreements with any third parties or unreasonably interfere with other OMNIPOTECH Clients' use of OMNIPOTECH services.

(b) *Breach of Warranties.* In the event of any breach of any of the foregoing warranties, in addition to any other remedies available at law or in equity, OMNIPOTECH will have the right, in its sole reasonable discretion, to suspend immediately any related Services if deemed reasonably necessary by OMNIPOTECH to prevent any harm to OMNIPOTECH and its business. OMNIPOTECH will provide notice and opportunity to cure, if practicable, depending on the nature of that breach. Once cured, OMNIPOTECH will promptly restore the Services.

6.2 *Compliance with Law and Acceptable Use Policy.* Client agrees that it will use the Services only for lawful purposes and in accordance with this MSA. Client will comply at all times with all applicable laws and regulations and the Acceptable Use Policy, as updated by OMNIPOTECH from time to time. The Acceptable Use Policy are incorporated into this MSA and made a part of this MSA by this reference. OMNIPOTECH may change the Acceptable Use Policy upon fifteen (15) days' notice to Client, which notice may be provided by posting such new Acceptable Use Policy at the OMNIPOTECH Web site www.OMNIPOTECH.com. Client agrees that it has received, read and understands the current version of the Acceptable Use Policy. The Acceptable Use Policy contains restrictions on Clients and Client's users' online conduct (including prohibitions against unsolicited commercial email) and contains penalties for violations of such restrictions. Client agrees to comply with such restrictions and, in the event of a failure to comply, Client agrees to be subject to the penalties in accordance with the Acceptable Use Policy. Client acknowledges that OMNIPOTECH exercises no control whatsoever over the content of the information passing through Client's sites and that it is the sole responsibility of Client to ensure that the information it and its users transmit and receive complies with all applicable laws and regulations and the Acceptable Use Policy.

6.3 *Access and Security.* Except with the advanced written consent of OMNIPOTECH, Client's access to the OMNIPOTECH Data Centers will be limited solely to the Representatives as set forth in the

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

Client Registration Form which is hereby incorporated by reference into this MSA. Representatives may only access the OMNIPOTECH Data Centers when accompanied by an authorized OMNIPOTECH representative.

6.4 *Restrictions on Use of Services*. Client shall not, without the prior written consent of OMNIPOTECH (which may be withheld in its sole discretion), resell the Services to any third parties.

ARTICLE 7 – INSURANCE

7.1 *OMNIPOTECH Minimum Levels*. OMNIPOTECH agrees to keep in full force and effect during the term of this MSA: (i) comprehensive general liability insurance in an amount not less than $1 million per occurrence for bodily injury and property damage and (ii) workers' compensation insurance in an amount not less than that required by applicable law, if any. OMNIPOTECH agrees that it will ensure and be solely responsible for ensuring that its contractors and subcontractors maintain insurance coverage at levels no less than those required by applicable law and customary in OMNIPOTECH's and its agents' industries.

7.2 *Client Minimum Levels*. In order to provide Clients with physical access to facilities operated by OMNIPOTECH and equipment owned by third parties, OMNIPOTECH is required by its insurers to ensure that each OMNIPOTECH Client maintains adequate insurance coverage. Client agrees to keep in full force and effect during the term of this MSA: (i) comprehensive general liability insurance in an amount not less than $100,000 per occurrence for bodily injury and property damage and (ii) workers compensation insurance in an amount not less than that required by applicable law, if any. Client agrees that it will ensure and be solely responsible for ensuring that its agents (including contractors and subcontractors) maintain insurance coverage at levels no less than those required by applicable law and customary in Client's and its agents' industries.

7.3 *Certificates of Insurance; Naming OMNIPOTECH as an Additional Insured*. Prior to any access of the OMNIPOTECH Data Centers by any Representative or other agent or employee of Client, Client will (i) deliver to OMNIPOTECH certificates of insurance which evidence the minimum levels of insurance set forth above; and (ii) cause its insurance providers to name OMNIPOTECH as an additional insured and notify OMNIPOTECH in writing of the effective date thereof.

ARTICLE 8 – LIMITATIONS OF LIABILITY

8.1 *Personal Injury*. EACH REPRESENTATIVE AND ANY OTHER PERSON VISITING AN OMNIPOTECH DATA CENTER DOES SO AT ITS OWN RISK. OMNIPOTECH ASSUMES NO LIABILITY WHATSOEVER FOR ANY HARM TO SUCH PERSONS RESULTING FROM ANY CAUSE OTHER THAN THE NEGLIGENCE OR WILLFUL MISCONDUCT OF OMNIPOTECH.

8.2 *CONSEQUENTIAL DAMAGES WAIVER*. EXCEPT FOR A BREACH OF SECTION 4.1 ("CONFIDENTIAL INFORMATION") OF THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE OR RESPONSIBLE TO THE OTHER FOR ANY TYPE OF INCIDENTAL, EXEMPLARY, SPECIAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST REVENUE, LOST PROFITS, REPLACEMENT GOODS, LOSS OF TECHNOLOGY, RIGHTS OR SERVICES, LOSS OF DATA, OR INTERRUPTION OR LOSS OF USE OF SERVICE OR EQUIPMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER ARISING UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE. FURTHER, NO CAUSE OF ACTION WHICH ACCRUED MORE THAN THREE (3) MONTHS PRIOR TO THE FILING OF A SUIT ALLEGING SUCH CAUSE OF ACTION MAY BE ASSERTED AGAINST OMNIPOTECH.

8.3 *Basis of the Bargain; Failure of Essential Purpose*. The parties agree that the limitations and exclusions of liability and disclaimers specified in this MSA represent the parties' agreement as to the allocation of risk between the parties in connection with OMNIPOTECH's obligations under this MSA and that such limitations, exclusions and disclaimers will survive and apply even if found to have failed of their essential purpose. The parties acknowledge that OMNIPOTECH has set its initial prices and entered into this MSA in reliance upon the limitations of liability, the disclaimers of warranties and damages, and payment via ACH set forth in this MSA, and that the same form an essential basis of the bargain between the parties.

ARTICLE 9 – INDEMNIFICATION

9.1 *Indemnification*. Each party will indemnify, defend and hold the other harmless from and against any and all costs, liabilities, losses, and expenses (including, but not limited to, reasonable attorneys' fees) (collectively, "*Losses*") resulting from any claim, suit, action, or proceeding (each, an "*Action*") brought by any third party against the other or its affiliates alleging (i) the infringement or misappropriation of any intellectual property right relating to the delivery or use of the Services (but excluding any infringement contributorily caused by the other party); (ii) personal injury caused by the negligence or willful misconduct of the other party; and (iii) any violation of or failure to comply with the Acceptable Use Policy.

9.2 *Notice*. Each party's indemnification obligations under this MSA shall be subject to (i) receiving prompt written notice of the existence of any Action; (ii) being able to, at its option, control the defense of such Action; (iii) permitting the indemnified party to participate in the defense of any Action; and (iv) receiving full cooperation of the indemnified party in the defense thereof.

ARTICLE 10 – TERMINATION

10.1 *Termination For Cause*. Either party may terminate this MSA, effective as of the date specified in written notice of termination provided to the other party, if: (i) the other party breaches any material term or condition of this MSA and fails to cure such breach within thirty (30) days after receipt of written notice of the same, except in the case of failure to pay fees, which must be cured within five (5) calendar days after receipt of written notice from OMNIPOTECH; (ii) the other party becomes the subject of a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors; or (iii) the other party becomes the subject of an involuntary petition in bankruptcy or any involuntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, if such petition or proceeding is not dismissed within sixty calendar (60) days of filing.

10.2 *Termination on Expiration of all Services*. Either party may terminate this MSA, effective as of the date specified in written notice of termination provided to the other party, if all Services have been terminated in accordance with the procedures in Section 2.2(b) or if no Order Forms are in effect.

10.3 *No Liability for Termination*. Neither party will be liable to the other for any termination or expiration of any Service or this MSA in accordance with its terms.

10.4 *Effect of Termination*. Upon the effective date of termination of this MSA:

(a) OMNIPOTECH will immediately cease providing the Services;

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

(b) any and all payment obligations of Client under this MSA for Services provided through the date of termination will immediately become due. A termination notice is invalid if a past due balance exists; therefore, the Client must bring the account balance to zero in order to submit a termination notification. A termination notification by Client other than a 'for cause' termination will be invalid unless full payment of all outstanding invoices, and future services to be provided through the termination date, is received by OMNIPOTECH within ten calendar (10) days of Client's termination notification.

(c) within ten calendar (10) days of such termination, each party will return all Confidential Information of the other party in its possession and will not make or retain any copies of such Confidential Information except as required to comply with any applicable legal or accounting record keeping requirement; and

(d) Client will pay to OMNIPOTECH all expenses incurred by OMNIPOTECH to return Clients' Confidential Information, including, but not limited to, labor costs and the cost of storage media. OMNIPOTECH has the right to request payment of any and all invoices and unbilled services prior to the return of Clients' Confidential Information.

10.5   *Termination Assistance.*   Notwithstanding the provisions of Section 10.4, upon the termination of this MSA for any reason, OMNIPOTECH will provide to Client such termination assistance relating to the Services, at OMNIPOTECH's then current standard rates, as may be reasonably requested in writing by Client. OMNIPOTECH's obligation to provide assistance pursuant to this Section 10.5 is limited to a period of fifteen calendar (15) days (the "*Assistance Period*"). Client will pay OMNIPOTECH, on the first day of the Assistance Period and as a condition to OMNIPOTECH's obligation to provide termination assistance to Client during the Assistance Period, an amount equal to OMNIPOTECH's reasonable estimate of the total amount payable to OMNIPOTECH for such termination assistance for the Assistance Period.

10.6   *Continuation of Services.*   Notwithstanding the provisions of Section 10.4, Client shall have the option, exercisable upon termination, by delivery of written notice to OMNIPOTECH, to continue the Services and this MSA on a month-to-month basis after the termination date or the expiration date, as applicable, for the then applicable fees set forth in the Order Forms. Client shall have the right to have this MSA continue on a monthly basis pursuant to this Section 10.6 for up to three months.   If this MSA is terminated by OMNIPOTECH, the Client will pay OMNIPOTECH, on the first day of each month and as a condition to OMNIPOTECH's obligation to continue to provide the Services to Client during that month, an amount equal to OMNIPOTECH's reasonable estimate of the total amount payable to OMNIPOTECH for such Services for that month. No pro-rata or partial month services will be allowed.

10.7   *Survival.*   The following provisions will survive any expiration or termination of this MSA: Articles 3, 8, 9, 10 and 11 (excluding Section 11.2) and Sections 4.1, 4.2, and 5.4.

10.8   *Responsibilities of Client Upon Termination Notification.*   A termination notification by Client will be invalid unless full payment of all outstanding invoices, all unbilled products or services, all unpaid project payments including interest, the remaining contract value of the current term, and all future services to be provided through the termination date is received by OMNIPOTECH within ten calendar (10) days of Client's termination notification.

10.9   *Termination for Convenience.*   Client can terminate the contract with one hundred (100) calendar day's notice for any reason after the completion of the first initial term for each order form. In addition to all the provisions in Sections 10.4(a), 10.4(b), 10.4(c), and 10.4(d), Client herein agrees to pay the remaining contract value for all Services on each Order Form through the current term in which the termination request has been made. No pro-rata or partial month services will be allowed.

ARTICLE 11 – MISCELLANEOUS PROVISIONS

11.1   *Force Majeure.*   Except for the obligation to make payments, neither party will be liable for any failure or delay in its performance under this MSA due to any cause beyond its reasonable control, including, but not limited to, acts of war, acts of God, earthquake, flood, embargo, riot, sabotage, terrorism, labor shortage or dispute, governmental act or failure of the Internet (not resulting from the actions or inactions of OMNIPOTECH) (each a "*Force Majeure Event*"), provided that the delayed party: (a) gives the other party prompt notice of such cause, and (b) uses its reasonable commercial efforts to promptly correct such failure or delay in performance. If OMNIPOTECH is unable to provide Services for a period of thirty calendar (30) consecutive days as a result of a continuing Force Majeure Event, Client may cancel the Services and this MSA on written notice to OMNIPOTECH with no further payment obligation for the remaining monthly contract term under this MSA and all related Service Orders.   Such termination will be effective on the date specified in the written notice.

11.2   *No Lease; Agreement Subordinate to Master Lease.* This MSA is a services agreement and is not intended to and will not constitute a lease of any real property. Client acknowledges and agrees that (i) it has been granted only a license to use the OMNIPOTECH Data Centers in accordance with this MSA; (ii) Client has not been granted any real property interest in the OMNIPOTECH Data Centers; (iii) Client has no rights as a tenant or otherwise under any real property or landlord/tenant laws, regulations, or ordinances; (iv) this MSA, to the extent it involves the use of space leased by OMNIPOTECH, shall be subordinate to any lease between OMNIPOTECH and its landlords; and (v) the expiration or termination of any such lease shall terminate this MSA as to such property subject to Client retaining any rights or claims it may have against OMNIPOTECH arising from the expiration or termination of such lease. Client hereby waives and releases any claims or rights to make a claim that it may have against the landlords under any lease by OMNIPOTECH with respect to any equipment or property of Clients' located in the premises demised to OMNIPOTECH by such landlords.

11.3   *Marketing.*   Neither party will not use the name, trademark, service mark, logo, website address, and likeness of website on their own website, press releases, marketing and advertising materials.

11.4   *Government Regulations.*   Client will not export, re-export, transfer, or make available, whether directly or indirectly, any regulated item or information to anyone outside the U.S. in connection with this MSA without first complying with all export control laws and regulations which may be imposed by the U.S. Government and any country or organization of nations within whose jurisdiction Client operates or does business.

11.5   *Non-Solicitation.*   During the term of this MSA and continuing through the first anniversary of the termination of this MSA, Client agrees that it will not, and will ensure that its affiliates do not knowingly, directly or indirectly, solicit or attempt to solicit for employment any agent or employee of OMNIPOTECH, or any former OMNIPOTECH agent or employee within one hundred eighty three (183) calendar days of that agent or employee's termination or resignation from OMNIPOTECH. OMNIPOTECH will provide Client notification of any employee or agent terminated by OMNIPOTECH during the term of this MSA.

If employment begins with the Client or its affiliates occurs during the exclusion period, the parties hereby agree that OMNIPOTECH will be damaged, but that the amount of this damage will be difficult to ascertain. Accordingly, the parties agree that for each such agent, consultant or employee, directly or indirectly employed or utilized as an employee, consultant or independent contractor by Client within such period, Client will pay OMNIPOTECH three times the total annual cost of the employee, including the total value of benefits, taxes and other costs of $150,000 as liquidated damages or an amount equivalent to the sum of all products and services provided under the duration of this MSA, for all order forms, whichever is greater.

11.6 *No Third Party Beneficiaries.* OMNIPOTECH and Client agree that, except as otherwise expressly provided in this MSA, there shall be no third party beneficiaries to this MSA, including but not limited to the insurance providers for either party or the Clients of Client.

11.7 *Governing Law; Dispute Resolution.* This MSA and the rights and obligations of the parties created hereby will be governed by and construed in accordance with the internal laws of the State of Texas without regard to its conflict of law rules and specifically excluding from application to this MSA that law known as the United Nations Convention on the International Sale of Goods. The parties will endeavor to settle amicably by mutual discussions any disputes, differences, or claims whatsoever related to this MSA. Failing such amicable settlement, any controversy, claim, or dispute arising under or relating to this MSA, including the existence, validity, interpretation, performance, termination or breach thereof, shall finally be settled by informal or formal mediation. Should mediation efforts be unsuccessful, the parties may choose arbitration in accordance with the Arbitration Rules (and if Client is a non-U.S. entity, the International Arbitration Rules) of the American Arbitration Association ("AAA"). If arbitration is agreeable to both parties, there will be three (3) arbitrators (the "*Arbitration Tribunal*"), the first of which will be appointed by the claimant in its notice of arbitration, the second of which will be appointed by the respondent within thirty calendar (30) days of the appointment of the first arbitrator and the third of which will be jointly appointed by the party-appointed arbitrators within thirty calendar (30) days thereafter. The language of the arbitration shall be English. The Arbitration Tribunal will not have the authority to award punitive damages to either party. Each party shall bear its own expenses, but the parties will share equally the expenses of the Arbitration Tribunal and the AAA. This MSA will be enforceable, and any arbitration award will be final, and judgment thereon may be entered in any court of competent jurisdiction. The arbitration will be held in Houston, Texas, USA. Notwithstanding the foregoing, claims for preliminary injunctive relief, other pre-judgment remedies, and claims for Client's failure to pay for Services in accordance with this MSA may be brought in a state or federal court in the United States with jurisdiction over the subject matter and parties.

11.8 *Severability.* In the event any provision of this MSA is held by a tribunal of competent jurisdiction to be contrary to the law, the remaining provisions of this MSA will remain in full force and effect.

11.9 *Waiver.* The waiver of any breach or default, or the failure to exercise any right provided herein, will not constitute a waiver of any subsequent breach, default or right, and will not act to amend or negate the rights of the waiving or non-exercising party.

11.10 *Assignment.* Client may assign this MSA in whole as part of a corporate reorganization, consolidation, merger, sale of all or substantially all of its assets, or transaction or series of related transactions that results in the transfer of fifty percent (50%) or more of the outstanding voting power of Client. Client may not assign its rights

or delegate its duties under this MSA either in whole or in part without the prior written consent of OMNIPOTECH, and any attempted assignment or delegation without such consent will be void. OMNIPOTECH may assign this MSA in whole or part. OMNIPOTECH also may delegate the performance of certain Services to third parties, including OMNIPOTECH's wholly owned subsidiaries, provided OMNIPOTECH controls the delivery of such Services to Client and remains responsible to Client for the delivery of such Services. This MSA will bind and inure to the benefit of each party's successors and permitted assigns.

11.11 *Notice.* Any notice or communication required or permitted to be given under this MSA may be delivered by hand, deposited with an overnight courier, or mailed by registered or certified mail, return receipt requested, postage prepaid, in each case to the address of the receiving party as listed on the Order Form or at such other address as may hereafter be furnished in writing by either party to the other party. Such notice will be deemed to have been given as of the date it is delivered, mailed, or sent, whichever is earlier.

11.12 *Relationship of Parties.* OMNIPOTECH and Client are independent contractors and this MSA will not establish any relationship of partnership, joint venture, employment, franchise or agency between OMNIPOTECH and Client. Neither OMNIPOTECH nor Client will have the power to bind the other or incur obligations on the other's behalf without the other's prior written consent, except as otherwise expressly provided in this MSA.

11.13 *Article and Section Headings; Pronouns; Plural and Singular.* The article and section headings herein are for reference purposes only and shall not affect the meaning or interpretation of this MSA. References to a designated "Article" or "Section" refer to an Article or Section of this MSA unless otherwise specifically indicated. All pronouns used in this MSA shall be construed as including both genders and the neuter. All capitalized defined terms used in this MSA are equally applicable to their singular and plural forms.

11.14 *Entire Agreement.* This MSA, including all documents incorporated herein by reference, constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all of the prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter of this MSA. Any additional or different terms in any Order Form or other response by Client, including purchase orders, shall be deemed objected to by OMNIPOTECH without need of further notice of objection, and shall be of no effect or in any way binding upon OMNIPOTECH.

11.15 *Counterparts and Originals.* This MSA may be executed in counterparts, which together shall constitute a single agreement. Delivery by telephonic facsimile transmission or digital delivery of a signed counterpart of this MSA shall be effective as delivery of a manually signed counterpart. Once signed, any reproduction of this MSA made by reliable means (e.g., photocopy, facsimile) is considered an original.

11.16 *Amendments.* This MSA may be amended or changed only by a written document signed by authorized representatives of OMNIPOTECH and Client in accordance with this Section 11.16.

11.17 *Interpretation of Conflicting Terms.* In the event of a conflict between or among the terms in this MSA, the Service Level Agreements, the Order Forms, Statements of Work and any other document made a part hereof, the documents shall control in the following order: the Order Form with the latest date, Statements of Work, the Service Level Agreements, this MSA and other documents.

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA

The undersigned affirms that they have the authority to enter into this agreement on behalf of the Client and agrees that the OMNIPOTECH Rate Schedule, Master Services Agreement, Network Service Level Agreement, Order Form(s), and Acceptable Use Policy are incorporated herein. Authorized representatives of Client and OMNIPOTECH have read the documents listed above and agree and accept such terms effective as of the date first referenced below.

| CLIENT: | BENDCO INC | OMNIPOTECH, Ltd. | |
|---|---|---|---|
| Signature: | _Kelly Hatcher_ | Signature: | _Robert D Kyslinger_ |
| Print Name: | Kelly Hatcher | Print Name: | Robert D. Kyslinger |
| Title: | CONTROLLER | Title: | Managing General Partner |
| Date: | 7/28/2015 \| 11:12:26 CT | Date: | 7/28/2015 \| 11:15:21 CT |

# Master Services Agreement
## Schedule 1.0 - Definitions

The following defined terms are equally applicable in their singular and plural forms:

(1) "Client Registration Form" means the list that contains the names and contact information (e.g. pager, email and telephone numbers) of Client and the individuals authorized by Client to enter the OMNIPOTECH Data Centers or access Client equipment with administrative or modify credentials, as delivered by Client to OMNIPOTECH and amended in writing from time to time by Client.

(2) "Client Technology" means Client's proprietary technology, including Client's Internet operations design, content, software tools, hardware designs, algorithms, software (in source and object forms), user interface designs, architecture, class libraries, objects and documentation (both printed and electronic), know-how, trade secrets and any related intellectual property rights throughout the world (whether owned by Client or licensed to Client from a third party) and also including any derivatives, improvements, enhancements or extensions of Client Technology conceived, reduced to practice, or developed during the term of this MSA by Client.

(3) "Initial Term" means the minimum term for which OMNIPOTECH will provide the Services to Client, as indicated on the Order Forms.

(4) "Notice of Service Commencement" means the written notice delivered by OMNIPOTECH to Client indicating the Service Commencement Date.

(5) "Order Form" means any of the forms specifying the Services, and the term and prices of such Services, to be provided by OMNIPOTECH to Client that are submitted by Client and accepted by OMNIPOTECH.

(6) "Professional Services" means any non-standard professional or consulting service provided by OMNIPOTECH to Client as more fully described in a Statement of Work.

(7) "Renewal Term" means any service term following the Initial Term, as specified in Section 2.2 of the MSA.

(8) "Representatives" mean the individuals identified in writing on the Client Registration Form and authorized by Client to enter the OMNIPOTECH Data Centers or access Client equipment with administrative or modify credentials.

(9) "Acceptable Use Policy" means the SunGard general Acceptable Use Policy governing Client's use of Services, including, but not limited to, online conduct, and the obligations of Client and its Representatives in the OMNIPOTECH Data Centers.

(10) "Services" means the specific services provided by OMNIPOTECH as described on the Service Order Forms.

(11) "Service Commencement Date" means the date OMNIPOTECH will begin providing the Services to Client, as indicated in a Notice of Service Commencement delivered by OMNIPOTECH to Client.

(12) "Service Level Agreement" is the detailed definition of service levels that OMNIPOTECH will provide to Client for a specific Service.

(13) "Service Level Warranty" is described and defined in Section 5.2 of the MSA.

(14) "Statement of Work" means the detailed descriptions of the Professional Services attached to Order Forms.

(15) "OMNIPOTECH Data Center" means any of the facilities used by OMNIPOTECH to provide the Services.

(16) "OMNIPOTECH Technology" means OMNIPOTECH's proprietary technology, including OMNIPOTECH Services, software tools, hardware designs, algorithms, software (in source and object forms), user interface designs, architecture, class libraries, objects and documentation (both printed and electronic), network designs, know-how, trade secrets and any related intellectual property rights throughout the world (whether owned by OMNIPOTECH or licensed to OMNIPOTECH from a third party) and also including any derivatives, improvements, enhancements or extensions of OMNIPOTECH Technology conceived, reduced to practice, or developed during the term of this MSA by either party that are not uniquely applicable to Client or that have general applicability in the art.

(17) The terms "written" and "in writing" mean anything reduced to a tangible form by a party, including a printed, photocopy, facsimile or hand written document but excluding email or other electronic formats.

(18) "Business Period" means 8:00AM to 5:00PM Central Standard Time, Monday-Friday excluding holidays as defined in "Holiday Period".

(19) "After-Hours Period" means 5:01PM to 7:59AM Central Standard Time, Monday-Friday excluding holidays as defined in "Holiday Period".

(20) "Weekend Period" means any Saturday or Sunday, Central Standard Time excluding holidays as defined in "Holiday Period".

(21) "Holiday Period" means New Year's Eve and New Year's Day, Easter, Memorial Day, Independence Day, Labor Day, Thanksgiving and the day after Thanksgiving, Christmas Eve and Christmas Day.

(22) "Base Rate" means the discounted hourly rate for work performed during the Business Period calculated in 15 minute increments with a 1 hour minimum charge for on-site service visits.

(23) "After-Hours Rate" means the standard hourly rate for work performed during the After-Hours Period with a 2 hours minimum charge.

(24) "Weekend Rate" means the standard hourly rate for work performed during the "Weekend Period" calculated portal-to-portal with a 4 hours minimum charge.

(25) "Holiday Rate" means the standard hourly rate for work performed during the "Holiday Period" calculated portal-to-portal with an 8 hours minimum charge.

(26) "Overage Rate" means the standard hourly rate for work performed during the "Business Period" for any time which exceeds the contracted amount for Retained Services.

DocuSign Envelope ID: 8F362663-3B24-463C-9CB5-F70D7DD190CA



**Network Service Level Agreement for**

**CLIENT:**     BENDCO INC



This Service Level Agreement (the "SLA") between OMNIPOTECH, Ltd. ("*OMNIPOTECH*") and ("*Client*") is entered into pursuant to Master Services Agreement ("*MSA*") between OMNIPOTECH and the Client. Capitalized terms used in this SLA and not otherwise defined below shall have the meanings given to them in the MSA.

**A. Purpose and Scope**
The purpose of this SLA is to define managed network service levels and operational specifications that OMNIPOTECH will provide to Client for datacenter services.   Specifics as to the Service(s) (the "*Services*") to be provided to the Client are set forth in the Order Form, which is incorporated into and made a part hereof.

**B. Service Levels**
*B.1 Managed Network*
OMNIPOTECH Managed Network environments consist of LAN and WAN infrastructures for the datacenter.   OMNIPOTECH Managed Network environments will be available on a 7 (day) x 24 (hour) x 52 (week) basis, except for Scheduled Outages. OMNIPOTECH Managed Network environments are designed with robust architectures and production system disciplines to ensure maximum performance and availability.  OMNIPOTECH will continuously employ network monitoring techniques to track performance levels of network components and systems. Network latency will be measured by averaging sample measurements taken every five (5) minutes during a calendar month between WAN nodes for WAN performance and between LAN nodes for LAN performance. Latency measurements will be total round trip durations in milliseconds (ms) of network transmissions. Availability will be calculated monthly using total actual minutes available divided by total possible minutes available. Availability calculations will exclude Scheduled Outages for maintenance and similar scheduled downtime. Performance measurements will exclude Client's collocated network equipment, Client's dedicated connectivity solutions, and Client Premise Equipment (CPE).  OMNIPOTECH will, at OMNIPOTECH expense, upgrade or improve capacity and performance levels within OMNIPOTECH Managed Network environments as OMNIPOTECH, through reasonable commercial judgment, determines improvements are warranted and necessary for availability and performance attainment.   All Managed Network modifications will follow the established change management practices described in this SLA.

OMNIPOTECH's performance levels for Managed Network availability and latency are as follows:

| LAN Performance | |
|---|---|
| Latency | Availability |
| ≤ 80 ms | > 99.00% |

| WAN Performance | | | |
|---|---|---|---|
| Public Network | VPN | Private Network | |
| Latency | Latency | Latency | Avail. |
| ≤ 200 ms | ≤ 160 ms | ≤ 120 ms | > 99.00% |

**C. Remedy**
*C.1 Remedies*
In the event that, as a direct result of OMNIPOTECH's actions or inactions, the Service levels provided by OMNIPOTECH fail to meet the specified performance levels stated above, as the sole and exclusive

remedy hereunder, Client shall receive a Service credit equal to 50% of the Daily Fee for the affected service for the affected month in accordance with the Order Form for the Service.

Such Service credit(s) shall be deemed to be liquidated damages. This credit will be in the form of a cash payment if this SLA has expired or if it has otherwise been terminated in accordance with the provisions of the MSA.

*C.2 Exceptions*
OMNIPOTECH will have no liability for any failure to provide Services (a) during any Scheduled Outage, (b) resulting from a Force Majeure Event, or (c) caused, directly or indirectly, by the acts or omissions of Client or its employees, agents, contractors or representatives or by Client's or its employees', agents', contractors' or representatives' equipment, or (d) caused by any outage to the datacenter network, circuits or equipment, or any circuits or equipment terminating at the Client or between the two parties.

Without limiting the foregoing, OMNIPOTECH is not responsible for acts or omissions of Client or its employees, agents, contractors or representatives that result in failure of, or disruption to, the Services. Client agrees that neither Client nor its employees, agents, contractors or representatives shall attempt in any way to circumvent or otherwise interfere with any security precautions or measures of OMNIPOTECH relating to the OMNIPOTECH Data Centers or any other OMNIPOTECH equipment. Any such attempts may, among other things, cause disruption to the Services. Any disruption to the Services resulting from a violation of these provisions shall not be an Unscheduled Outage and Client will have no right to any Service credit or other remedy under this SLA or otherwise with respect to such disruption.   Client will be responsible for, and will indemnify OMNIPOTECH for, any damage or service interruptions caused by Client or its employees, agents, contractors or representatives in violation of these provisions, including, without limitation, any damage to any OMNIPOTECH provided equipment. Further, the Client will pay OMNIPOTECH, at OMNIPOTECH's then current rates, for all remedial services resulting from the Client's actions.

*C.3 Termination for Chronic Problems*
The conditions warranting termination of Services applicable to this SLA, as specified on the Order Form, are as follows:

a) OMNIPOTECH's failure to provide Service credits owed to Client, as specified in the Remedy provision of this SLA, for two (2) consecutive months.
b) OMNIPOTECH's failure to achieve SLA specified performance for three (3) consecutive months.

Client must provide OMNIPOTECH written notice of termination for Chronic Problems and such termination will be effective upon thirty (30) days written notice to OMNIPOTECH.

**D. Service Level Change Request Procedures**
Either party may request changes to this SLA at any time.  Since a change could affect the fees, schedules or other terms related to this SLA or the MSA, both the Client and OMNIPOTECH must approve each change, and this SLA and/or the MSA must be appropriately amended before implementation of any change.  The change request procedure is as follows:

a)  The project manager for the requesting party will submit a change request ("CR") in writing. It will describe the change and include whatever rationale and/or estimated effect the change will have on the SLA and/or the MSA.

b)  The other party's project manager will review each CR. The project manager will weigh the merits of the proposed change and approve it for investigation or reject it. If rejected, the project manager will return the CR to the requesting party, together with the reason(s) for rejection.

c)  Approval of a CR for investigation by both parties constitutes authorization by the Client of any fee proposed by OMNIPOTECH to investigate the CR. During such investigation, the effect on the Monthly Fee, Service Term or other terms of this SLA will be determined.  Following completion of such investigation, the requested change will then be approved or disapproved for implementation.

d)  Approved changes will be incorporated into this SLA or the MSA through written modifications, which shall be signed by duly authorized representatives of both parties

**E. Change Management**

The Client will be provided at least three calendar (3) days prior written notice of any changes to be made by OMNIPOTECH that affect the Services. However, if a shorter notification period is required, changes will be made with the agreement of the Client.  OMNIPOTECH will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, OMNIPOTECH will use best reasonable efforts to minimize the impact of the change and schedule the outage based upon the Client's and OMNIPOTECH's requirements. If an outage is required, such outage will be considered a Scheduled Outage. OMNIPOTECH intends to work with the Client on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA.  OMNIPOTECH reserves the right, however, to proceed with any change if it is determined, by OMNIPOTECH, that the change will not cause harm to the Client's specific environment and/or is otherwise necessary. Client is required to provide prior notification to OMNIPOTECH of any changes to its configurations that interface with the provided Services.  If necessary, OMNIPOTECH will provide a representative to work with the Client to address any issues that arise during the Client's configuration changes.

**F. Event Notification**

OMNIPOTECH shall provide initial notice to a designated Client's representative by telephone, e-mail, pager or comparable notification service within four (4) hours of OMNIPOTECH becoming aware of an event that has caused or may cause an Unscheduled Outage.  In the event Client first becomes aware of such event, Client shall promptly provide initial notice to OMNIPOTECH via phone at 281-768-4800 or the support procedures listed at http://www.omnipotech.com.  Status reports about the event will continue on the hour until either the event has been resolved or both OMNIPOTECH and the Client have determined a course of action that does not require continued notification.

**G. Definitions**

Underline LAN (Local Area Network):  Those network components and facilities that are installed within OMNIPOTECH Data Centers providing local connectivity to installed equipment, and that are owned and managed by the OMNIPOTECH Operations Group and made available to subscribers of OMNIPOTECH services.

Managed Network:  The system of LAN and WAN environments utilized by OMNIPOTECH Data Centers.

Monthly Fee:  The monthly fee for a Service as set forth in the Order Form for that Service.

Scheduled Outages:  Periods of time, during the Service Term, that OMNIPOTECH temporarily interrupts any Services for upgrades, maintenance, or for any other agreed upon reason or purpose, including an established framework for scheduling and managing such outages.

Service Term:  The minimum term for which OMNIPOTECH will provide the Service to Client as set forth in the Order Form for that Service.

Unscheduled Outages:  Interruptions in Services arising from failures associated with Services provided by OMNIPOTECH or a Force Majeure Event.  Such interruptions include only interruptions caused by matters under OMNIPOTECH direct control and do not include Scheduled Outages.

OMNIPOTECH Operations Group:  The OMNIPOTECH Operations Group, responsible for the daily delivery and management of Services provided to the Client.

WAN (Wide Area Network):  Those network components and facilities that are installed at the boundaries of OMNIPOTECH Data Centers providing connectivity to external or remote networks and made available to subscribers of OMNIPOTECH services.  Any connectivity owned by Client is excluded from this WAN definition and is the sole responsibility of the respective telecom provider.

---

The undersigned affirms that they have the authority to enter into this agreement on behalf of the Client and agrees that the OMNIPOTECH Rate Schedule, Master Services Agreement, Network Service Level Agreement, Order Form(s), and Acceptable Use Policy are incorporated herein. Authorized representatives of Client and OMNIPOTECH have read the documents listed above and agree and accept such terms effective as of the date first referenced below.

| | | |
|---|---|---|
| **CLIENT:** | BENDCO INC | **OMNIPOTECH, Ltd.** |
| Signature: | *Kelly Hatcher* | Signature: *Robert D Kyslinger* |
| Print Name: | Kelly Hatcher | Print Name:  Robert D. Kyslinger |
| Title: | CONTROLLER | Title:   Managing General Partner |
| Date: | 7/28/2015  \|  11:12:26 CT | Date:   7/28/2015  \|  11:15:21 CT |