ENTERED
06/25/2019

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | **CASE NO. 18-30849** |
| **BENDCO, INC.** | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |

| | | |
|---|---|---|
| In re: | § | |
| | § | **CASE NO. 19-32076** |
| **801 HOUSTON AVE PROPERTY LLC** | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |

## ORDER (I) GRANTING IN PART AND DENYING IN PART DEBTORS' EMERGENCY MOTION FOR ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND BREAKUP FEE; AND (B) SETTING SALE HEARING; (II) APPROVING AUCTION AND SALE OF DEBTORS' ASSETS; (III) APPROVING ASSET PURCHASE AGREEMENT WITH PASADENA PIPE BENDERS, LLC AND PASADENA HOLDCO, LLC; (IV) APPROVING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF DEBTORS FREE AND CLEAR OF LIENS AND ENCUMBRANCES; (V) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SALE; AND (VI) AUTHORIZING THE DEBTORS TO CONSUMMATE ALL TRANSACTIONS RELATED TO THE ABOVE
(Docket No. 156)

This matter came before the Court on June 17, 2019 (the "**Hearing**") in connection with *Debtors' Emergency Motion (A) Approving Asset Purchase Agreement and Breakup Fee; and (B) setting Sale Hearing (Docket no. 156)* (the "**Motion**"). After considering the Motion, documents filed in support of the Motion, the Exhibits to the Motion, and the arguments of counsel at the Hearing; and after conducting an auction in Court with the consent of all parties attending the Hearing; and the Court having determined that (i) certain relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and parties in interest; and (ii) the legal and factual bases set forth in the Motion and the arguments of counsel at the Hearing, and the auction conducted at the Hearing by agreement of the parties, establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY FOUND AND DETERMINED:

A.      The Court has jurisdiction to hear and determine the propriety of entering this Order

1

pursuant to 28 U.S.C. §1334.  Venue of this proceeding in this district is proper pursuant to 28 U.S.C. § 1409.  The Motion and Hearing constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2), as well as sections 105, 363 and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, and 6006.

B.   The Debtors provided notice of the Motion and Hearing which under the circumstances of this case and pursuant to Bankruptcy Rule 2002(a)(2) was proper, timely, adequate and sufficient, and in accordance with the various provisions of the United States Bankruptcy Code, 11 U.S.C. §§101-1530, as amended (the "**Bankruptcy Code**"), the Bankruptcy Rules (including without limitation 2002, 6004, and 6006), the local rules of this Court, and all requirements of procedural due process, and the notice provided by the Debtors is all that was reasonably practicable under the circumstances.  No other notice is or shall be required.

C.   Capitalized terms which are not otherwise defined in this Order shall have the same meaning as set out in the Asset Purchase Agreement attached to this Order ("**APA**").

D.   The sale of the Acquired Assets to Buyers[1] in accordance with the APA, and the assumption/assignment of the Assumed Contracts, is an appropriate exercise of the Debtors' business judgment, and is in the best interests of the Debtors and their estates. After taking into account all factors, the APA and attendant highest cash auction bid for $3,050,000.00, together with all purchase terms contained in the APA, represents the highest and best offer for the Acquired Assets.

E.   Good, sufficient, and sound business justification exists, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, for the sale of the Acquired Assets (including the assumption, assignment and sale of the Assumed Contracts) to Buyers.

F.   The sale of the Acquired Assets is duly authorized pursuant to sections 363(b)(l) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  As demonstrated by (i) the representations of counsel made on the record at the Hearing, and (ii) the entire record in this case, the Debtors have marketed the Acquired Assets and conducted all aspects of the sale process at arms' length, in good faith, and in compliance with applicable law.  The marketing process undertaken by the Debtors and their professionals with respect to the Acquired Assets has been adequate, appropriate, and reasonably calculated to maximize value for the benefit of all stakeholders.  The sale process (which culminated in a live auction in this Court during the Hearing) was conducted in a diligent, non-collusive, fair, and good faith manner.  The APA, including the highest cash auction bid for $3,050,000.00, constitutes the highest and best offer for the Acquired Assets.

G.   The Debtors, through Rick Friery, (i) have full corporate power and authority to execute the APA and all documents necessary to effectuate the sale of the Acquired Assets, and the sale of the Acquired Assets by the Debtors to the Buyers has been duly and validly authorized by all necessary corporate action, (ii) have all of the corporate power and

---

[1] The Buyers are Pasadena Pipe Benders, LLC and Pasadena Holdco, LLC.

authority necessary to consummate the sale of the Acquired Assets and all transactions contemplated by the APA, (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtors of the sale of the Acquired Assets and all transactions contemplated thereby, and (iv) require no consents or approvals that have not been obtained, other than the Court's entry of this Order and those expressly provided for in the APA to consummate such transactions. Neither the execution and delivery of the APA nor the consummation by Debtors of the transactions contemplated thereby will constitute any violation or breach of or conflict with: (a) the Certificate of Incorporation or By-Laws of Debtors; or (b) any law applicable to the Acquired Assets.

H.      Approval of the APA and consummation of the sale and related transactions provided for in the APA and in this Order are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

I.      The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications, and (ii) compelling circumstances for this Court to approve the APA and consummation of the sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code prior to and outside of a plan of reorganization because the Debtors cannot sustain their operations much longer, and this likely is the last opportunity for the Debtors to receive market value for the Acquired Assets.

J.      The APA was negotiated, proposed, and entered into by the Debtors and the Buyers without collusion, in good faith, and on an arms-length basis. The Buyers are third party purchasers with no affiliations with the Debtors or their estates. Neither the Debtors, nor the Buyers, nor any affiliate of the Buyers has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.

K.      Each of the Buyers is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

L.      Each of the Buyers is not an "insider" of any of the Debtors, as that term is defined in section 101 (31) of the Bankruptcy Code.

M.      The consideration provided by the Buyers for the Acquired Assets pursuant to the APA is (a) reasonably equivalent value under the Bankruptcy Code and any Uniform Fraudulent Transfer Act, including the Texas Uniform Fraudulent Transfer Act, (b) fair consideration under any Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, fair salable value, and fair value under any such laws as applicable or any other applicable laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

N.      As of the Closing, pursuant and subject to the terms of the APA, the transfer of the Acquired Assets and the sale of the Acquired Assets will effect a legal, valid, enforceable, and effective transfer of the Acquired Assets and will vest the Buyers with all of the

Debtors' right, title, and interest in the Acquired Assets, free and clear of all Liens[2], claims, encumbrances, and other interests of any kind or nature whatsoever,

O.     The Buyers would not have entered into the APA and would not have consummated the sale of the Acquired Assets, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Acquired Assets to the Buyers was not free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever.

P.     The Debtors may sell the Acquired Assets free and clear of all Liens, claims, and other interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. All parties in interest, including, without limitation, any holders of Liens, claims, encumbrances, and other interests, that did not object, or who withdrew their objection, to the sale of the Acquired Assets or the Motion have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code. Additionally, the provisions of Section 363(f) of the Bankruptcy Code have been satisfied, because (i) pursuant to § 363(f)(2), Bank of America, N.A. (the "**Bank**") consents to entry of this Order subject to the indefeasible payment to the Bank at Closing of $2,200,000.00 from the Purchase Price Proceeds[3]; (ii) non-bankruptcy law (including without limitation foreclosure law) permits the sale of such property free and clear under Section 363(f)(1); and (iii) the parties could be compelled to accept money satisfaction of such interests under Section 363(f)(5).

Q.     Neither the Buyers nor any of their affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Buyers nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the APA or in this Order.

R.     USA Bending, LLC and Houston Avenue Holdings, LLC have jointly earned a break-up fee in the total amount of $250,000.00 (the "**Break-Up Fee**") to be paid at Closing from the Purchase Price by the title company handling the Closing (the "**Title Company**"). Further, USA Bending, LLC and Houston Avenue Holdings, LLC are approved as the back-up buyer (the "**Back-Up Buyer**") with a cash bid of $2,950,000.00, to purchase the Acquired Assets in the event the Buyer's purchase does not close by July 3, 2019.

---

[2] "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

[3] The Purchase Price Proceeds less reasonable and customary closing costs are referred to herein as the "Net Purchase Price Proceeds." Also, the Bank asserts that its debt is not satisfied in full by the payment at closing of $2,200,000.00. The Bank's liens attaches to the remaining Net Purchase Price Proceeds, subject to further Order of the Court.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is GRANTED only to the extent provided for in this Order. In all other respects to the Motion is DENIED.

## Approval of APA

2.    The APA, including all of the terms and conditions thereof, is hereby approved.

3.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and directed to perform their obligations under, and comply with, the terms of the APA, and consummate the sale of the Acquired Assets and related transactions, pursuant to and in accordance with the terms and conditions of the APA and this Order. The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any reasonable expenses or costs (exclusive of professional fees subject to approval by the Court) that are required to be paid in order to consummate the transactions contemplated by the APA or perform their obligations under the APA.

4.    The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the APA, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be reasonably requested by the Buyers for the purpose of assigning, transferring, granting, conveying and conferring to the Buyers or reducing to possession, the Acquired Assets and the Assumed Contracts, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA. Rick Friery is hereby authorized and directed, to approve and sign on behalf of Debtors and their estates, all documents in connection with the sale of the Acquired Assets and to take, in his sole reasonable discretion, all actions necessary, required or appropriate to consummate such sale on behalf of the Debtors and their estates, and such documents and actions are binding on the Debtors and their estates without any further additional corporate actions or approvals.

5.    This Order and the APA shall be binding in all respects upon the Debtors and their estates, successors, and assigns, all creditors of and equity holders in any Debtor, and any and all other parties in interest; including, without limitation, any and all holders of Liens, claims, encumbrances, and other interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever in the Acquired Assets, and any trustee or successor trustee appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code. The APA and the sale of Acquired Assets and all related transactions are not subject to rejection or avoidance (whether through any avoidance or recovery, claim, action, or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal Law or any other cause of action) by the Debtors, any chapter 7 or chapter 11 trustee of the Debtors' bankruptcy estates or any other person or entity. The APA, this Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these or any subsequent bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without

the prior written consent of the Buyers.   Nothing contained in any chapter 11 plan confirmed in these or any subsequent chapter 11 cases or the confirmation order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the APA or this Order.

6.      The terms of the APA and any ancillary agreements may be waived, modified, amended, or supplemented by the written and signed agreement of the Debtors and the Buyers without further action of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material or is not adverse to the Debtors' estates.

### Transfer of the Acquired Assets

7.      Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities (as defined in section 101(15) of the Bankruptcy Code), including, but not limited to, all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, creditors holding Liens or claims of any kind or nature whatsoever against or in the Debtors or any of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing or the transfer of the Acquired Assets to the Buyers, hereby are forever barred, estopped, and permanently enjoined from asserting any Liens or claims of any kind or nature whatsoever against the Buyers and its successors, designees, assigns, or property, or the Acquired Assets conveyed in accordance with the APA.

8.      The transfer of the Acquired Assets to the Buyers pursuant to the APA shall constitute a legal, valid, and effective transfer of the Acquired Assets on the Closing, and shall vest the Buyers with all of the Debtors' rights, title, and interests in the Acquired Assets free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever.

9.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens,* or other documents or agreements evidencing Liens in the Acquired Assets conveyed pursuant to the APA and this Order has not delivered to the Debtors, prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the person or entity has with respect to the Acquired Assets or otherwise, then (a) the Debtors or the Title Company closing the sale of the Acquired Assets are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets, and (b) the Buyers are hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Acquired Assets of any kind or nature whatsoever.

10.     All liens on the Acquired Assets shall attach to the Net Purchase Price Proceeds in the same order of priority as existed prior to the sale, and will be paid from the Net Purchase Price

Proceeds as provided by further Court Order (to the extent not provided for in this Order). The Bank shall be paid $2,200,000.00 at Closing from the Net Purchase Price Proceeds, without prejudice to the Bank's claim to the remaining Net Purchase Price Proceeds, and without prejudice to the Debtor's right to object to the Bank's claim to all or part of the remaining Net Purchase Price Proceeds.

## Additional Provisions

11.    This Order (a) shall be effective as a determination that, upon the Closing, all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, foreign, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Acquired Assets.

12.    The APA has been negotiated and entered into with the Buyers at arm's length and in good faith and the Buyers are good faith purchasers of the Acquired Assets as that term is used in section 363(m) of the Bankruptcy Code. The Buyers are hereby granted the protections of a good faith purchaser under 11 U.S.C. § 363(m). The consideration provided by Buyers for the sale of the Acquired Assets is fair and reasonable and the sale may not be avoided under section 363(n) of the Bankruptcy Code.

13.    Any amounts that become payable by the Debtors to the Buyers pursuant to the APA and any related agreements executed in connection therewith shall (a) be entitled to administrative expense claim status under sections 503(b)(l)(A) and 507(a)(2) of the Bankruptcy Code; (b) not be subordinate to any other administrative expense claim against the Debtors, except for Court approved professional fees (for clarity, any amounts payable to Buyers described in this numbered paragraph 13 are subordinate to Court approved professional fees), (c) not be altered, amended, discharged or affected by any chapter 11 plan proposed or confirmed in these chapter 11 cases without the prior written consent of the Buyers, (d) be paid by the Debtors in the time and manner provided for in the APA without further order of this Court, and (e) not be subject to any bar date in these chapter 11 cases or any requirement to file any request for allowance of administrative claim or proof of claim.

14.    At any time prior to the Closing, Buyers may assign the APA or its rights thereunder to one or more of its affiliates, which shall be entitled to assume and accede to the APA and to purchase and acquire any or all of the Acquired Assets in lieu of Buyers, and such affiliate(s) shall be deemed to be Buyers for all purposes under this Order.

15.    Neither the Buyers nor any of their affiliates are or shall be deemed, as a result of the consummation of the sale contemplated herein, to: (a) be legal successors to the Debtors

or their estates by reason of any theory of law or equity, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect. Except as expressly permitted or otherwise specifically provided for in the APA or this Order, neither the Buyers nor any of their affiliates shall (i) assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates or (ii) have any liability or responsibility for any liability or other obligation of the Debtors' arising under or related to the Acquired Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, the Buyers and their affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Buyers and their affiliates shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of warranty, product liability, environmental, successor or transferee liability, labor law, *de facto* merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing.

16. This Court retains jurisdiction to enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Acquired Assets or performance of other obligations owed to the Buyers; (b) resolve any disputes arising under or related to the APA, except as otherwise provided therein; (c) interpret, implement, and enforce the provisions of this Order; and (d) protect the Buyers and their affiliates against (i) any Liens against the Debtors or the Acquired Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Acquired Assets that may be in their possession.

17. The stay of this Order provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby lifted to allow for the Closing of the sale of the Acquired Assets to occur immediately or thereafter; and notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any entity obtaining a stay pending appeal, the Debtors and the Buyers are free to close the sale under the APA and this Order in accordance with its terms at any time.

18. To the extent of any conflict between the APA and this Order, the terms and provisions of this Order shall govern. The failure to specifically reference any particular provisions of the APA or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

19. Buyers have provided adequate assurance of their future performance under the Assumed Contracts, specifically Buyers are strong financially and are committed to the underlying business, and the assumption, assignment and sale of the Assumed Contracts satisfy the

requirements of sections 363, 365(b)(1) and (f) of the Bankruptcy Code, as applicable.

20.  The Buyers shall serve a copy of this Order on all non-debtor parties to the Assumed Contracts. Such non-debtor parties shall have five (5) days from the date of such service to file a notice of cure amount specifying any and all monetary arrearages owed under their Assumed Contracts. Any non-debtor party to an Assumed Contract that fails to timely file such a notice shall not be entitled to any cure payments or damages claims arising from the assumption and assignment, and shall be forever barred from asserting any such claims or damages for pre-assumption amounts against the Debtors, the Buyers, or the bankruptcy estate. Any dispute over alleged cure amounts shall be decided by this Court. At any time prior to Closing Buyers may delete any contract or lease from the list of Assumed Contracts.

21.  The failure specifically to include any particular provisions of the APA or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA is approved in its entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing Date. The APA and all of its terms are incorporated herein by reference.

22.  The ad valorem tax liens of Harris County and Pasadena ISD for years prior to 2019 shall be paid at Closing in amounts as ultimately determined by such taxing authorities or by this Court.

23.  The ad valorem tax liens of Harris County for the 2019 tax year are hereby expressly retained against the Acquired Assets until payment is made to fully satisfy the 2019 ad valorem taxes, and any penalties or interest which may ultimately accrue to those 2019 taxes.

24.  The ad valorem tax liens of Pasadena ISD for the 2019 tax year are hereby expressly retained against the respective Acquired Assets until payment is made to fully satisfy the 2019 ad valorem taxes, and any penalties or interest which may ultimately accrue to those 2019 taxes.

25.  The provisions of this Order are nonseverable and mutually dependent. Further, any actions taken pursuant to this Order shall survive entry of any order dismissing the Debtors' cases.

26.  This Order shall be binding upon, and shall inure to the benefit of, all creditors, equity interest holders, and parties in interest, the Parties and their respective successors and assigns.

27.  The Break-Up Fee is approved. At Closing, USA Bending, LLC and Houston Avenue Holdings, LLC shall jointly be paid (by the Title Company and from the Purchase Price Proceeds) the Break-Up Fee of $250,000.00 as a closing cost.

28.  If the Closing of the sale to the Buyers does not occur on or before July 3, 2019, then the Debtor shall sell to the Back-Up Buyer pursuant to the Asset Purchase Agreement attached

to Docket No. 156, and all references in this Order to "Buyers" shall then apply to the Back-Up Buyer, and all references in this Order to the APA shall then apply to the Asset Purchase Agreement attached to Docket No. 156.

29.     In exchange for Ascentium Capital LLC ("**Ascentium**") (a) not exercising its rights with respect to that certain Akyapak AK BEND Hydraulic Section Bending Machine, Model APK-300 that is the subject of a lift stay Order entered May 16, 2018 appearing at Docket No. 48 (the "**Ascentium Equipment**"),  and (b) agreeing to include the Ascentium Equipment in the Acquired Assets, Buyers shall pay Ascentium at Closing $125,000.00. Such $125,000.00 is in addition to the Purchase Price.  The Acquired Assets include the Ascentium Equipment.

SO ORDERED.

   **Signed:  June 20, 2019**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

(SIGNATURES CONTINUED ON NEXT PAGE)

**APPROVED AS TO FORM AND SUBSTANCE**

FUQUA & ASSOCIATES, PC

/s/ *Richard L. Fuqua*
Richard L. Fuqua
Texas Bar No. 07552300
5005 Riverway, Suite 250
Houston, Texas  77056
(713) 960-0277 Telephone
(713) 960-1064 Facsimile
RLFuqua@fuqualegal.com

Attorneys for Debtors Bendco, Inc.
and 801 Houston Ave Property, LLC


WADDELL JENEVEIN, P.C.

/s/ *Richard G. Dafoe*
Richard G. Dafoe
State Bar No. 05309500
Vincent Serafino Geary
1601 Elm Street, Suite 4100
Dallas, Texas  75201
(214) 979-7427 Telephone
(214) 979-7402 Facsimile
rdafoe@vinlaw.com

Attorneys for Bank of America, N.A.


JACKSON WALKER LLP

/s/ *Bruce J. Ruzinsky*
Bruce J. Ruzinsky
Texas Bar No. 17469425
1401 McKinney, Suite 1900
Houston, Texas  77010
(713) 752-4204 Telephone
(713) 308-4155 Facsimile
bruzinsky@jw.com

Attorneys for Wolfcreek Group, LLC,
Pasadena Pipe Benders, LLC, and
Pasadena Holdco, LLC

**APPROVED AS TO FORM ONLY**

THE LAW OFFICES OF TOM KIRKENDALL

/s/ *Tom Kirkendall*
Tom Kirkendall
State Bar No. 11517300
2 Violetta Ct.
The Woodlands, Texas  77381-4550
(281) 364-9946 Telephone
(281) 582-0646 Facsimile
bigtkirk@kir.com

Attorneys for USA Bending, LLC and Houston
Avenue Holdings, LLC

**APPROVED (AS TO FORM AND SUBSTANCE) Regarding Numbered Paragraph 29 Only**

WRIGHT LAW GROUP, PLLC

/s/ *Melody G. Anderson*
Melody G. Anderson
California Bar No. 173875
So. Dist. Of Texas ID No. 3071089
4470 W. Sunset Blvd., Suite 90003
Los Angeles, CA  90027
mga@replevin.com
Matthew T. Wright
Texas Bar No. 24053563
Jared A. Rougeau
Texas Bar No. 24093076
33 Garden Oaks Blvd., #84356
Houston, Texas  77018
(855) 737-5384 Telephone
(866) 496-1006 Facsimile
mtw@replevin.com
jar@replevin.com

Attorneys for Ascentium Capital LLC

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

### BENDCO, INC., as Seller,

### 801 HOUSTON AVE PROPERTY LLC, as Seller

## AND

### PASADENA PIPE BENDERS, LLC, as Buyer

### PASADENA HOLDCO, LLC, as Buyer

**Dated as of June 17, 2019**

# TABLE OF CONTENTS

Page

ARTICLE 1. Purchase and Sale of Assets; Assumption of Certain Specified Liabilities ..............2
1.1       The Acquired Assets ....................................................................................2
1.2       Excluded Assets ..........................................................................................5
1.3       Assumption of Certain Liabilities; Excluded Liabilities ..........................5
1.4       Intentionally Omitted. ................................................................................8
1.5       Consents. .....................................................................................................8
1.6       Consideration and Closing Payment; Indebtedness; Escrow......................9
1.7       Bankruptcy Court Matters........................................................................10
1.8       10

ARTICLE 2. Closing; Deliveries of the Parties at Closing ...........................................13
2.1       The Closing ...............................................................................................13
2.2       Conditions Precedent to Obligation of Buyers ........................................13
2.3       Conditions Precedent to Obligation of Bendco ......................................14
2.4       Bendco Covenants ....................................................................................15
2.5       Buyers Covenants .....................................................................................17
2.6       Public Announcement. ..............................................................................17
2.7       Deliveries at the Closing by Bendco........................................................17
2.8       Deliveries at the Closing by Buyers.........................................................19
2.9       Passage of Title .........................................................................................19
2.10      Transfer Taxes, Etc ...................................................................................19
2.11      Right to Contest ........................................................................................19
2.12      Fulfillment of Conditions and Agreements Prior to Closing ...................19
2.13      Termination Prior to Closing....................................................................20

ARTICLE 3. Representations and Warranties of Bendco ..............................................22
3.1       Corporate Status; Authority .....................................................................22
3.2       Corporate Action; Authority; Execution..................................................23
3.3       No Conflicts...............................................................................................23
3.4       Monthly Operating Report and Records ..................................................23
3.5       Absence of Certain Changes or Events ....................................................24
3.6       Licenses, Permits and, Authorizations.....................................................24
3.7       Assets Used in the Business......................................................................24
3.8       Employee Benefit Matters ........................................................................25
3.9       Brokers and Financial Consultants ..........................................................25
3.10      Contracts ...................................................................................................25
3.11      Compliance with Laws .............................................................................26
3.12      Environmental Matters..............................................................................26
3.13      Taxes .........................................................................................................28
3.14      Employees..................................................................................................28
3.15      Transactions with Affiliates .....................................................................28
3.16      Customers and Suppliers...........................................................................29

i

ARTICLE 4. Representations and Warranties of 801 ..................................................29
    4.1           Corporate Status; Authority ..............................................................29
    4.2           Corporate Action; Authority; Execution...........................................29
    4.3           No Conflicts ......................................................................................29
    4.4           Real Property; Environmental Matters ..............................................30
    4.5           ..........................................................................................................30

ARTICLE 5. Representations and Warranties of Buyers ...........................................31
    5.1           Corporate Status; Authority ..............................................................31
    5.2           Corporate Action; Authority; Execution...........................................31
    5.3           No Conflicts ......................................................................................31
    5.4           Financing...........................................................................................31

ARTICLE 6. Additional Agreements ..........................................................................32
    6.1           Cooperation.......................................................................................32
    6.2           Employees .........................................................................................32
    6.3           Taxes; Final Sales Tax Return ..........................................................32
    6.4           Name Change ....................................................................................33

ARTICLE 7. Claims ....................................................................................................33
    7.1           General Provisions ............................................................................33
    7.2           Specific Performance ........................................................................33

ARTICLE 8. Miscellaneous.........................................................................................34
    8.1           Costs and Expenses...........................................................................34
    8.2           Binding Effect Assignments. ............................................................34
    8.3           Further Assurances. ...........................................................................34
    8.4           Notices ..............................................................................................34
    8.5           Amendment and Modification ...........................................................35
    8.6           Captions ............................................................................................35
    8.7           Governing Law; Submission to Jurisdiction; Waivers .....................35
    8.8           Waiver of Provisions.........................................................................36
    8.9           Execution of Agreement; Counterparts; Electronic Signatures .........36
    8.10         Entire Agreement ..............................................................................37
    8.11         Intentionally Omitted. .......................................................................37
    8.12         Definitions; Construction...................................................................37
    8.13         No Third Party Beneficiaries ............................................................39
    8.14         Waiver of Jury Trial ..........................................................................39

23268874v.5

## EXHIBITS

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Assumption Agreement (Operating Assets) |
| Exhibit A-2 | Form of Assignment and Assumption Agreement (Real Estate) |
| Exhibit B-1 | Form of Bill of Sale |
| Exhibit B-2 | Form of Special Warranty Deed |
| Exhibit C-1 | Form of Sale Motion |
| Exhibit C-2 | Form of Sale Order |

## SCHEDULES

**Schedule 1.1(a)(ii)**
**Customer Owned Property**

**Schedule 1.1(b)**
**Customer Prepayments and Covered Receivables**

**Schedule 1.1(d)**
**Equipment/Machines/Office Furniture**

**Schedule 1.1(e)**
**Real Property Description for 801 Houston Ave**

**Schedule 1.1(j)**
**Specified Equipment Contracts**

**Schedule 1.6(b)**
**Bank of America Indebtedness**

**Schedule 2.2(f)**
**Required Consents**

**Schedule 2.4(a)**
**Pre-Closing Transactions/ Indebtedness Outside Ordinary Course of Business**

Schedule 3.3
Conflicts

Schedule 3.5(a)
Exceptions to Financing Statements

Schedule 3.6
Licenses, Permits

Schedule 3.7(b)
Liens

Schedule 3.10
Material Contracts

Schedule 3.12
Environmental Permits

Schedule 3.16
Material Customers or Suppliers Who Have
Terminated or Reduced Its Business with Sellers

Schedule 4.4
801 Houston Ave Lease

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this **"Agreement"**), dated as of May ___, 2019, is entered into by and among Bendco, Inc., a Texas corporation and debtor-in-possession ("**Bendco**"), 801 Houston Ave. Property, LLC, a Texas limited liability company and debtor-in-possession ("**801**"), Pasadena Pipe Benders, LLC, a Texas limited liability company (**"New Bendco"**), and Pasadena Holdco, LLC, a Texas limited liability company (**"New Bendco Property"**). Bendco and 801 will be referred to singly a "**Seller**" and collectively as "**Sellers,**" when no distinction is to be made between them.  New Bendco and New Bendco Property will be referred to singly a "**Buyer**" and collectively as "**Buyers,**" when no distinction is to be made between them.   The Sellers and Buyers may be referred to singly as a "**Party**" and collectively as the "**Parties**" when no distinction is to be made among them

## RECITALS

WHEREAS, Bendco owns and operates a business of modifying, bending, creating and delivering pipe, coils, and structural steel (collectively, the **"Business"**);

WHEREAS, 801 owns the Real Property;

WHEREAS, Bendco and 801 desire to sell, assign, and transfer to Buyers, and Buyers desire to purchase from Bendco and 801, all properties, assets, privileges, rights, interests and claims, real and personal, tangible and intangible, of every type and description (including the Real Property), wherever located, including the Business as a going concern and goodwill, that are owned, used, or held for use by Bendco or 801 in connection with the Business, except only for the Excluded Assets (the assets so described, the "**Acquired Assets**"), all on the terms and subject to the conditions described in this Agreement;

WHEREAS, New Bendco Property will acquire the Real Property from 801 (and to the extent Bendco has any interest therein or claim thereto, Bendco);

WHEREAS, New Bendco will acquire the rest of the Acquired Assets from Bendco (and to the extent 801 has any interest therein or claim thereto, 801) (such other Acquired Assets, the "**Operating Assets**");

WHEREAS, Bendco commenced proceedings (Case No. 18-3089) under Chapter 11 of the Bankruptcy Code (the "**Bendco Case**") in the United States Bankruptcy Court at the Southern District of Texas (the "**Bankruptcy Court**") and 801 also commenced proceedings (Case 19-32076) under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**801 Case**");

WHEREAS, the Bendco Case and 801 Case (a "**Case**" or the "**Cases,**" when no distinction is made between them) have been administratively consolidated by the Bankruptcy Court;

WHEREAS, the Sellers and the Buyer desire to implement the purchase and sale and other transactions contemplated hereby pursuant to Sections 363 and 365 and other applicable provisions of the Bankruptcy Code and pursuant to a Final Order (as defined below);

1

NOW, THEREFORE, in reliance upon the recitals above (which are made a part of the agreements below) and in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties to this Agreement agree as follows:

## ARTICLE 1.
### Purchase and Sale of Assets; Assumption of Certain Specified Liabilities

1.1     The Acquired Assets.     Subject to and in reliance upon the representations, warranties, and agreements set forth in this Agreement, and subject to the terms and conditions contained in this Agreement and the Sale Order, Bendco and 801 shall grant, convey, sell, assign, transfer, and deliver to Buyers on the Closing Date, and Buyers shall purchase on the Closing Date the Acquired Assets, free and clear of all covenants, restrictions, liens, security interests, claims, pledges, assignments, subleases, options, rights of refusal, charges, leases, licenses, encumbrances and any other restriction of any kind or nature (collectively, **"Liens"**) other than Permitted Liens and free and clear of all Excluded Liabilities.  Without limiting the generality of the foregoing, the Acquired Assets shall include, without limitation, items in the following categories that conform to the definition of the term "Acquired Assets":

(a)     Inventory and Customer-Owned Property.

(i)     Inventories.  All inventories (including raw materials, work-in-progress, and finished goods) and supplies of Bendco, including any such items held at the Real Property and excluding any customer-owned property held by Bendco (collectively, the "**Inventory**");

(ii)     Customer-Owned Property.  All customer-owned property held by Bendco in accordance with the Purchase Orders, to the extent of Bendco's rights thereto ("**Customer-Owned Property**"); the Customer-Owned Property as of the date of this Agreement is set forth on Schedule 1.1(a)(ii), which schedule will be updated by Bendco weekly by Friday morning at 11:30 a.m. (Houston Time) and on the Closing Date;

(b)     Customer Prepayments and Covered Receivables.  All prepayments, deposits, advances and the like by Customers with respect to sales, services, or other transactions as to which delivery or performance has been fully completed as of the Closing Date under Final Purchase Orders (the "**Customer Prepayments**") and any accounts receivable, notes receivable, and other rights of payment whether or not the underlying sales, services or other transactions have been fully performed as of the Closing Date (the "**Covered Receivables**"), a list of which Customer Prepayments and Covered Receivables as of the date hereof (assuming the Closing Date occurred on such date) is attached as Schedule 1.1(b) and will be updated by Bendco weekly by Friday morning at 11:30 a.m. (Houston Time) (assuming the Closing Date occurred on such date) and on the Closing Date;

    (c) <u>Prepaid Items; Deposits; Cash</u>.  (i) All prepaid items and expenses of Bendco, and all security deposits held by third parties for the benefit of Bendco or 801, (ii) the amounts held in escrow in account #____ by the Vincent Serafino Law Firm with Texas Citizens Bank (the "**Ad Valorem Trust Account**") and (iii) all cash on hand or in bank accounts and other cash items and cash equivalents, certificates of deposit and short-term investments, less unpaid payroll and operating expenses for the current period;

    (d) <u>Machinery, Equipment, and Other Personal Property</u>.  All physical assets, machinery, equipment, presses, motor vehicles, racking, molds, forms, dies and tooling, spare parts, furniture, fixtures, office equipment and supplies, packing materials, computer hardware and software, photocopiers, facsimile machines, and other tangible personal property of every kind and description owned, leased, or licensed by Bendco except only for the Excluded Equipment (the "**Equipment**"), together with any express or implied warranty by the manufacturers or Bendco or lessors of any item or component part thereof and all maintenance records and other documents relating thereto, including, without limitation, the assets listed on <u>Schedule 1.1(d)</u>;

    (e) <u>Real Property</u>.  All parcels of real estate, and the improvements thereon, used by Bendco  to operate the Business, including the parcels of real property described on <u>Schedule1.1(e)</u>, together with all of the buildings, structures, warehouses, fixtures, and other improvements erected or located thereon, together with all leaseholds, privileges, rights, easements, rights-of-way, licenses, permits, hereditaments, appurtenances and related rights and privileges of every nature appurtenant thereto, and all other leasehold interests and estates in real property owned, leased, or licensed by Bendco or 801, together with all of the buildings, structures, warehouses, fixtures, and other improvements erected or located thereon, and all leaseholds, privileges, rights, easements, rights-of-way, licenses, permits, hereditaments, appurtenances and related rights and privileges of every nature appurtenant thereto (collectively, the "**Real Property**");

    (f) <u>Intellectual Property</u>.  All of Bendco's rights and goodwill in and to all trademarks, service marks, copyrights, copyright registrations, patents, patent registrations, trade names, domain names, the name "Bendco", slogans, logos, industrial models, methodologies, computer software, technical information, drawings and designs, know-how, show-how, and trade secrets, and other intangible rights, including any applications therefor and licenses with respect thereto, whether or not subject to statutory registration or protection, including all of Bendco's rights and goodwill in and to the name "Bendco" and any derivations thereof (collectively, the "**Intellectual Property**");

    (g) <u>Permits, Licenses, and Authorizations</u>.  All governmental permits, licenses, and authorizations held by Bendco or 801, including those listed on <u>Schedule 3.6</u>, to the extent the same may be transferred to Buyer;

    (h) <u>Claims</u>.  (i) All rights, claims, credits or causes of action against third parties, except as provided in <u>Section 1.2</u>(b), (ii) any right or claim of 801 against Bendco; and (iii) all rights of Bendco with respect to each employee loan, all claims and actions of either Seller arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code against their current or former directors, partners, managers, members, stockholders, officers, insiders or Affiliates, and all other all claims, indemnities, causes of action, rights of recovery, rights of set-off and rights of

3

recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) against their current or former directors, partners, managers, members, stockholders, officers, insiders or Affiliates, excluding any claims against Mr. John Tharp, GPM Check Cashing, Ltd, and G&A Partners and (iii) any and all claims for refunds, rebates, credits, claims and entitlements related to Taxes paid or attributable to a taxable period (or portion thereof) ending prior to the Closing Date (collectively, "Claims");

(i)     Insurance.  All insurance benefits, including all rights and proceeds, arising from or relating to the Acquired Assets or the Assumed Liabilities prior to the Effective Time, to the extent the same may be transferred to Buyer;

(j)     Contracts.  Bendco's rights under the written Contracts consisting of the following (collectively, the "**Assumed Contracts**"):

(i)     the customer purchase orders of Bendco that are outstanding for the purchase of products or services from Bendco on the Closing Date will be referred to as the "**Final Customer Purchase Orders**";

(ii)     the vendor purchase orders of Bendco that are outstanding for the purchase of products or services by Bendco on the Closing Date will be referred to as the "**Final Vendor Purchase Orders**." The Final Customer Purchase Orders and Final Vendor Purchase Orders will be referred to as the "**Purchase Orders**."

(iii)     the equipment leases relating to Equipment that are identified under the heading "Specified Equipment Leases" on Schedule 1.1(j) (the "**Specified Equipment Contracts**")[1];

(k)     Files and Records.  All files, records, books of account, general, financial, and accounting records, invoices, computer programs, tapes, electronic data (including relating to customers, sales history, inventory, accounts receivable, vendors, employees and accounts payable), processing software, customer, supplier, and vendor lists and records, studies and reports, advertising and sales material, test records, personnel and payroll records, correspondence, and all other records that pertain directly to or are used in connection with the Business.  Sellers will have the right to access the foregoing to the extent provided in Section 6.1;

(l)     Guarantees.  All guarantees, warranties, indemnities, and similar rights in favor of Bendco or 801 with respect to the Business or any of the Acquired Assets, including the Real Property;

(m)     Goodwill.  All of Bendco's goodwill in, and the going concern value of, the Business.

All of the foregoing except for the Real Estate will be included in the Operating Assets and acquired by New Bendco; the Real Estate will be acquired by New Bendco Property

---

[1] Will only list the TCF and the US Bank agreements

4

    1.2    <u>Excluded Assets</u>.  The following shall be excluded from the Acquired Assets and retained by Bendco or 801, as applicable (collectively, the **"Excluded Assets"**):

    (a)    <u>Employee Benefit Plans</u>.  All Employee Benefit Plans, including, without limitation, employee pension, profit sharing 401(k), medical benefit or health plans and trusts, and related trust accounts, funds, insurance policies, investments, or other assets and any sale bonus or retention agreements;

    (b)    <u>Retained Rights</u>.  All rights, claims, causes of action and credits (including all indemnities, warranties and similar rights) in favor of Bendco or 801 to the extent arising out of or resulting from any Excluded Asset or any Excluded Liability;

    (c)    <u>Corporate and Other Records</u>.  All minute books, seal, stock records, tax returns and tax records, and all other books and records related to the Excluded Assets;

    (d)    <u>Transaction Rights</u>.  All rights that accrue or will accrue to Bendco or 801 under the Transaction Agreements;

    (e)    <u>Securities</u>. All equity securities or other ownership interest of either Seller and all equity securities or other ownership interest of any of such Seller's Affiliates; and

    (f)    <u>Deposit</u>. Any adequate assurance deposit under Section 366 of the Bankruptcy Code.

    (g)    <u>Tharp Claims</u>.  any rights, claims, credits or causes of action against Mr. John Tharp, GPM Check Cashing, Ltd, and G&A Partners.

    1.3    <u>Assumption of Certain Liabilities; Excluded Liabilities</u>.

    (a)    Upon the terms and subject to the conditions of this Agreement, effective as of the Closing Date, New Bendco shall assume and agree to pay, perform, discharge, and satisfy when due and payable, and otherwise be solely responsible for, the specific Liabilities and obligations set forth in this <u>Section 1.3(a)</u> which relate to the operation of the Business or the Acquired Assets as of the Closing Date (the **"Assumed Liabilities"**), except for the Assumed Liabilities relating to the Real Estate, which will be assumed by New Bendco Property.  Such assumptions by Buyer will be evidenced by the execution and delivery of an Assignment and Assumption Agreement substantially in the form of <u>Exhibit A-1</u> and Assignment and Assumption Agreement substantially in the form of <u>Exhibit A-2</u> attached hereto (the **"Assignment and Assumption Agreements"**).

The Assumed Liabilities shall consist solely of:

    (i)    the Assumed Contracts, including the Specified Equipment Contracts,  but only to the extent that (A) all payments and obligations thereunder are current (or outstanding and due Liabilities thereunder are deducted from the Purchase Price under <u>Section 1.4(c)</u>) and (B) the Liabilities and obligations arise or accrue after the Closing Date under the express terms of the Assumed Contracts and only relate to periods after the Closing Date (and in no event any Liabilities with respect to any breach or any

damages, penalties, interests or other claims by reason of actions or omissions of either of the Sellers, all of which shall be Excluded Liabilities); provided, however, the Assumed Contracts shall be assumed by Sellers and assigned to Buyer in accordance with the requirements of Section 365 of the Bankruptcy Code, and Sellers shall be obligated to pay, on the Closing Date, all amounts needed to cure any defaults to the extent such defaults are required to be cured and such cure amounts are required to be paid as a condition to assumption and assignment of any such Assumed Contracts ("**Cure Costs**");[2]

        (ii)     all Liabilities for Taxes arising from or attributable to the Acquired Assets, the Real Property and the ownership and operation of the Business for any taxable period (or portion thereof) and after the Closing Date;

        (iii)    all Taxes relating to the Real Property (including prorated Taxes owed by Sellers) outstanding as of the Closing Date and those arising after the Closing Date;

        (iv)    Pre-petition and post-petition ad valorem Taxes with respect to the Acquired Assets, provided that Sellers shall be responsible for making the Ad Valorem Trust Account available to be applied to pay such amounts.

        (v)     other than the Excluded Liabilities set forth in <u>Section 1.3(b)</u> below, all Liabilities and obligations arising after the Closing Date and attributable to Buyer's ownership, operation and control of the Acquired Assets, the Real Property and the Business;

        (vi)    Liabilities for remediation or clean up with respect to physical conditions currently on the Real Property, but excluding any of the foregoing that relates to any adjoining or other properties (the "**Assumed Environmental Liabilities**").

        (b)     Buyers do not, and shall in no event assume or be deemed to assume, nor shall it be liable for, any Liabilities of Bendco or 801 or the Acquired Assets of any kind or nature whatsoever (whether express or implied, fixed or contingent, known or unknown or whether the Liabilities could be asserted against or imposed upon Buyers as successors or transferees of a Sellers as an acquirer of the Acquired Assets under any legal principle) other than the Assumed Liabilities (all Liabilities of Bendco or 801 other than the Assumed Liabilities are referred to herein collectively as the "**Excluded Liabilities**").

Without limiting the generality of the foregoing, Excluded Liabilities shall include:

        (i)     Liabilities to, under or with respect to any Benefit Plan and the administration of any Benefit Plan, or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits with respect to employees or former employees of Bendco or any of its predecessors, under any employment, severance, retention or termination agreement with any employee of Bendco or any of its Related Parties, or arising out of or relating to any employee claim or allegation whether or not the affected employees are hired by Buyer, including any amounts payable under and sale bonus or

retention agreements and/or any disputes related thereto or relating to injuries suffered by employees prior to the Closing Date;

(ii)     any trade payables or any other Liability for any product or service provided to either Seller on or before the Closing Date;

(iii)     Liabilities relating to all Taxes arising as a result of Bendco's (or 801's) operation of the Business or ownership of the Acquired Assets prior to the Effective Time, save and except Taxes relating to the Real Property which shall be an Assumed Liability of Buyers (including prorated Taxes owed by Sellers) and further save and except Sellers' pre-petition and post-petition ad valorem taxes on the Acquired Assets which shall also be an Assumed Liability of Buyers, and Taxes based on net income or attributable to sales or use that are assessed, accrued, or attributable for periods on or prior to the Closing Date and related penalties and interest, if any, but excluding transfer Taxes, if any (which are addressed in Section 2.10);

(iv)     Liabilities relating to any complaint, action, arbitration or regulatory, administrative or government proceeding or investigation involving Bendco or 801 arising from actions of Bendco or 801 on or prior to the Closing Date;

(v)     all Indebtedness and leases of Bendco or 801, other than the Specified Equipment Contracts assumed by Buyer pursuant to Section 1.3(a)(i);

(vi)     Liabilities for any products shipped, distributed, processed, assembled or manufactured, or for any services provided, by Bendco (or any of its predecessors) or by the Business, on or prior to the Closing Date, including all Liabilities for all express and implied product warranties related to such products and services or product liability claims related to such products or services (the "**Prior Product Claims**");

(vii)     Liabilities arising out of any transaction affecting Bendco or 801, and Liabilities incurred by Bendco or 801, after the Closing Date;

(viii)     any Liability to indemnify, defend, or hold harmless any of Bendco's or 801's officers, directors, employees, agents, or any Related Party;

(ix)     Except for Assumed Environmental Liabilities, Liabilities of Bendco or 801 or any of their respective predecessors arising out of or relating to any of the following matters (the "**Excluded Environmental Liabilities**"):

(A)     any non-compliance with, or violation of, Environmental Laws existing on or prior to the Closing Date arising from or related to (1) the ownership, use or operation of the Business, the Real Property, any property of the Business or any Acquired Assets; (2) the design, configuration or condition of the Real Property or any equipment of the Business; (3) the failure to have or to comply with any Environmental Permits; or (4) the failure to have, maintain or properly operate programs and equipment for monitoring of, or the failure to report in an accurate and timely manner any discharges, emissions or releases;

7

(B)     any environmental condition that exists on, at, or under the Acquired Assets (including the Real Property) on or prior to the Closing Date and that is attributable to the period of ownership of Bendco or 801;

(C)     the storage, transportation, treatment, disposal, discharge, recycling or Release of any Hazardous Material on or under or from the Real Property during or prior to Bendco or 801's ownership thereof or at any off-site location by Bendco or 801 before the Closing Date, or the arrangement by Bendco or 801 for any storage, transportation, treatment, disposal, discharge, recycling, or Release of any Hazardous Material at any off-site location on or prior to the Closing Date; and

(D)     any contractual indemnity obligations relating to requirements of Environmental Law or environmental Liabilities that Bendco or 801 has undertaken in connection with the Business or the Real Property;

(x)     any Liability for or with respect to (A) any breach or default by and any past due payment obligation of Bendco or 801 under any Assumed Contract occurring or existing on or prior to the Closing Date, (B) an obligation to perform under the Assumed Contracts that were to be performed on or before the Closing Date (whether or not failure to perform constituted a breach or default or whether the Sellers had cure rights), or (C) any Assumed Contract to the extent that such Liability related to or arose with respect to periods on or before the Closing Date;

(xi)     any Liability of either Seller under any contract that is not an Assumed Contract;

(xii)     any Liability of either Seller relating to and arising from the ownership or operation of the Acquired Assets or the Business prior to the Closing;

(xiii)     any Liability of either Seller arising out of or resulting from its compliance or noncompliance with any Law (except Environmental Laws, the Liabilities for which are governed by Section 1.3(b)(ix));

(xiv)     any Liability of either Seller that could be or has been asserted or deemed in the Bankruptcy Cases or the basis of which arose or accrued on or prior to the Closing Date, regardless of whether so asserted or claimed;

(xv)     any Liability of either Seller to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement; and

(xvi)     any other Liability of a Seller that is not an Assumed Liability.

1.4     Intentionally Omitted.

1.5     Consents.

8

(a)     Buyers acknowledge that the Final Sale Order will authorize the assumption and assignment of the Assumed Contracts without the requirement of any consent by the parties thereto.

(b)     To the extent any Assumed Contract is not assumable and assignable by Sellers to Buyers under Section 365 of the Bankruptcy Code without the consent of the applicable counterparty thereto, Sellers and Buyers shall use their commercially reasonable efforts prior to Closing to obtain all such required consents of third parties which are necessary for the consummation of the transactions contemplated hereby (without conditions that are materially adverse to Buyers) (the "**Required Consents**"). All such Required Consents shall be in writing and executed counterparts thereof shall be delivered to Buyers on or before the Closing Date.

(c)     If a Required Consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights thereunder so that Buyers would not receive all such rights, Sellers shall use their commercially reasonable efforts after Closing to provide to Buyers the benefits under any such Contract or any claim or right, including, without limitation, enforcement for the benefit of Buyers of any and all rights of Sellers against a third party thereto arising out of the default or cancellation by such third party or otherwise. Bendco shall continue to deal with the other contracting party or parties, with the benefits of such contract, property, right, or asset after the Closing Date accruing to the benefit of Buyers; Bendco shall hold all moneys received thereunder for the benefit of Buyers and shall pay the same to Buyers when received. Notwithstanding the foregoing, if Sellers does not obtain a Required Consent, Buyers shall not be required to assume (or deemed to have assumed) such Contract (and such Contract will not be an Assumed Contract, unless the Buyers otherwise consent in writing).

(d)     Nothing in this Section 1.5 shall be deemed a waiver by Buyers of their right to receive an effective assignment of the Acquired Assets on the Closing Date, nor shall this Section 1.5 be deemed to constitute an agreement to exclude from the Acquired Assets any assets described in this Section 1.5.

1.6     Consideration and Closing Payment; Indebtedness; Escrow.

(a)     Consideration. Buyers shall purchase the Acquired Assets for an aggregate consideration equal to (the "**Purchase Price**"):

(i)     a cash payment of Three Million and Fifty Thousand US Dollars ($3,050,000.00) minus the Assumed Liabilities described in Sections 1.3(a)(i) (including Cure Costs, if any) and (iii) (the "**Closing Payment**"); and

(ii)     the assumption of the Assumed Liabilities in accordance with this Agreement.

Allocation of the Purchase Price as between the Buyers and as among the Acquired Assets shall be made pursuant to Section 1.8.

(b)     Closing Payment. The Closing Payment less the Adjustment Amount, shall be payable by Buyers at Closing, by (i) wire transfer of immediately available funds to the accounts

9

and to the Persons as designated on a Flow of Funds ("**Flow of Funds**") delivered by Bendco[3] in writing to Buyers at least three (3) business days prior to the Closing Date. Bendco and 801 direct Buyers to make the Closing Payment to the recipients (including pursuant to Section 1.6(b), on behalf of Bendco and 801 (as applicable), in the amounts set forth on the Flow of Funds, which shall include the wire transfer instructions of the applicable recipients, including the Bank of America with respect to the Indebtedness described in Schedule 1.6(b) and all payments of accrued or prorated Taxes and utilities as provided in Section 2.10. In order to facilitate such repayment, no less than three (3) business days prior to the Closing, Bendco shall obtain payoff letters for all Indebtedness, which payoff letters will be in a form satisfactory to Buyers and shall indicate that such lenders have agreed to immediately release all Liens relating to the Acquired Assets upon receipt of the amounts indicated in such payoff letters. Subject to the satisfaction of all of the conditions, covenants and obligations to be satisfied prior to the Closing, in connection with the Closing, Buyers shall make the payments referenced in such payoff letters on the Closing Date in order to discharge the Indebtedness covered thereby. As to Taxes and utilities prorated under Section 2.10 to Bendco or 801 payment shall be made directly to the payee thereof from the Closing Payment pursuant to the Flow of Funds against receipt or evidence of payment.[4]

    1.7     Bankruptcy Court Matters.

        (a)     Approval of Motion for Sale.

            (i)     Within two (2) Business Days following the date of this Agreement, Sellers shall file with the Bankruptcy Court an emergency motion in form attached hereto as Exhibit C-1 (the "**Sale Motion**") seeking an emergency hearing ("**Final Sale Order Hearing**") to approval of the Final Sale Order as described in Section 1.7(b) (the date of such hearing, the "**Final Sale Order Hearing Date**") and find that an expedited hearing is required because of the exigent circumstances of the Sellers's financial condition. Such Sale Motion and all exhibits thereto shall be in form and substance acceptable to Buyers, in their sole discretion.

            (ii)     Intentionally Omitted.

            (iii)     Sellers shall promptly serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Sale Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the Southern District of Texas and any other applicable order of the Bankruptcy Court, so that in each case the Final Sale Order Hearing properly and validly occurs on or before the Outside Final Sale Order Hearing Date.

        (b)     Final Sale Order.

            (i)     At the Final Sale Order Hearing the Bankruptcy Court will approve and enter a final sale order (the "**Final Sale Order**") that shall, among other things,

---

[3] Flow of Funds will provide for the payment of the fees of Fuqua & Associates

23268874v.5

(A)      approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and direct the sale and assignment of the Acquired Assets to Buyers and approve and direct the assumption and assignment of the Assumed Contracts to Buyers free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); provided that notwithstanding anything to the contrary in the Agreement, Buyers shall not be entitled to disapprove the Sale Order by reason of, and Buyers' (or a successful overbidder's) obligation to consummate the transactions provided for herein shall not be conditioned upon the assumption and assignment of, any Assumed Contracts with respect to which the Bankruptcy Court determines that Buyers (or a successful overbidder) has failed to provided adequate assurance of future performance pursuant to Section 365 of the Bankruptcy Code;

(B)      the execution, delivery and performance by Sellers of all Transaction Agreements,

(C)      the performance by Sellers of their respective obligations under this Agreement; and

(D)      find that Buyers are "good faith" purchasers within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyers the protections under such section;

(E)      find that Buyers are not deemed to be successors to Sellers, to have, de facto or otherwise, merged with or into Sellers or to be a mere continuation of Sellers

(F)      find that the Purchase Price is a fair and reasonable price for the Acquired Assets;

(G)      include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry;

(H)      authorize the assumption and assignment of the Assumed Contracts without the requirement of any consent by the parties thereto;

(I)      include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement including matters relating to title to the Acquired Assets and claims against the Acquired Assets which arose or were based on facts or occurrences prior to the Closing; and

(J)      establish the amount of the supersedeas bond in the event of an appeal of the Final Sale Order at $2,750,000.

(ii)      Buyers agrees that they will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the

11

Final Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Buyers are "good faith" purchasers under Section 363(m) of the Bankruptcy Code, and (B) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

(c) <u>Contracts</u>. To the extent required under applicable Bankruptcy Rules, Sellers shall serve on all non-Seller counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs or any other aspect of the proposed assumption and assignment of their Contracts to Buyers.

(d) <u>Certain Bankruptcy Undertakings by Sellers</u>.

(i) Except as ordered by the Bankruptcy Court, Sellers shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement or result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Buyers' rights hereunder), or (B) the entry of a stay pending appeal.

(ii) If the Final Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller, with the cooperation and support of Buyers, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

(iii) The Closing shall not be consummated unless the Final Sale Order shall have been entered, has become final and non-appealable, and shall not have been reversed, stayed, modified or amended.

1.8 <u>Allocation of Purchase Price</u>. The Purchase Price shall be allocated among the Acquired Assets in accordance the allocation specified by the Buyers (the "**Allocation**"). Bendco and 801 shall timely and properly prepare, execute, file and deliver any and all documents, forms and authorizations (including powers of attorney) as Buyers may reasonably request in order to prepare and report such Allocation (including any amendments thereto) to Taxing authorities. Buyers shall prepare (with a reasonable time for review and approval of Bendco, which shall not be unreasonably withheld) and deliver a final IRS Form 8594 to Bendco within ninety (90) calendar days after the Closing Date. Buyers, Bendco, and 801 shall report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby, including those required by Section 1060 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and IRS Form 8594, in a manner consistent with such Allocation and shall not take any position inconsistent therewith upon examination of any tax return, in any refund claim, in any litigation, or otherwise.

**ARTICLE 2.**
**Closing; Deliveries of the Parties at Closing**

2.1     The Closing.  The consummation of the transactions provided for in this Agreement (the **"Closing"**), which shall be deemed to occur at 11:59 p.m. Central time (the **"Effective Time"**) within five Business Days of the date that all of the conditions precedent to Closing set forth in this Article II have been satisfied or on such other date as the Parties may agree (**"Closing Date"**), shall take place at the offices of Jackson Walker LLP, 1401 McKinney, Suite 1900, Houston, Texas 77010, at 9:00 a.m. Central time, or at such other time or place as the Parties may agree.  The rights and obligations of the Parties if there is no Closing are set forth in Section 2.13.

2.2     Conditions Precedent to Obligation of Buyers.  The obligation of Buyers to proceed with the Closing is expressly subject to the fulfillment prior to or at Closing of the conditions precedent set forth in this Section 2.2.  Any one or more of these conditions precedent may be waived, in whole or in part, in writing by Buyers at Buyers' sole option.

(a)     Representations and Warranties.  The representations and warranties of (i) Bendco contained in Article 3 and (ii) 801 contained in Article 4, shall be, individually and collectively, true and correct (in the case of any representation or warranty containing any materiality qualification) or true and correct in all material respects (in the case of any representation or warranty without any materiality qualification) (A) at and as of the date of this Agreement and (B) on and as of the Closing Date as if made on the Closing Date.

(b)     Agreements.  Each of Bendco and 801 shall have performed in all material respects all of the agreements and complied with all of the provisions required by this Agreement and the Bendco Transaction Documents to be performed or complied with by each such Party at or before the Closing Date.

(c)     Adverse Claims.  None of the Parties shall have received any claim by any Person asserting that any Person other than Bendco or 801 is the owner of any of the material Acquired Assets or is entitled to all or any portion of the Purchase Price (other than any lenders to be repaid at Closing as contemplated by this Agreement).

(d)     No Material Adverse Effect.  Between the date of this Agreement and the Closing Date, no event or events shall have occurred that, individually or in the aggregate, has had or is reasonably likely to result in a Bendco Material Adverse Effect.

(e)     Bankruptcy Matters.  The Final Sale Order shall have been entered by the Bankruptcy Court and the Bankruptcy Court has waived the stay under Bankruptcy Rule 6004(h) to allow the parties to consummate the sale immediately (the **"Waiver"**)

(f)     Required Consents.  Buyers shall have received all Required Consents set forth on Schedule 2.2(f) hereto, if any, and all of which will be in full force and effect.  To the best of Sellers' knowledge, there are no required consents.

(g)     Closing Certificate.  The President of Bendco shall have delivered a certificate, dated as of the Closing Date, in a form satisfactory to Buyers, certifying to the

13

fulfillment of the conditions set forth in subparagraphs (a), (b), (c), (d), (e), and (f) of this Section 2.2.

(h)     Intentionally Omitted.

(i)     Real Property.  Buyers shall have received an owner's affidavit in the form reasonably required by First American Title or such other title company identified in writing by Buyers (the "**Title Company**") related to the Real Property executed by Bendco and 801.  Further, to the extent required by the Title Company, Bendco and 801 shall arrange for the execution and delivery of a mechanic's lien indemnity and any other related documentation necessary for such title company to deliver the Owner's Title Policy (as defined below) free of an exception for mechanic's liens.   Buyers shall have received a settlement statement prepared by the Title Company, reflecting the terms of this Agreement and related to the sale of the Real Property.

(j)     Employment Payments.  Buyers shall have received evidence reasonably satisfactory to Buyers that Bendco, on or prior to the Closing Date, has paid all of its employees all salary, wages, bonuses (including pro rata share of any typical annual bonus) and other compensatory obligations from the date of filing of Chapter 11 through the Closing Date (including any that arise as a result of the Closing).

(k)     Closing Documents.  Buyers shall have received the other agreements and documents referred to in Section 2.7.  All certificates and other documents delivered by Bendco to Buyers under this Agreement shall be in form and substance satisfactory to Buyers.

2.3     Conditions Precedent to Obligation of Bendco and 801.  The obligation of Bendco and 801 to proceed with the Closing is expressly subject to the fulfillment prior to or at Closing of the conditions precedent set forth in this Section 2.3.  Any one or more of these conditions may be waived, in whole or in part, in writing by Bendco and 801 at the sole option of Bendco and 801.

(a)     Representations and Warranties.  The representations and warranties of Buyers contained in Article 5 shall be, individually and collectively, true and correct (in the case of any representation or warranty containing any materiality qualification) or true and correct in all material respects (in the case of any representation or warranty without any materiality qualification) (i) at and as of the date of this Agreement, and (ii) on and as of the Closing Date as if made on the Closing Date.

(b)     Agreements.  Buyers shall have performed in all material respects all of the agreements and complied with all of the provisions required by this Agreement and the Buyer Transaction Documents to be performed or complied with by it at or before the Closing Date.

(c)     Litigation. None of the Parties to this Agreement shall be (i) subject to any restraining order or injunction restraining or prohibiting the consummation of the transactions contemplated by this Agreement or (ii) have received written notice from any Governmental Entity of its intention to institute any action or proceeding seeking to restrain, enjoin, or nullify this Agreement or the transactions contemplated hereby.

14

(d)     Closing Certificate.  The managing directors of Buyers shall have delivered a certificate, dated as of the Closing Date, in a form satisfactory to Bendco, certifying to the fulfillment of the conditions set forth in subparagraphs 2.2(a), 2.2(b) and 2.2(c) of this Section 2.3.

(e)     Bankruptcy Matters.  The Final Sale Order as contemplated by Section 1.7(b) shall have been entered by the Bankruptcy Court and shall be final and non-appealable and not have been reversed, stayed, modified or amended.

(f)     Closing Documents.  Bendco shall have received the documents and other items referred to in Section 2.8.

2.4     Bendco Covenants.  Bendco covenants and agrees as follows:

(a)     Pre-Closing Conduct of Business.  Between the date of this Agreement and the Closing Date, Bendco shall operate the Business and perform its obligations under all Contracts and agreements relating to the Business in the usual and ordinary course of business and in accordance with existing policies and past practices, except as expressly contemplated by this Agreement.  Without limiting the generality of the foregoing, except as disclosed on Schedule 2.4(a), Bendco shall not (without the prior written consent of Buyers):

(i)     engage in any transaction outside the ordinary course of Business or in a manner inconsistent with past practice, or enter into, terminate, or amend or modify, any Material Contract;

(ii)     incur, commit to incur or maintain any Indebtedness outside the ordinary course of Business or in a manner inconsistent with past practice, except as disclosed on Schedule 2.4(a);

(iii)     assume, guarantee, endorse or otherwise become responsible for the obligations of any other Person or make any loans or advances to any Person;

(iv)     issue, sell, pledge, lease, dispose of, encumber, or authorize the issuance, sale, pledge, lease, disposition or encumbrance of (A) any shares of capital stock of any class or any options, warrants, convertible securities or other rights of any kind to acquire any shares of capital stock, or any other ownership interest, of Bendco, or (B) any assets that are material, individually or in the aggregate, to the Business except for the sales of Inventory in the ordinary course of business and in a manner consistent with past practice;

(v)     grant or pay any bonus, increases in compensation, incentive compensation or other employee benefit to, or enter into any contract with, its officers or its employees, except for in the ordinary course and consistent with past practices;

(vi)     initiate, settle or compromise any material claims or litigation or, except in the ordinary and usual course of business, waive, release or assign any material rights or claims; or

15

(vii)    permit any insurance policy naming Bendco or 801 as a beneficiary or a loss payable payee to be canceled or terminated.

(b)    <u>Business and Goodwill</u>.  Prior to the Closing Date, Bendco shall use its commercially reasonable efforts to preserve intact the Business, to preserve and maintain Bendco's goodwill and business relationships with customers, suppliers, employees and others having business relations with it, and to maintain in full force and effect and to protect and enforce, each in accordance with past practices, all permits, licenses, authorizations and Intellectual Property rights of Bendco.

(c)    <u>Insurance</u>.  Bendco shall maintain, or cause to be maintained, in full force and effect, through the Closing, all of the insurance policies of or covering Bendco, its Business, the Acquired Assets and its employees in effect on the date hereof, unless replaced by substantially comparable coverage.  Bendco shall promptly advise in writing Buyers of any fire, accident, or other casualty or loss occurring prior to the Closing Date, which individually or in the aggregate adversely affects the value of the Acquired Assets in an amount in excess of $25,000.

(d)    <u>Access to Properties, Facilities, Files, and Records</u>.  At the reasonable request of Buyers and upon reasonable advance notice, Bendco and 801 shall, during normal business hours, give or cause to be given to Buyers and the Representatives of Buyers (i) full access to the Real Property, management personnel, property, accounts, books, deeds, title papers, insurance policies, licenses, agreements, contracts, commitments, logs, records and files of every character, related to the equipment, machinery, fixtures, furniture, vehicles and notes and accounts payable and receivable, and (ii) all such other information as Buyers may reasonably request, all as it relates to the Business.  In addition, Buyers shall have the right to have the Real Property and tangible personal property included within the Acquired Assets inspected by Buyers or Buyers' Representatives for purposes of determining the physical condition and legal characteristics of the Real Property and tangible personal property.  In the event subsurface or other invasive testing is recommended by any Representatives of Buyers, Buyers shall submit a written sampling plan to Bendco and 801 for approval, which approval shall not be unreasonably withheld; <u>provided</u> that, in all cases, Buyers shall be permitted to perform subsurface or other invasive testing in a manner that is reasonably adequate to Buyers and that meets or exceeds the reasonable standard of care for such invasive testing in Harris County, Texas.  Prior to the entry of the Final Sale Order, as Buyers may reasonably request, Bendco will cooperate with Buyers for the purpose of permitting Buyers and its Representatives to discuss the business, prospects and assets of Bendco with Bendco's key employees, customers, counsel, and accounting firm, provided that Buyers and its Representatives shall not contact any employee or customer of Bendco without attendance by or prior approval from Mr. Ricky Friery or Mr. Rodney Friery.  For the avoidance of doubt, other than with respect to any notice required to be given to Bendco and 801 as a precondition to any inspection, review, assessment, interview, test or audit (each an "**Assessment**"), which may be conducted by Buyers or its Representatives pursuant to this Agreement, Buyers and its Representatives shall coordinate and communicate directly with the Representatives of Bendco and 801 in connection with the scheduling and undertaking, and the disclosure of the outcome or results, of any such Assessment.

(e)    <u>Notice of Proceedings</u>.  Bendco shall promptly notify Buyers telephonically and in writing upon Bendco (i) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the

16

transactions contemplated hereunder, or (ii) receiving any notice from any Governmental Entity or the Bankruptcy Court of its intention (A) to institute an investigation into, or institute a suit or proceeding to restrain or enjoin, the consummation of this Agreement or such transactions, or (B) to nullify or render ineffective this Agreement or such transactions if consummated.

(f)     <u>Title Insurance</u>.  Bendco and 801 shall provide, or cause to be provided, to the Title Company any affidavits, undertakings, memoranda or other assurances reasonably requested by the Title Company from Bendco or 801 necessary for the Title Company to issue the Owner Title Policy.

2.5     <u>Buyers Covenants</u>.  Buyers covenants and agrees to promptly notify Bendco telephonically and in writing upon Buyers (a) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the transactions contemplated hereunder or (b) receiving any notice from any Governmental Entity of its intention (i) to institute an investigation into, or institute a suit or proceeding to restrain or enjoin, the consummation of this Agreement or such transactions, or (ii) to nullify or render ineffective this Agreement or such transactions if consummated.

2.6     <u>Public Announcement</u>.  Subject to the provisions of the Bankruptcy code and Seller's right to make such filings and disclosures as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, no Party hereto shall make or issue, or cause to be made or issued, any public, announcement or written statement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other Party hereto (which will not be unreasonably withheld or delayed), unless counsel to such Party advises that such announcement or statement is required by law (such as an obligation to disclose under federal securities laws of the United States) (in which case the Parties hereto shall make reasonable efforts to consult with each other prior to such required announcement). Buyers and Sellers shall issue the previously agreed upon form of joint press release announcing the execution and delivery of this Agreement, promptly after the execution of this Agreement.

2.7     <u>Deliveries at the Closing by Bendco</u>.  At the Closing, Bendco or 801 (as applicable) shall deliver, or cause to be delivered, to Buyer (unless delivered previously):

(a)     the Assignment and Assumption Agreement in substantially the form of <u>Exhibit A-1</u> relating to the Operating Assets;

(b)     the Assignment and Assumption Agreement in substantially the form of <u>Exhibit A-2</u> relating to the Real Estate;

(c)     a Bill of Sale in substantially the form of <u>Exhibit B-1</u> attached hereto (the "**Bill of Sale**"), together with assignments, certificates of title and other instruments of sale, transfer, and assignment in form and substance reasonably satisfactory to New Bendco and its counsel sufficient to sell, transfer, and assign to New Bendco all right, title, and interest of Bendco and good and valid title to Bendco's and 801's interest in and to the Operating Assets;

(d)     a Special Warranty Deed in the form attached hereto as <u>Exhibit B-2</u>, duly executed and acknowledged in form and substance reasonably satisfactory to New Bendco

17

Property and its counsel, granting, conveying, and warranting to New Bendco Property good and indefeasible fee simple title to the Real Property, free and clear of all Liens other than Permitted Liens;

(e)     an agreement pertaining to certain transition services (the **"Transition Services Agreement"**) to be entered into in reasonable and customary form;[5]

(f)     certified copies of resolutions, duly adopted by the Board of Directors of each of Bendco and 801, which shall be in full force and effect at the time of the Closing, authorizing the execution, delivery, and performance by Bendco and 801 of this Agreement and the consummation of the transactions contemplated hereby and any other authorization required for the transfer of the Acquired Assets to Buyers;

(g)     all affidavits, undertakings, memoranda or other assurances reasonably requested by the title company from Bendco and 801 to issue the Owner Title Policy;

(h)     all payoff letters from the applicable lenders, in form and substance satisfactory to Buyers, as provided in Section 1.4(c) to immediately release all Liens (other than Permitted Liens) relating to the Acquired Assets upon receipt of the amounts indicated in such payoff letters and all evidences of payment of Taxes and utilities prorated to the Sellers as contemplated by Section 1.4 and Section 2.10;

(i)     all termination statements and releases necessary or appropriate to terminate, release, and discharge any Liens (other than Permitted Liens) on or affecting the Acquired Assets it being understood and agreed by Buyers that the Final Sale Order entered by the Bankruptcy Court shall fully satisfy Sellers' obligations under this Section 2.7(i);

(j)     certificates of title to all motor vehicles included in the Acquired Assets, duly endorsed for transfer to Buyers as of the Closing Date;

(k)     Buyers shall have received on the Closing Date a certificate, as contemplated under and meeting the requirements of section 1.1445-2(b)(2)(i) of the Treasury Regulations, to the effect that neither Bendco nor 801 is a foreign person within the meaning of the Code and applicable Treasury Regulations;

(l)     a certificate from the President of Bendco and the Manager of 801, in a form and substance reasonably satisfactory to Buyers, setting forth the aggregate amount of Indebtedness of Bendco and 801 as of the Closing Date; and

(m)     such other documents or instruments as Buyers or its counsel may request that are reasonably required to be delivered by Bendco or 801 at or prior to Closing pursuant to this Agreement or otherwise required in connection herewith (such items referred to in clauses (a) through (p), together with this Agreement are collectively referred to as the **"Bendco Transaction Documents"**).

---

[5] Will address the Akyapak equipment, Omnipotec lines, ASM certification, and P O Box

18

2.8     <u>Deliveries at the Closing by Buyers</u>.  At the Closing, Buyers shall deliver to Bendco (unless delivered previously):

(a)     the Assignment and Assumption Agreement in substantially the form of <u>Exhibit A-1</u> relating to the Operating Assets, executed by New Bendco;

(b)     the Assignment and Assumption Agreement in substantially the form of <u>Exhibit A-2</u> relating to the Real Estate, executed by New Bendco Property;

(c)     the Closing Payment, payable in accordance with <u>Section 1.6(a)(i)</u>;

(d)     the Transition Services Agreement; and

(e)     such other documents or instruments as Bendco or its counsel may request that are reasonably required to be delivered by Buyers at Closing pursuant to this Agreement or otherwise required in connection herewith (such items referred to in clauses (a) through (h) above, together with this Agreement are collectively referred to as the "**Buyers Transaction Documents**").

2.9     <u>Passage of Title</u>.  Title to all Acquired Assets shall pass from Bendco and 801, as applicable, to Buyers at Closing, subject to the terms and conditions of this Agreement.

2.10    <u>Transfer Taxes, Etc</u>.

(a)     Buyers shall pay any transfer Taxes incurred in connection with the transfer of the Acquired Assets from Bendco to Buyers in connection with this Agreement.

(b)     As of the Closing Date, all real and personal property Taxes and similar ad valorem obligations related to the Acquired Assets for Tax periods beginning before and ending after the Closing Date shall be assumed by Buyers.  Further, utilities (which shall include water, gas, electric, sewer, fuel and the like) meters shall be read, to the extent that the utility company will do so, during the daylight hours on the Closing Date (or as near as practicable prior thereto), with charges to that time paid by Bendco and charges thereafter paid by Buyers.  Prepaid utility charges shall be prorated on a per diem basis based upon the last available invoice therefor as of the Closing Date, and Buyers shall pay Bendco for Buyers' prorated share thereof (which shall be determined on a per diem basis from the Closing to the end of the relevant period).  Charges for utilities which are un-metered, or the meters for which have not been read on the Closing Date, will be prorated between Buyers and Bendco as of the Closing Date.

(c)     All of the prorations shall be made on the Closing Date and any amount payable by Bendco or 801 will be paid out of the Closing Price against evidence of such payment.

2.11    <u>Right to Contest</u>.  The assumption and agreement by Buyers to pay, perform, and discharge the Assumed Liabilities shall not prohibit Buyers from contesting with a third party the amount, validity, or enforceability of any thereof.

2.12    <u>Fulfillment of Conditions and Agreements Prior to Closing</u>.  Each Party shall use commercially reasonable efforts to satisfy all of those conditions to the obligations of the other

19

under this Article 2 that are not beyond its reasonable control prior to the Closing Date. Each Party shall use commercially reasonable efforts to take, or cause to be taken, all action and do, or cause to be done, all things necessary, proper or advisable, including making or obtaining any and all consents and authorizations, to consummate and make effective the transactions contemplated by this Agreement, including making all filings required under applicable law. Notwithstanding the foregoing, Buyers shall not be required to take any action to comply with any legal requirement or agree to the imposition of any Governmental Entity order, judgment, or decree that would (a) prohibit or restrict the ownership or operation by Buyers of any portion of the Acquired Assets, (b) compel Buyers to dispose of or hold separate any portion of its assets, or (c) impose any limitation on the ability of Buyers to own or operate the Business.

2.13    Termination Prior to Closing.

(a)    Events of Termination. This Agreement may be terminated in writing at any time prior to the Closing as follows:

(i)    by the mutual consent of Buyers, on the one hand, and Bendco on the other hand;

(ii)    by written notice from Buyers, if any of the conditions specified in Section 2.2 shall not have been fulfilled (or if satisfaction becomes impossible) by June 30, 2019 (the "**Outside Date**") and shall not have been waived by Buyers; provided further, however, that Buyers shall not be permitted to terminate this Agreement pursuant to this Section 2.13(a)(ii) if Buyers are in material breach of this Agreement;

(iii)    by written notice from Bendco, if any of the conditions specified in Section 2.3 shall not have been fulfilled (or if satisfaction becomes impossible) by the Outside Date and shall not have been waived by Bendco; provided further, however, that Bendco shall not be permitted to terminate this Agreement pursuant to this Section 2.13(a)(iii) if Bendco or 801 is in material breach of this Agreement;

(iv)    by written notice from Buyers if (A) any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or appointing a trustee in the Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged power relating to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (B) an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after entry thereof;

(v)    by written notice from Buyers, if the Sale Order shall not have been approved and entered by the Bankruptcy Court by the close of business on the Outside Sale Order Date;

(vi)    by written notice from Buyers, if (A) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Sale Order, (B) the

20

Sellers fail to perform their obligations under Section 1.7(a)(iii), or (C) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Buyers in their sole discretion;

      (vii)   by written notice from Buyers if on or prior to the Outside Final Sale Order Hearing Date (A) the Final Sale Order Hearing has not taken place, (B) the Bankruptcy Court has not entered the Final Sale Order approving the sale of the Acquired Assets to Buyers on the terms and conditions set forth herein or (C) the Final Sale Order fails to contain substantially the same provisions as described in Section 1.7(b) (or as may be approved by Buyers in their sole discretion),

      (viii)   by written notice from Buyers if (A) the Final Sale Order does not provide for the Waiver or (B) without Buyers' prior written consent in their sole discretion and if they so consent then by written notice from Buyers if the Final Sale Order has not become final and non-appealable;

      (ix)   by written notice from Buyers, if a material breach of any provision of this Agreement has been committed by Bendco or 801 and such breach has not been cured or waived by Buyers after prior written notice and reasonable opportunity to cure; and

      (x)   by written notice from Bendco, if a material breach of any provision of this Agreement has been committed by Buyers and such breach has not been cured or waived by Bendco after prior written notice and reasonable opportunity to cure;

      (xi)   by written notice from Sellers or Buyers if either of the Sellers have agreed to enter into an Alternative Transaction;

      (xii)   by written notice from Buyers if the Bankruptcy Court enters an Order approving an Alternative Transaction, whether before or after the Sale Order is entered;

      (xiii)   if not sooner terminated pursuant to other powers of termination above, automatically upon the consummation and funding of an Alternative Transaction;

      (xiv)   by written notice from the Sellers or Buyers, if there is in effect a final order of a Governmental Entity of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to the other provisions of this Section 2.13.

Each power in this Section 2.13 pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such power. If more than one of the termination powers set forth in this Section 2.13 is applicable, the applicable Party shall have the right to choose the termination power pursuant to which this Agreement is to be terminated. The Parties

21

acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this <u>Section 2.13</u> shall become effective until two (2) Business Days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) Business Day period.

        (b)    <u>Intentionally Omitted.</u>

        (c)    <u>Consequences of Termination</u>.

        (i)    If this Agreement is terminated by mutual consent of Bendco and Buyers, no Party hereto shall have any obligation to any other Party as a result of that termination.

        (ii)    If any Party terminates this Agreement for any other reason described in <u>Section 2.13(a)(iv)</u>, <u>Section 2.13(a)(v)</u>, <u>Section 2.13(a)(vi)</u>, <u>Section 2.13(a)(vii)</u>, or <u>Section 2.13(a)(viii)</u>,  Buyers, on the one hand, and Bendco, on the other hand, may be liable to the other for any material breach of this Agreement by such Party which breach led to such termination (subject to the last sentence of <u>Section 2.13(b)(ii)</u>). Each Party shall also be entitled to any other remedy to which it may be entitled at law or in equity, including injunctive relief and specific performance, in the event of a termination of this Agreement that is not in accordance with <u>Section 2.13(a)</u>, all of which remedies hereunder are cumulative and are not exclusive of any other remedies.

        (iii)    If the Closing does not occur on or before the Outside Date and no Party's material breach of this Agreement was the cause of the failure to close by that date (and such Party is otherwise complying with all of its obligations under this Agreement), then no Party shall have any Liability to the other Party under this Agreement, and this Agreement shall terminate.

All rights and obligations of the Parties set forth in this <u>Section 2.13</u> and <u>Article 8</u>,  and the Sale Order (if entered) shall survive termination of this Agreement.

### ARTICLE 3.
### <u>Representations and Warranties of Bendco</u>

Bendco hereby represents and warrants to Buyers as follows:

    3.1    <u>Corporate Status; Authority</u>.  Bendco is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas.  Bendco is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except such jurisdictions where the failure to be so qualified or in good standing, individually or in the aggregate, have not had and will not have or be reasonably expected to have a Bendco Material Adverse Effect.  Bendco has all requisite corporate power to carry on its business and operations as it is now being conducted and to own and operate the Business, and

22

to enter into this Agreement, to perform its obligations hereunder and to complete the transactions contemplated hereby.

3.2     Corporate Action; Authority; Execution.  All corporate, individual, and stockholder actions and proceedings necessary to be taken by or on the part of Bendco in connection with the transactions contemplated by this Agreement and each other Bendco Transaction Documents to which Bendco is a party have been duly and validly taken, and this Agreement has been duly and validly authorized, executed, and delivered by Bendco and constitutes, and upon the execution and delivery thereof in accordance with its terms, each of the other Bendco Transaction Documents to which Bendco is a party, as applicable, will be duly and validly authorized, executed, and delivered by Bendco and will constitute, the legal, valid, and binding obligation of Bendco, enforceable against Bendco in accordance with and subject to its terms, except as may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights and by equitable principles.

3.3     No Conflicts.  Except as set forth on Schedule 3.3, neither the execution, delivery, and performance by Bendco of this Agreement or any of the Bendco Transaction Documents nor the consummation by Bendco of the transactions contemplated hereby or thereby is an event that, by itself or with the giving of notice or the passage of time or both, will (a) conflict with the certificate of incorporation or by-laws, as the same may be amended from time to time, of Bendco, (b) constitute a violation of, or conflict with, or result in any breach of or any default under, or constitute grounds for termination or acceleration of, any license, mortgage, indenture, lease, Contract (including the Assumed Contracts), agreement or instrument to which Bendco is a party or by which it is bound or result in the creation of any Lien (other than a Permitted Lien and such Liens as are set forth on Schedule 3.7(b)) upon any of the Acquired Assets, or (c) violate (i) any judgment, decree, or order or (ii) any statute, rule, or regulation, in each such case, applicable to Bendco.  Except as set forth on Schedule 3.3, the execution, delivery, and performance by Bendco of this Agreement, and the consummation by Bendco of the transactions contemplated hereby, require no action by or in respect of, or filing with, any Governmental Entity other than the Bankruptcy Court.

3.4     Monthly Operating Report and Records.

(a)     Bendco has filed all Monthly Operating Reports required to be filed with the Bankruptcy Court including for all monthly commencing with August 2018 and including April 2019 (the "**Financial Statements**.")  The Financial Statements have been prepared from the books and records of Bendco.  Except as set forth on Schedule 3.5(a), the Financial Statements present fairly in all material respects the financial condition, results of operation and cash flows of Bendco in conformity with GAAP and all laws, except as noted on such Financial Statements and unlawful or improper acts of Bendco's former president, John Tharp, which occurred prior to his termination in December 2018.

(b)     The books of account and related records of Bendco reflect accurately and in detail the Acquired Assets and Assumed Liabilities, as determined in a manner consistent with past practice.  The books of account of Bendco have been maintained in accordance with sound business practices.

3.5     Absence of Certain Changes or Events.

(a)     Except as set forth on Schedule 3.5, as reflected on the Financial Statements and further save and except the unlawful or improper actions of Bendco's former president, John Tharp, prior to his termination in December 2018 (the **"Tharp Actions"**), since August 31, 2018, (i) Bendco has used its commercially reasonable efforts consistent with past practice to preserve the Business and Bendco's relationships with customers, suppliers, lenders, creditors, employees, licensors, licensees, distributors and others with whom Bendco has a business or financial relationship, and as of the date hereof no such Person or group of Persons having a business or financial relationship with the Bendco has informed any employee of Bendco that such Person intends to significantly reduce the overall dollar volume purchased by such Person or significantly reduce the gross margins related to the overall volumes purchased from such Person, or discontinue such relationship, and (ii) there has not occurred with respect to the Business any event, occurrence, or development which, individually or in the aggregate, has had or would have a Bendco Material Adverse Effect.  Since August 31, 2018, except for the Tharp actions, the Business has been conducted in the ordinary course consistent with past practice (**"Ordinary Course"**) and capital expenditures and inventory levels) and there has not occurred with respect to the Business:

(i)     any material damage, destruction or loss not fully covered by insurance;

(ii)     any sale or other disposition of any capital asset having a net book value in excess of $10,000 used in the Business;

(iii)     any increase in the wage, salary, commission or other compensation (other than routine increases granted in the ordinary course of business and consistent with past practice) payable or to become payable by Bendco to any of its employees, or any change in any existing, or creation of any new, insurance or other plan under which Bendco provides benefits to such employees; or

(iv)     any release or waiver by Bendco of any material claim or right.

3.6     Licenses, Permits and, Authorizations.  Schedule 3.6 lists and describes all licenses, permits and authorizations that are currently held by Bendco and are required for the conduct of the Business.  Except as set forth in Schedule 3.6, (a) such licenses, permits and authorizations are not subject to any restrictions or conditions that would limit the operation of the Business and (b) there are no applications by Bendco or complaints by others pending or threatened before any Governmental Entity relating to any licenses, permits or authorizations involving the Acquired Assets, the Business or Bendco.

3.7     Assets Used in the Business.

(a)     The Acquired Assets constitute all of the assets and property used or held for use in the Business and constitute all of the assets and property necessary to conduct the Business as the same has been conducted in the twelve (12) months prior to Closing in all material respects and as the same is to be conducted by Buyers.  At the Closing, the Acquired Assets will

24

include all of those assets (real, personal and tangible) necessary to conduct the Business as presently conducted (other than inventory used, sold or consumed in the ordinary course of business to non-affiliated third parties or worn out or obsolete fixed assets disposed of in the ordinary course of business) and will enable Buyers to operate the Business in the same manner as operated by Bendco prior to and as of the Closing Date.

(b)     Bendco has good and valid title to all Acquired Assets, except those sold or otherwise disposed of in the ordinary course of business consistent with past practice and not in violation of this Agreement, in each case, free and clear of all Liens of any kind except (i) such as are set forth on Schedule 3.7(b), (ii) mechanics', carriers', workmen's, or repairmen's liens arising in the ordinary course of business and for which payment is not yet delinquent, provided that all payment obligations associated with such liens are paid at Closing or are the subject of an Assumed Contract or Assumed Accounts Payable, (iii) Liens for Taxes that are not yet delinquent, and (iv) the easements, restrictions, covenants and other matters affecting the Real Property as set forth on Schedule 3.7(b) (the **"Real Estate Encumbrances"**) (such Liens, encumbrances and imperfections of title described in clauses (ii), (iii) and (iv) are hereinafter referred to collectively as **"Permitted Liens"**).

3.8     Employee Benefit Matters.

(a)     Bendco does not maintain, does not contribute to and has no Liability as to any employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended (**"ERISA"**) or any other and each other employment, pension, welfare, savings, deferred compensation, severance, termination, holiday, vacation, sick leave, performance, incentive, bonus, insurance, stock option, stock purchase or other equity-based plan, program, arrangement or understanding (collectively **"Benefit Plan"**).

(b)     No employee of Bendco will be entitled to any additional benefits or any acceleration of the time of payment or vesting of any benefits under any Benefit Plan as a result of the transactions contemplated hereby.

3.9     Brokers and Financial Consultants.  There is no investment banker, broker or finder, financial consultant or other Person who will have any valid claim against Bendco for a commission or brokerage fee in connection with this Agreement or the transactions contemplated hereby as a result of any agreement of, or action taken by, Bendco. Bendco has no Knowledge of, and has taken no action which would give rise to, any claim for a broker's or finder's fee to be paid by Buyers in connection with the consummation of the transactions provided for in this Agreement.

3.10     Contracts.  Schedule 3.10 hereto contains a complete and accurate list of all Contracts of the types described below to which Bendco is currently a party or otherwise bound (the "**Material Contracts**"):

(a)     Contracts under which Bendco has Indebtedness, or issued any note, bond, debenture or other evidence of indebtedness to, any Person or any other note, bond, debenture or other evidence of indebtedness issued to any Person;

(b)     Contracts under which (i) any Person has directly or indirectly guaranteed indebtedness, Liabilities of Bendco, or (ii) Bendco has directly or indirectly guaranteed indebtedness, Liabilities of any Person;

(c)     pledges, security agreements, financing statements or other documents granting a Lien on any of the Acquired Assets (other than Permitted Liens and such Liens as are set forth on Schedule 3.7(b));

(d)     Contracts under which Bendco is lessee of, or holds or operates, any machinery, equipment, vehicle or other tangible personal property owned by a third party and used in the Business;

(e)     Contracts or other arrangements (other than with respect to at-will employment or compensation) with any current or former officer, director, employee, or stockholder (including, without limitation, any transaction bonuses, stay bonuses, or other similar Contracts or arrangements), or with any relative, beneficiary, or spouse of the foregoing Persons, or with any Affiliate of Bendco, or any of their respective Affiliates, including Mr. Friery or any Person related to Mr. Friery within the second degree of affiliates or for the degree of leasing units (each, a **"Related Party"**);

(f)     any other Contract, whether or not made in the ordinary course of business, which is material to the Business or the termination of which has had or may have a Bendco Material Adverse Effect.

Neither Bendco nor any other party is (with or without the lapse of time or the giving of notice or both) is in default in any respect under any Material Contract.  Bendco has made available to Buyers true and complete copies of all Material Contracts.  Each Material Contract is in full force and effect and constitutes a legal, valid and binding obligation of Bendco, and the other parties thereto, enforceable in accordance with its terms except as may be limited by bankruptcy or other laws affecting creditors' rights and by equitable principles.  Bendco has not received any notice (written or oral) of the intention of any party to terminate or fail to renew any Material Contract.

3.11    Compliance with Laws.  The operations of the Business are not now being conducted and have not been conducted in violation of any applicable law, ordinance, statute, rule or regulation of any Governmental Entity, except to the extent that Mr. John Tharp's admitted embezzlement constitutes a violation of the law by the Businesses.  Bendco has not received, at any time since January 1, 2015, any notice from any Governmental Entity that the operations of the Business are being conducted in violation of any applicable law, ordinance, statute, rule or regulation of any Governmental Entity, or of any investigation or review pending or threatened by any Governmental Entity investigating or reviewing any alleged violation.

3.12    Environmental Matters.  Except as set forth in Schedule 3.12:

(a)     Permits.  (i) Bendco has obtained all material permits, registrations or other governmental approvals required under applicable Environmental Laws (**"Environmental Permits"**), (ii) all such Environmental Permits are in full force and effect, (iii) Bendco will not

26

take any action to cancel or terminate any such Environmental Permits between the date hereof and the Closing Date, (iv) Bendco has kept all material records, made all material reports and filings required by such Environmental Permits; and (v) no action is pending, or to Bendco's Knowledge, threatened, by any Governmental Entity to revoke, suspend, modify or limit any Environmental Permit. All Environmental Permits issued to the Business or the Real Property (including the Real Property) are listed on Schedule 3.12. Bendco shall cooperate with the transfer to Buyers of those Environmental Permits which must be held by the owner of the Acquired Assets, to the extent the same are assignable.

(b)     Pending or Threatened Claims.     There are no Environmental Claims pending, or, to Bendco's Knowledge, threatened, in connection with the operation of the Business or the ownership or use of the Real Property (including the Real Property), or, to Bendco's Knowledge, related to any other locations to which the Business sent or caused to be sent any Hazardous Materials. Schedule 3.12 lists any and all Environmental Claims against, or otherwise related to, Bendco, the Business, the Real Property (including the Real Property), or the Acquired Assets, within the five-year period prior to the Closing Date. Bendco has not received any request for information, notice of claim, demand or other notification or communication that it is or may be potentially responsible with respect to any Liability related to any Environmental Laws or to any threatened or actual Release of any Hazardous Materials. There has been no past, and there is no pending, or to the Knowledge of Bendco, contemplated, claim by or against Bendco under any Environmental Law. Bendco has not entered into any agreement or arrangement with any Person within the past five year period regarding any Environmental Law.

(c)     Hazardous Wastes.     There are no hazardous waste storage, treatment or disposal units as to which Bendco is in any material violation of Environmental Law or that require a permit under Environmental Law or waste surface impoundments at the Real Property (including the Real Property).

(d)     Reports.     Bendco has delivered to Buyers true and complete copies and results of any assessments, audits, reports, studies, analyses, tests, or monitoring in possession or control of Bendco or 801 (or any of their respective Representatives or Affiliates) pertaining to (i) the matters in this Section 3.12, (ii) Hazardous Materials or activities in, on or under the Real Property (including the Real Property), or (iii) compliance with Environmental Laws by the Bendco. To the Knowledge of Bendco, no other documents reflecting such assessments, audits, reports, studies, analyses, tests, or monitoring pertaining to the Real Property (including the Real Property) or Business exist.

(e)     Definitions.     For purposes of this Agreement,

(i)     **"Environmental Claim"** means any claim by any Governmental Entity for enforcement, cleanup, removal, response, remedial or other actions or damages or penalties pursuant to any applicable Environmental Law, and any claim or action by any third party seeking damages, compensation, or injunctive relief from the presence of Hazardous Materials or arising from alleged violation of Environmental Law or injury or threat of injury to public health or safety or the environment.

27

(ii) **"Environmental Law"** means all federal, state, local and foreign laws and regulations, all common law and all other provisions having the force or effect of law relating to pollution or protection of the environment, public health or safety, including, without limitation, those relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the use, treatment, storage, transport or handling of Hazardous Materials, and any Environmental Permits, orders, decrees, judgments, or injunctions issued, promulgated, approved, or entered thereunder.

(iii) **"Hazardous Materials"** means all substances defined as any (A) hazardous substance as defined by any Environmental Law, (B) any petroleum or petroleum product, oil or waste oil; (C) any asbestos or polychlorinated byphenyls; (D) any hazardous material, toxic substance, toxic pollutant, solid waste, municipal waste, industrial waste, hazardous waste, flammable material, radioactive material, pollutant or contaminant or words of similar meaning and regulatory effect under any applicable Environmental Law; and (E) any other chemical, material, or substance exposure to which or whose discharge, emission, disposal or Release is prohibited, limited, or regulated under any applicable Environmental Law.

(iv) **"Release"** means any release, spill, emission, discharge, leaking, pumping, pouring, dumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the Environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata).

3.13    Taxes. There are no present audits, disputes or proceedings as to any Taxes of the Business, save and except the IRS proof of claim filed in Sellers' bankruptcy proceeding.

3.14    Employees.

(a) Bendco has not made any written or verbal commitments to any officer, employee, former employee, consultant or independent contractor of Bendco with respect to compensation, promotion, retention, termination, severance or similar matters in connection with the transactions contemplated by this Agreement. Bendco is not delinquent in payments to any of the Bendco Employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed by them to date or amounts required to be reimbursed to such Bendco Employees.

(b) Bendco is in compliance in all material respects with all laws respecting employment and employment practices, terms and conditions of employment and wages and hours.

3.15    Transactions with Affiliates.

(a) None of the Contracts between Bendco or 801, on the one hand, and any of its Affiliates or any Related Party, on the other hand, will continue in effect subsequent to the Closing.

28

(b)     After the Closing, neither Bendco, 801 nor any Affiliate or Related Party will have any interest in any property (personal, tangible or intangible) or Contract used in or pertaining to the Business.

(c)     Neither Bendco, 801 nor any Affiliate or Related Party has any direct or indirect ownership interest in any Person in which the Business has any direct or indirect ownership interest or with which the Business competes or has a business relationship.

3.16    Customers and Suppliers.

(a)     Except as set forth on Schedule 3.16, no material customer or supplier has terminated its relationship with, or materially reduced its purchases from or sales to, Bendco, and Bendco has no Knowledge that any such customer or supplier intends to terminate its relationship with, or materially reduce its purchases from or sales to, Bendco.

### ARTICLE 4.
### Representations and Warranties of 801

801 hereby represents and warrants to Buyers as follows:

4.1    Corporate Status; Authority.  801 is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas.  801 is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary.  801 has all requisite corporate power to carry on its business and operations as it is now being conducted and to own the 801 Real Property, and to enter into this Agreement, to perform its obligations hereunder and to complete the transactions contemplated hereby.

4.2    Corporate Action; Authority; Execution.  Corporate, individual, and stockholder actions and proceedings necessary to be taken by or on the part of 801 in connection with the transactions contemplated by this Agreement and each of the other Bendco Transaction Documents to which 801 is a party have been duly and validly taken, and this Agreement has been duly and validly authorized, executed, and delivered by 801 and constitutes, and upon the execution and delivery thereof in accordance with its terms, each of the other Bendco Transaction Documents to which 801 is a party, as applicable, will be duly and validly authorized, executed, and delivered by 801 and will constitute, the legal, valid, and binding obligation of 801, enforceable against 801 in accordance with and subject to its terms, except as may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights and by equitable principles.

4.3    No Conflicts. Neither the execution, delivery, and performance by 801 of this Agreement or any of the Bendco Transaction Documents to which 801 is a party nor the consummation by 801 of the transactions contemplated hereby or thereby is an event that, by itself or with the giving of notice or the passage of time or both, will (a) conflict with the certificate of incorporation or by-laws, as the same may have been amended from time to time, of 801, (b) constitute a violation of, or conflict with, or result in any breach of or any default under, or constitute grounds for termination or acceleration of, any license, mortgage, indenture, lease,

29

Contract (including the Assumed Contracts), agreement or instrument to which 801 is a party or by which it is bound or result in the creation of any Lien (other than a Permitted Lien and such Liens as are set forth on Schedule 3.7(b)) upon any of the Acquired Assets, or (c) violate (i) any judgment, decree, or order or (ii) any statute, rule, or regulation, in each such case, applicable to 801.  The execution, delivery, and performance by 801 of this Agreement, and the consummation by 801 of the transactions contemplated hereby, require no action by or in respect of, or filing with, any Governmental Entity other than the Bankruptcy Court.

4.4     Real Property; Environmental Matters.

(a)     Schedule 1.1(e) lists each parcel of the Real Property owned by 801.  801 has good and indefeasible fee simple title to the Real Property, in each case free and clear of all Liens, other than Permitted Liens and such Liens as are set forth on Schedule 3.7(b).  Except as disclosed on Schedule 4.4, 801 has not leased or otherwise granted to any Person the right to use or occupy such 801 Real Property or any portion thereof, other than Bendco related to the Business.  Other than the right of Buyers pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such 801 Real Property or any portion thereof or interest therein.  801 is not a party to any agreement or option to purchase any real property or interest therein relating to, or intended to be used in the operation of, the Business.

(b)     No parcel of the 801 Real Property is held under a tax account with any property that is not also part of the 801 Owned Property.  There is no pending or threatened condemnation, expropriation, eminent domain or similar proceeding affecting all or any portion of the 801 Real Property.  All public utilities (including water, gas, electric, storm and sanitary sewage, and telephone utilities) required to conduct the Business therein as currently conducted are available to the 801 Real Property and enter the boundaries of the 801 Real Property through adjoining public streets or permanent, irrevocable easements or rights-of-way of record in favor of 801.  801 has not received any written notice of any proposed, planned or actual curtailment of service of any utility supplied to any facility owned by 801.  All Real Property has access to a public street.[6]

(c)     All improvements included in the Real Property have been constructed, and are in compliance, in all material respects, with all applicable building laws and codes, and all necessary building permits have been obtained.

(d)     There are no attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings under the Bankruptcy Code, 11 U.S.C. §101, et seq., or under any other debtor relief laws contemplated by or pending or, to the best knowledge of 801, threatened against 801 or the Real Property except for the 801 Case.

(e)     801 is neither a "foreign person", nor a "disregarded entity", as those terms are defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and/or applicable regulations.

30

(f)      801 hereby makes all of the representations and warranties made by Bendco contained in <u>Section 3.12</u> (Environmental Matters) with respect to the Real Property.

**ARTICLE 5.**
**<u>Representations and Warranties of Buyers</u>**

Each Buyer separately represents to Sellers as follows:

5.1      <u>Corporate Status; Authority</u>.  Buyer is [a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.]  Buyer is duly qualified and in good standing to do business in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except such jurisdictions where the failure to be so qualified or in good standing, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on the ability of Buyer to perform its obligations under or to consummate the transactions contemplated by this Agreement.  Buyer has all requisite power to carry on its business as it is now being conducted, to own and operate such business and Buyer has all requisite power to enter into this Agreement, to perform its obligations hereunder and to complete the transactions contemplated hereby.

5.2      <u>Corporate Action; Authority; Execution</u>.  All organizational proceedings necessary to be taken by or on the part of Buyer in connection with the transactions contemplated by the Buyer Transaction Documents have been duly and validly taken, and this Agreement has been duly and validly authorized, executed and delivered by Buyer and constitutes, and upon execution and delivery thereof in accordance with its terms, each of the other Buyer Transaction Documents will be duly and validly authorized, executed and delivered by Buyer and will constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer, in accordance with and subject to its terms, except as may be limited by bankruptcy, insolvency, reorganization, or other laws affecting creditors' rights generally and by general equitable principles.

5.3      <u>No Conflicts</u>.  Neither the execution, delivery and performance by Buyer of this Agreement or any of the Buyer Transaction Documents, nor the consummation by Buyer of the transactions contemplated hereby or thereby is an event that, by itself or with the giving of notice or the passage of time or both, will (a) conflict with the organizational documents of Buyer, (b) constitute a violation of, or result in any breach of or any default under, or constitute grounds for termination or acceleration of, any material mortgage, indenture, lease, contract, agreement or instrument to which Buyer is a party or by which it is bound, or (c) violate (i) any judgment, decree or order, or (ii) any statute, rule or regulation, in each such case, applicable to Buyer.  Except with respect to the Sale Order, the execution, delivery and performance by Buyer of this Agreement, and the consummation by Buyer of the transactions contemplated hereby, require no action by or in respect of, or filing with, any Governmental Entity other than the Bankruptcy Court.

5.4      <u>Financing</u>.  As of the Closing Date, Buyer will have cash and available credit facilities in an aggregate amount sufficient to pay the Purchase Price as required by this Agreement.  Buyers' obligations hereunder are not conditioned upon Buyers' obtaining financing from any source.

31

## ARTICLE 6.
## Additional Agreements

6.1     Cooperation.  Bendco and 801 agree to furnish to Buyers, and Buyers agree to furnish to Bendco and 801, upon request as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business, and with access to the books and records transferred pursuant to Section 1.1(k) as is reasonably necessary for the filing of any tax return, declaration or report, the making of any election related to Taxes, the preparation for any audit by any taxing authority, or the prosecution or defense of any claim, suit, or proceeding, or the winding up of their affairs (which information shall be maintained confidentially).  Bendco, 801, and Buyers shall cooperate fully as to and to the extent reasonably requested, in the conduct of any audit, litigation or other proceeding to the extent relevant to the Acquired Assets of the Business.  Bendco shall cooperate fully with Buyers to provide any documentation and forms required for use of any available tax exemptions or discounts related to the sale that is the subject of this Agreement and/or to otherwise satisfy any Tax related balances.

6.2     Employees.

(a)     New Bendco shall have no Liability for any costs or Liabilities arising from any employee's termination of employment with Bendco, including but not limited to costs and Liabilities attributable to Bendco Employees, (including, without limitation, any severance payments resulting therefrom and continued group health plan benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") on and after the Closing Date to any Bendco Employee or eligible dependent of a Bendco Employee. In the event that New Bendco or one of its Affiliates incurs any Liability or expense as a result of being required to provide COBRA continuation coverage to an "M&A qualified beneficiary" (within the meaning of Treasury Regulation Section 54.4980B-9) from and after the Closing Date, Bendco will reimburse New Bendco or New Bendco's Affiliate for any costs and expenses incurred by New Bendco and New Bendco's Affiliate in connection with providing such COBRA coverage, including, without limitation, third party administrative fees and charges incurred with respect to the administration and maintenance of the COBRA coverage described hereunder.  Nothing in this Agreement shall be construed as obligating Buyers to hire any Bendco employee for any period of time.

(b)     At Closing Buyers will fund $12,758.27 into the trust account with Fuqua & Associates to provide for certain amounts owed to the Employees of the Sellers.  Any of such amounts not ultimately expended for such purpose shall be returned to the Buyers.

6.3     Taxes; Final Sales Tax Return.

(a)     Taxes.  Except with respect to ad valorem Taxes, which shall be the responsibility of the Buyers, Sellers shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Acquired Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be an Excluded Liability. All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Sellers, including any and all sales or transfer taxes incurred or owed as a result of the transactions contemplated by this Agreement.   Buyers shall be responsible for prepetition and post-petition ad valorem Taxes with

32

respect to the Acquired Assets, provided that the Sellers shall be responsible for making the Ad Valorem Trust Account available to be applied to pay such amounts.

     (b)    <u>Filings and Cooperation</u>.

        (i)    Bendco shall be responsible for filing or causing to be filed and paying all federal income Taxes of or payable by Bendco and all state, local, provincial and foreign income Taxes with respect to which Bendco is required to file for all taxable periods ending on or prior to the Closing Date. Bendco shall file its final sales tax Return and pay the sales Taxes due, if any, within fifteen (15) days of the Closing Date. In connection with the Closing, Bendco shall prepare and execute a statement of occasional sale and file the same with the Texas Comptroller of Public Accounts.

        (ii)    Sellers and Buyers shall (A) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (B) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (C) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

    6.4    <u>Name Change</u>. As promptly as practicable after the Closing Date, Bendco shall file in all jurisdictions in which it is qualified to do business any documents necessary to reflect such change of name or to terminate its qualification therein.

    6.5    <u>Administrative Expenses</u>. At Closing Buyers will fund $165,000 into the trust account with Fuqua & Associates to provide for the payment of (i) post-petition amounts owed to the Internal Revenue Service and (ii) administrative expense professional fees. Any of such amounts not ultimately expended for such purpose shall be returned to the Buyers

**ARTICLE 7.**
**Claims**

    7.1    <u>General Provisions</u>. The representations, warranties and, to the extent performable after Closing, covenants set forth in this Agreement shall survive the Closing.

    7.2    <u>Specific Performance</u>. Sellers considered as a group, on the one hand and Buyers considered as group, on the other hand, acknowledge that the rights of the members of the other group to consummate the transactions contemplated hereby are unique and recognize and affirm that in the event of a breach of this Agreement by Sellers or Buyers, as the case may be, money damages may be inadequate and the non-breaching members of the other group may have no adequate remedy at law. Accordingly, the Parties agree that such non-breaching members of the other group shall have the right, in addition to any other rights and remedies existing in their favor at law or in equity, to enforce their rights and the other Party's obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive or other equitable relief (without posting of bond or other security).

33

# ARTICLE 8.
## Miscellaneous

8.1     Costs and Expenses.  Each Party hereto shall bear all its expenses incurred in connection with the transactions contemplated by this Agreement, including, without limitation, accounting, legal and financial advisory fees and expenses incurred in connection herewith; provided that the foregoing shall not limit the obligation to pay the Breakup Fee as contemplated hereby.

8.2     Binding Effect Assignments.  This Agreement shall be binding upon Buyers and, subject to entry of the Sale and Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, Seller, and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 case.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party to this Agreement except as provided below.

No Party hereto may assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other Parties, and any such attempted assignment or delegation without such consent shall be void and of no force and effect.  Notwithstanding the foregoing, Buyers shall have the right to assign its rights and delegate its duties under this Agreement to (a) any of its Affiliates or (b) any other Person or entity, provided that such Person or entity acquires (whether by merger, operation of law, or otherwise) all or substantially all of Buyers' assets, and provided, further, that, in either case, no assignment shall relieve Buyers of any of its obligations hereunder.

8.3     Further Assurances.  The Parties shall from time to time do and perform such additional acts and execute and deliver such additional documents and instruments as may be required or reasonably requested by any Party to establish, maintain or protect its rights and remedies or to effect the purpose of this Agreement.

8.4     Notices.  Notices and other communications required or provided for herein shall be in writing (which shall include notice by facsimile transmission) and shall be deemed to have been duly given and received (a) upon receipt, when delivered by hand or personal delivery, (b) upon transmission, when sent by facsimile transmission (with written confirmation of successful transmission), (c) on the second business day after the date of mailing, if delivered by a nationally recognized overnight delivery service (receipt requested), or (d) upon receipt, if delivered by certified or registered mail (receipt requested), in each case addressed as follows:

If to Bendco or 801:

c/o Mr. Rick Friery
801 Houston Ave
Pasadena, Texas 77502

with a copy to:
Richard L. Fuqua, Esq.

34

Fuqua & Associates, P.C.
5005 Riverway Dr., Suite 250
Houston, TX 77056

If to Buyers:

Pasadena Pipe Benders, LLC
c/o Wolfcreek Group
1333 West Loop South, Suite 1600
Houston, Texas 77027
Attention:  Joseph Frost
Facsimile: (713) 300-2307

Pasadena Holdco, LLC
c/o Wolfcreek Group
1333 West Loop South, Suite 1600
Houston, Texas 77027
Attention:  Joseph Frost
Facsimile: (713) 300-2307

with a copy to:

Bruce J. Ruzinsky
Jackson Walker LLP
1401 McKinney, Suite 1900
Houston, Texas 77010
Facsimile: (713) 308-4155

or to such other address as a Party may from time to time designate in writing to each of the other Parties in accordance with this Section 8.4.

8.5     Amendment and Modification.  This Agreement may be amended, modified, or supplemented at any time after the Closing Date but only by the written agreement of the Parties hereto.

8.6     Captions.   The captions of Articles and Sections of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

8.7     Governing Law; Submission to Jurisdiction; Waivers.

(a)     This Agreement, any other Transaction Agreement, and all suits, actions, proceedings or counterclaims (whether based on contract, tort or otherwise) directly or indirectly arising out of or relating to this Agreement, any other Transaction Agreement and any of the transactions contemplated  hereby or thereby, or the actions of the Parties in the negotiation,

35

administration, performance and enforcement hereof and thereof, shall be governed by and construed in accordance with the Bankruptcy Code to the extent applicable and where state law is otherwise applicable, the laws of the State of Texas, without regard to principles of conflicts of law thereof.

(b)     Each of the Parties hereto irrevocably agrees that any suit, action, proceeding or counterclaim directly or indirectly arising out of or relating to this Agreement, any other Transaction Agreement, and the rights and obligations arising hereunder or thereunder, shall be brought and determined exclusively in the Bankruptcy Court and all disputes between or amount the Parties, whether at law or equity, arising out; provided, however, that if the bankruptcy court is unwilling or unable to hear any such dispute, the state or federal district courts of Harris County, Texas and any appellate court therefrom. Each of the Parties hereto agrees that mailing of process or other papers in connection with any such actions in the manner provided in Section 8.4 (Notices) or such other manner as may be permitted by applicable law, will be valid and sufficient service thereof. Each of the Parties hereto hereby irrevocably submits with regard to any such action for itself and in respect to its property, generally and unconditionally, to the exclusive personal jurisdiction of the aforesaid courts (provided that the judgment of any such court may be enforced by any court of competent jurisdiction) and agrees that it will not bring any action in any court or tribunal other than the aforesaid courts. Each Party hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action directly or indirectly arising out of or relating to this Agreement, any other Transaction Agreement, and the rights and obligations arising hereunder and thereunder, or for recognition and enforcement of any judgment in respect hereunder and thereunder (i) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve process in accordance with this Section 8.7(b); (ii) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (iii) to the fullest extent permitted by applicable law, any claim that (i) the suit, action, proceeding or counterclaim in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action, proceeding or counterclaim is improper and (iii) this Agreement, any other Transaction Agreement or the subject matter hereof or thereof, may not be enforced in or by such courts.

8.8     Waiver of Provisions.  The terms, covenants, representations, warranties and conditions of this Agreement may be amended, modified or waived only by a written instrument executed by the Party sought to be bound thereby. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The failure of any Party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right of such Party at a later date to enforce the same. No waiver by any Party of any condition or the breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

8.9     Execution of Agreement; Counterparts; Electronic Signatures.

(a)      This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to other Parties; it being understood that all Parties need not sign the same counterparts.

(b)      The exchange of copies of this Agreement and of signature pages by facsimile transmissions (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" ("**.pdf**") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signature of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

8.10    Entire Agreement.  This Agreement, including the Schedules and Exhibits hereto (which are incorporated herein by reference), the Bill of Sale, the Special Warranty Deed, the Assignment and Assumption Agreements, and the [Transition Services Agreement,] collectively, the "**Transaction Agreements**") constitute the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede, cancel, and replace any and all prior or contemporaneous agreements, understandings, and negotiations between the Parties and constitute a complete and exclusive statement of the terms of the agreement between and among the Parties with respect to the subject matter hereof.

8.11    Intentionally Omitted.

8.12    Definitions; Construction.

(a)      As used herein, the following terms shall have the following meanings:

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under the direct or indirect common control with such specified Person.

"**Alternative Transaction**" means (a) the consummation and funding of a sale or sales of all or substantially all of the Acquired Assets to a Person other than Buyers after approval by the Bankruptcy Court in which the Alternative Buyer funds the Overbid Amount; or (b) the filing of a plan of reorganization that does not contemplate the sale of the Acquired Assets to Buyers in accordance with the terms hereof. The Person other than the Buyers described in (a) or (b) acquiring Acquired Assets may be referred to as the "**Alternative Buyer**."

"**Bendco Material Adverse Effect**" means any material adverse effect (a) on the condition (financial or otherwise), Liabilities, properties, assets, or results of operations or prospects of the Business, taken as a whole, or (b) on the ability of Bendco or 801 to perform its obligations under or to consummate the transactions contemplated by this Agreement; provided, however, that the following shall not be considered in determining whether a Bendco Material Adverse Effect has occurred: (A) any effect resulting from a change (i) in the economy, or financial, banking, currency or capital markets, in general (including, without limitation, changes

37

in interest or exchange rates or commodities prices), or (ii) the industry in which the Business operates, provided that any such affect does not disproportionately affect the Business as compared to other businesses in the industry; (B) any effect resulting from the announcement of this Agreement or the consummation of any of the transactions contemplated hereby; (C) any effect resulting from (i) any act of war, sabotage or terrorism, or any escalation or worsening of any such acts of war, sabotage or terrorism threatened or underway as of the date of this Agreement, or (ii) hurricanes, tornados or other natural disasters; (D) any effect resulting from the taking of actions by Bendco or 801 required by the terms of this Agreement; (E) the effect of any changes in applicable laws or accounting principles or standards; and (F) any failure to meet revenue or earnings projections (provided that any change or development causing any such failure to meet projections may be taken into account in determining whether a Bendco Material Adverse Effect has occurred).

"**Business Day**" and "**Business Days**" mean any calendar day(s) except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of Texas are authorized or required by law or other governmental action to close.

"**Contract**" means any contract, lease, license, purchase order, indenture, agreement, commitment, or other contractual arrangement, whether oral or written, express or implied.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Governmental Entity**" means any domestic or foreign government or political subdivision thereof, whether on a federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"**Indebtedness**" as applied to any Person, means without duplication: (i) all obligations of such Person for borrowed money or in respect of loans or advances (including the Specified New Equipment Indebtedness); (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (iii) all obligations in respect of letters of credit, whether or not drawn, and bankers' acceptances issued for the account of such Person; (iv) all capitalized lease Liabilities of such Person; (v) all obligations for the costs or purchase prices of any of the Acquired Assets; (vi) any debt-like obligation or financing-type arrangement in respect of the deferred purchase price of the Acquired Assets; and (vii) any accrued interest, prepayment premiums or penalties or other costs or expenses related to any of the foregoing.

"**Knowledge**," "to the knowledge," "known" or similar variations thereof shall mean, with respect to Bendco or 801, the knowledge of Mr. Fiery and the knowledge that each could be expected to discover or otherwise become aware of in the course of conducting a reasonable investigation concerning the existence of the matters addressed.

"**Liability**" or "**Liabilities**", as used in this Agreement, with respect to any Person or any property of such Person, includes any debt, liability, duty, responsibility, commitment, requirement to perform, or obligation of any such Person or any claim, expense, loss, damage or

23268874v.5

penalty as against such Person or for which such Person may have (or is alleged to have) liability, in each case of any kind or nature, whether or not due, known or unknown, fixed, accrued, unaccrued, or contingent, including Indebtedness.

"**Person**" means an individual, a corporation, a limited liability company, a partnership, a joint venture, a business association, a trust or any other entity or organization, including a Governmental Entity.

"**Representative**" when used with respect to any Person means any directors, officers, employees, stockholders, agents or Representatives (including attorneys, accountants, consultants, banks and financial advisors) of such Person.

"**Taxes**" shall mean all Federal, state, local and foreign taxes or similar charges, including all income, franchise, margin, real property, withholding, employment, sales, excise and transfer taxes and any interest and penalties thereon.

"**Third Party**" means any Person other than any Party to this Agreement and any such Party's officers, directors and Affiliates (as applicable).

(b)     The definitions in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement. The term "or" is not exclusive.

8.13     No Third Party Beneficiaries. This Agreement is not intended to confer upon any Person other than the Parties hereto and their respective permitted successors and assigns any rights or remedies hereunder.

8.14     Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

**[SIGNATURE PAGE FOLLOWS]**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

23268874v.5

IN WITNESS WHEREOF, the Parties to this Agreement have each caused this Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

BUYERS:

PASADENA PIPE BENDERS, LLC

By: _____
Name: David B. Duncan
Title: Managing Director

PASADENA HOLDCO, LLC

By: _____
Name: David B. Duncan
Title: Managing Director

SELLERS:

BENDCO, INC.

By: _____
Name: _____
Title: _____

801 HOUSTON AVE PROPERTY, LLC

By: _____
Name: _____
Title: _____

1

**Schedule 1.1(a)(ii)**

**Customer Owned Property**

As listed on Customer work orders

**Schedule 1.1(b)**

**Customer Prepayments and Covered Receivables**

See attached A/R Aging

06-Jun-19  1:24PM
BENOCO, INC

**AR Aging**
Aging As Of: 6/6/2019

Page 1 of 9
by Invoice Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| AFG | | AMERI-FORGE CORPORATION | | | | Contact: ALEX MACGREGOR | | Ph: (713) 393-4200 | | |
| | | | | | | Terms: NET 30 | | Fax: (000) 000-0000 | | |
| INV | 56313 | 249173 | 06-Apr-19 | 06-May-19 | 61 | | | $12,600.00 | | $12,600.00 |
| INV | 56423 | 253841 | 15-May-19 | 14-Jun-19 | 22 | $8,250.00 | | | | $8,250.00 |
| INV | 56460 | 254274 | 31-May-19 | 30-Jun-19 | 6 | $13,000.00 | | | | $13,000.00 |
| | | | | Customer Totals: | | $21,250.00 | | $12,600.00 | | $33,850.00 |
| APP | | AMERICAN PIPING PRODUCTS, INC. | | | | Contact: ABIGAIL MUELLER | | Ph: (225)647-6700 | | |
| | | | | | | Terms: NET 30 | | Fax: (225)647-6706 | | |
| INV | 56385 | 324628 | 03-May-19 | 02-Jun-19 | 34 | | $720.00 | | | $720.00 |
| INV | 56448 | 325883 | 24-May-19 | 23-Jun-19 | 13 | $200.00 | | | | $200.00 |
| | | | | Customer Totals: | | $200.00 | $720.00 | | | $920.00 |
| ASFI | | ABLE STEEL FAB. INC. | | | | Contact: BARBARA/JERRY | | Ph: (480) 830-2253 | | |
| | | | | | | Terms: NET 30 | | Fax: (480) 396-8732 | | |
| INV | 56392 | 217-30 | 03-May-19 | 02-Jun-19 | 34 | | $7,837.69 | | | $7,837.69 |
| INV | 56396 | 217-30 TEST BEND | 07-May-19 | 06-Jun-19 | 30 | $4,500.00 | | | | $4,500.00 |
| | | | | Customer Totals: | | $4,500.00 | $7,837.69 | | | $12,337.69 |
| BMWC | | BMWC CONSTRUCTORS, INC. | | | | Contact: KYLE COOK | | Ph: 832-649-4251 | | |
| | | | | | | Terms: 2% 10 Net 30 | | Fax: 832-514-6061 | | |
| INV | 56419 | 702324-0005 | 15-May-19 | 14-Jun-19 | 22 | $1,899.79 | | | | $1,899.79 |
| | | | | Customer Totals: | | $1,899.79 | | | | $1,899.79 |
| BO | | BESTWAY OILFIELD | | | | Contact: CHRIS KEELING | | Ph: 281-452-2525 | | |
| | | | | | | Terms: NET 30 | | Fax: 281-452-2524 | | |
| INV | 56414 | 14579 | 13-May-19 | 12-Jun-19 | 24 | $3,750.00 | | | | $3,750.00 |
| | | | | Customer Totals: | | $3,750.00 | | | | $3,750.00 |
| CHICA | | CHICAGO METAL ROLLED PRODUCTS | | | | Contact: ANDY KALNMALS | | Ph: 773-523-5757 | | |
| | | | | | | Terms: NET 30 | | Fax: 773-650-1439 | | |
| INV | 56438 | B129172A | 23-May-19 | 22-Jun-19 | 14 | $3,400.00 | | | | $3,400.00 |
| | | | | Customer Totals: | | $3,400.00 | | | | $3,400.00 |
| COASTMAC | | COASTAL MACHINE & MECHANICAL, LLC | | | | Contact: L.G. "BUTCH" MURRELL, JR. | | Ph: (979)849-9323 | | |
| | | | | | | Terms: NET 30 | | Fax | | |
| INV | 56297 | 19120-009700 | 06-Apr-19 | 06-May-19 | 61 | | | $900.00 | | $900.00 |
| | | | | Customer Totals: | | | | $900.00 | | $900.00 |
| DEEP D | | DEEP DOWN, INC. | | | | Contact: AMANDA BAYGENTS | | Ph: (281) 862-2201 | | |
| | | | | | | Terms: NET 30 | | Fax: (281) 862-2522 | | |
| INV | 56386 | 19-34700 | 03-May-19 | 02-Jun-19 | 34 | | $885.00 | | | $885.00 |
| | | | | Customer Totals: | | | $885.00 | | | $885.00 |
| DFM | | DELTA FABRICATION & MACH. | | | | Contact: BARRY GAGE | | Ph: (903) 645-3458 | | |
| | | | | | | Terms: NET 30 | | Fax: (903) 645-2470 | | |

06-Jun-19  1:24PM
BENDCO, INC

**AR Aging**
Aging As Of: 6/6/2019

Page 2 of 9
by Document Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| DFM | | DELTA FABRICATION & MACH. | | Contact: BARRY GAGE | | | Ph: (903) 845-3458 | | | |
| | | | | Terms: NET 30 | | | Fax: (903) 645-2470 | | | |
| INV | 56289 | 06-6718-01 | 29-Mar-19 | 28-Apr-19 | 69 | | | $1,125.00 | | $1,125.00 |
| INV | 56418 | 06-7043 | 14-May-19 | 13-Jun-19 | 23 | $1,000.00 | | | | $1,000.00 |
| | | | | Customer Totals: | | $1,000.00 | | $1,125.00 | | $2,125.00 |
| DRI | | DRIL-QUIP INC. | | Contact: AARON GILBERT | | | Ph: (713) 939-7711 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 939-8063 | | | |
| INV | 56323 | 7411456 | 11-Apr-19 | 11-May-19 | 56 | | $450.00 | | | $450.00 |
| | | | | Customer Totals: | | | $450.00 | | | $450.00 |
| EFI | | EXTREME FAB INC. | | Contact: MAURICIO JUAREZ | | | Ph: (713) 637-0001 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 637-0003 | | | |
| INV | 56439 | 7719-1 | 23-May-19 | 22-Jun-19 | 14 | $450.00 | | | | $450.00 |
| | | | | Customer Totals: | | $450.00 | | | | $450.00 |
| ENERG | | ENERGY METALS, INC. | | Contact: JAMES | | | Ph: (713) 790-0222 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 790 0223 | | | |
| INV | 56285 | 224799-00 | 29-Mar-19 | 28-Apr-19 | 69 | | | $1,350.00 | | $1,350.00 |
| INV | 56450 | 227954-00 | 26-May-19 | 27-Jun-19 | 9 | $1,050.00 | | | | $1,050.00 |
| | | | | Customer Totals: | | $1,050.00 | | $1,350.00 | | $2,400.00 |
| ENVAS | | ENVASCO | | Contact: BRENDA JOHNSON | | | Ph: 713-675-7625 | | | |
| | | | | Terms: NET 30 | | | Fax: 713-675-7535 | | | |
| INV | 56346 | 46742B | 18-Apr-19 | 18-May-19 | 49 | | $250.00 | | | $250.00 |
| | | | | Customer Totals: | | | $250.00 | | | $250.00 |
| EXXM | | EXXONMOBIL | | Contact: ADAM G. GENTRY | | | Ph: | | | |
| | | | | Terms: NET 30 | | | Fax: | | | |
| INV | 55097 | 4551395376 | 13-Dec-17 | 12-Jan-18 | 540 | | | | $495.00 | $495.00 |
| INV | 56176 | 4002643548 | 06-Feb-19 | 08-Mar-19 | 120 | | | | $3,500.00 | $3,500.00 |
| | | | | Customer Totals: | | | | | $3,995.00 | $3,995.00 |
| EXXON-BR | | EXXONMOBIL CHEMICAL CO. | | Contact: ACCOUNTS PAYABLE | | | Ph: 800-833-1510 | | | |
| | | | | Terms: NET 30 | | | Fax: | | | |
| INV | 56257 | 4540141413 | 15-Mar-19 | 14-Apr-19 | 83 | | | $25,000.00 | | $25,000.00 |
| INV | 56440 | 4540141413 | 23-May-19 | 22-Jun-19 | 14 | $20,000.00 | | | | $20,000.00 |
| | | | | Customer Totals: | | $20,000.00 | | $25,000.00 | | $45,000.00 |
| FCI | | FABCORP, INC. | | Contact: CHRIS | | | Ph: (713) 466-3982 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 465-3470 | | | |
| INV | 56412 | 1561303-00 | 13-May-19 | 12-Jun-19 | 24 | $1,350.00 | | | | $1,350.00 |
| | | | | Customer Totals: | | $1,350.00 | | | | $1,350.00 |

06-Jun-19  1:24PM
BENDCO, INC

**AR Aging**
Aging As Of: 6/6/2019

Page 3 of 9
by Document Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| **FERGUS** | | **FERGUSON FIRE & FAB INC.** | | Contact: ACCOUNTS PAYABLE | | | Ph: (713) 896-8093 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 896-8760 | | | |
| INV | 56426 | W710-3455 | 17-May-19 | 16-Jun-19 | 20 | $780.00 | | | | $780.00 |
| INV | 56428 | W710-3558 | 17-May-19 | 16-Jun-19 | 20 | $600.00 | | | | $600.00 |
| INV | 56463 | W728-3904 | 29-May-19 | 28-Jun-19 | 8 | $920.00 | | | | $920.00 |
| | | | | Customer Totals: | | $2,300.00 | | | | $2,300.00 |
| **FISH** | | **FRAZIER INTERNATIONAL SUPPLY HOUSE** | | Contact: | | | Ph: 713-456-0169 | | | |
| | | | | Terms: NET 30 | | | Fax: | | | |
| INV | 56337 | 5531-019 | 12-Apr-19 | 12-May-19 | 55 | | $4,670.00 | | | $4,670.00 |
| | | | | Customer Totals: | | | $4,670.00 | | | $4,670.00 |
| **FOSFEN** | | **FOSTER FENCE CORP.** | | Contact: ALAN RATJEN | | | Ph: (281) 456-7273 | | | |
| | | | | Terms: NET 30 | | | Fax: (281) 458-0221 | | | |
| INV | 56447 | 29209 | 24-May-19 | 23-Jun-19 | 13 | $200.00 | | | | $200.00 |
| | | | | Customer Totals: | | $200.00 | | | | $200.00 |
| **GASP** | | **GASPAR, INC.** | | Contact: | | | Ph: | | | |
| | | | | Terms: NET 30 | | | Fax: | | | |
| INV | 56437 | 59579 | 22-May-19 | 21-Jun-19 | 15 | $1,400.00 | | | | $1,400.00 |
| | | | | Customer Totals: | | $1,400.00 | | | | $1,400.00 |
| **GATOR** | | **GATOR VALVE INC** | | Contact: JASON HERNANDEZ | | | Ph: 337-837-8228 | | | |
| | | | | Terms: DUE UPON RECEIP | | | Fax: | | | |
| INV | 56452 | 0036080 | 29-May-19 | 29-May-19 | 8 | $350.00 | | | | $350.00 |
| | | | | Customer Totals: | | $350.00 | | | | $350.00 |
| **GAUMER** | | **GAUMER COMPANY INC** | | Contact: MICHELLE | | | Ph: (713) 460-5200 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 460-1444 | | | |
| INV | 56449 | 91000 | 24-May-19 | 23-Jun-19 | 13 | $600.00 | | | | $600.00 |
| | | | | Customer Totals: | | $600.00 | | | | $600.00 |
| **GC** | | **GALLOP CORPORATION** | | Contact: JOHN KEENER | | | Ph: 281-449-1051 | | | |
| | | | | Terms: NET 30 | | | Fax: 281-449-4241 | | | |
| INV | 56421 | 4544-3 | 15-May-19 | 14-Jun-19 | 22 | $1,500.00 | | | | $1,500.00 |
| | | | | Customer Totals: | | $1,500.00 | | | | $1,500.00 |
| **GWM** | | **GREAT WESTERN METALS** | | Contact: CAROL JOBE | | | Ph: (281) 484-1150 | | | |
| | | | | Terms: NET 30 | | | Fax: (281) 484-7674 | | | |
| INV | 54841 | F71403 | 24-Aug-17 | 23-Sep-17 | 651 | | | | $450.00 | $450.00 |
| INV | 55950 | F78072 | 31-Oct-18 | 30-Nov-18 | 218 | | | | $5,900.00 | $5,900.00 |
| | | | | Customer Totals: | | | | | $6,350.00 | $6,350.00 |
| **HSC** | | **W & W AFCO / HIRSCHFELD STEEL COMPAN** | | Contact: | | | Ph: | | | |
| | | | | Terms: DUE UPON RECEIP | | | Fax: | | | |

06-Jun-19  1:24PM
RENDCO, INC

**AR Aging**
Aging As Of: 6/6/2019

Page 4 of 9
by Document Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| HSC | | W & W AFCO / HIRSCHFELD STEEL COMPAN | | Contact: | | | Ph: | | | |
| | | | | Terms: DUE UPON RECEIP | | | Fax: | | | |
| INV | 55390 | J49806 | 06-Apr-18 | 06-Apr-18 | 426 | | | | $3,952.50 | $3,952.50 |
| INV | 55666 | J49806 | 17-Jul-18 | 17-Jul-18 | 324 | | | | $3,656.25 | $3,656.25 |
| INV | 55673 | J43889 | 20-Jul-18 | 20-Jul-18 | 321 | | | | $7,200.00 | $7,200.00 |
| INV | 55689 | J49806 | 26-Jul-18 | 26-Jul-18 | 315 | | | | $2,887.50 | $2,887.50 |
| INV | 55691 | P0003925 | 26-Jul-18 | 25-Aug-18 | 315 | | | | $6,000.00 | $6,000.00 |
| INV | 55696 | J49806 | 27-Jul-18 | 27-Jul-18 | 314 | | | | $3,202.50 | $3,202.50 |
| INV | 55741 | J49806 | 10-Aug-18 | 10-Aug-18 | 300 | | | | $8,898.75 | $8,898.75 |
| INV | 55764 | J49806 | 15-Aug-18 | 15-Aug-18 | 295 | | | | $4,038.71 | $4,038.71 |
| INV | 56364 | P0019067 | 26-Apr-19 | 26-May-19 | 41 | | $3,600.00 | | | $3,600.00 |
| | | | | Customer Totals: | | | $3,600.00 | | $39,836.21 | $43,436.21 |
| HYDR | | HYDRIL USA MFG LLC | | Contact: 281-449-2000 | | | Ph: (281)985-8887 | | | |
| | | | | Terms: NET 45 | | | Fax: (281)715-4099 | | | |
| INV | 56162 | 330878 | 06-Feb-19 | 23-Mar-19 | 120 | | | | $1,550.00 | $1,550.00 |
| INV | 56334 | 3334453 | 12-Apr-19 | 12-May-19 | 55 | | $275.00 | | | $275.00 |
| | | | | Customer Totals: | | | $275.00 | | $1,550.00 | $1,825.00 |
| INDEP | | INDEPENDENT HOSE & | | Contact: | | | Ph: (713) 673-5007 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 676-1420 | | | |
| INV | 56359 | 30548600 | 24-Apr-19 | 24-Apr-19 | 43 | | $200.00 | | | $200.00 |
| | | | | Customer Totals: | | | $200.00 | | | $200.00 |
| INSU | | INSULTHERM, INC. | | Contact: BOBBY | | | Ph: (281) 470-8442 | | | |
| | | | | Terms: NET 30 | | | Fax: (281) 470-2042 | | | |
| INV | 56457 | PO-104216 | 31-May-19 | 30-Jun-19 | 6 | $1,425.00 | | | | $1,425.00 |
| | | | | Customer Totals: | | $1,425.00 | | | | $1,425.00 |
| JERRY | | JERRY'S MACHINE & FABRICATION, INC. | | Contact: GRADY BEAKLEY | | | Ph: (337) 437-4080 | | | |
| | | | | Terms: NET 30 | | | Fax: (337) 437-1126 | | | |
| INV | 56279 | 180311 | 22-Mar-19 | 21-Apr-19 | 76 | | $2,120.00 | | | $2,120.00 |
| | | | | Customer Totals: | | | $2,120.00 | | | $2,120.00 |
| JOE | | JOE BUSH & ASSOCIATES,INC | | Contact: JOE BUSH | | | Ph: (512) 238-0450 | | | |
| | | | | Terms: NET 30 | | | Fax: (512) 238-0439 | | | |
| INV | 56395 | SIGNED QUOTE | 07-May-19 | 06-Jun-19 | 30 | $750.00 | | | | $750.00 |
| | | | | Customer Totals: | | $750.00 | | | | $750.00 |
| JWI | | JETT WELD, INC. | | Contact: Chuck Sifferd | | | Ph: (713) 937-6200 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 937-0178 | | | |
| INV | 56393 | 4046-47 CO#1 | 06-May-19 | 05-Jun-19 | 31 | $2,200.00 | | | | $2,200.00 |
| | | | | Customer Totals: | | $2,200.00 | | | | $2,200.00 |

06-Jun-19  1:24PM
BENDCO, INC

**AR Aging**
Aging As Of: 6/6/2019

Page 5 of 9
by Document Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| KF | | KING FABRICATION, L.L.C. | | Contact: BILL KAESER<br>Terms: NET 30 | | | | Ph: (281) 209-0811<br>Fax: (281) 209-1774 | | |
| INV | 56407 | 18-086-000003 | 09-May-19 | 08-Jun-19 | 28 | $18,000.00 | | | | $18,000.00 |
| INV | 56431 | 18-004-000004 | 17-May-19 | 16-Jun-19 | 20 | $7,700.00 | | | | $7,700.00 |
| INV | 56433 | 18-004-000004 | 21-May-19 | 20-Jun-19 | 16 | $7,700.00 | | | | $7,700.00 |
| INV | 56445 | 18-004-000004 | 24-May-19 | 23-Jun-19 | 13 | $15,400.00 | | | | $15,400.00 |
| | | | | Customer Totals: | | $48,800.00 | | | | $48,800.00 |
| KWII | | KW INDUSTRIES, INC. | | Contact: John Aulbaugh<br>Terms: NET 30 | | | | Ph: (281) 240-0909<br>Fax: (281) 240-2588 | | |
| INV | 56405 | PO76643-00 | 09-May-19 | 08-Jun-19 | 28 | $360.00 | | | | $360.00 |
| | | | | Customer Totals: | | $360.00 | | | | $360.00 |
| LI | | LOGAN INDUSTRIES INTERNATIONAL, INC. | | Contact: ACCOUNTS PAYABLE<br>Terms: NET 30 | | | | Ph: 713-849-2979<br>Fax: 713-849-5266 | | |
| INV | 56268 | 82636 | 15-Mar-19 | 14-Apr-19 | 83 | | | $1,500.00 | | $1,500.00 |
| | | | | Customer Totals: | | | | $1,500.00 | | $1,500.00 |
| LUBR | | LUBRIZOL CORPORATION | | Contact: CHRISTY HENDERSON<br>Terms: 2% NET 10 | | | | Ph: (281) 479-2851<br>Fax: (281) 884-5244 | | |
| INV | 55967 | 4503065575 | 19-Nov-18 | 19-Nov-18 | 199 | | | | $1,350.00 | $1,350.00 |
| | | | | Customer Totals: | | | | | $1,350.00 | $1,350.00 |
| MERI | | MERICHEM COMPANY | | Contact: REY RDRIGUEZ<br>Terms: NET 30 | | | | Ph: (713) 428-5255<br>Fax: (000) 000-0000 | | |
| INV | 56305 | JOB 40000770 | 06-Apr-19 | 06-May-19 | 61 | | | $1,200.00 | | $1,200.00 |
| | | | | Customer Totals: | | | | $1,200.00 | | $1,200.00 |
| MISSIO | | MISSION METAL FABRICATORS | | Contact: ACCOUNTING DEPT<br>Terms: NET 30 | | | | Ph: (210) 223-3242<br>Fax: (210) 223-3243 | | |
| INV | 56256 | 264991 | 15-Mar-19 | 14-Apr-19 | 83 | | | $880.00 | | $880.00 |
| INV | 56417 | 271206 | 14-May-19 | 13-Jun-19 | 23 | $880.00 | | | | $880.00 |
| | | | | Customer Totals: | | $880.00 | | $880.00 | | $1,760.00 |
| MSC3 | | MOBIL STEEL INTERNATIONAL | | Contact: JIM WAILES<br>Terms: NET 30 | | | | Ph: (713)991-0540<br>Fax: (713) 991-7636 | | |
| INV | 56404 | 1819M19250 | 09-May-19 | 08-Jun-19 | 28 | $1,305.00 | | | | $1,305.00 |
| INV | 56406 | 1911M19249 | 09-May-19 | 08-Jun-19 | 28 | $1,065.00 | | | | $1,065.00 |
| | | | | Customer Totals: | | $2,370.00 | | | | $2,370.00 |
| NCI | | NCI BUILDING SYSTEMS LP | | Contact: ANDREW RICHARDS<br>Terms: NET 30 | | | | Ph: (281) 897-7788<br>Fax: (713) 849-2703 | | |
| INV | 56424 | 5000086622 | 15-May-19 | 14-Jun-19 | 22 | $300.00 | | | | $300.00 |
| | | | | Customer Totals: | | $300.00 | | | | $300.00 |

06-Jun-19  1:24PM
BENDCO, INC

**AR Aging**

Aging As Of: 6/6/2019

Page 6 of 9
by Document Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| NOV WIL | | NOV WILSON - DNOW LP | | | | Contact: ADRIANA GUTIERREZ | Ph: 281-823-4700 | | | |
| | | | | | | Terms: NET 30 | Fax: | | | |
| INV | 56357 | 660542412 | 24-Apr-19 | 24-May-19 | 43 | | $7,500.00 | | | $7,500.00 |
| | | | | | | Customer Totals: | $7,500.00 | | | $7,500.00 |
| OII | | ORIZON INDUSTRIES, INC. | | | | Contact: DAWN REED | Ph: (281) 375-7700 | | | |
| | | | | | | Terms: NET 30 | Fax: (281) 375-7979 | | | |
| INV | 56459 | 4607006 | 31-May-19 | 30-Jun-19 | 6 | $8,000.00 | | | | $8,000.00 |
| | | | | | | Customer Totals: | $8,000.00 | | | $8,000.00 |
| OTB | | OILTANKING BEAUMONT | | | | Contact: JUAN GONZALES | Ph: 409-225-9170 | | | |
| | | | | | | Terms: NET 30 | Fax: 281-247-7092 | | | |
| INV | 56390 | 4500009579 | 06-May-19 | 05-Jun-19 | 31 | | $1,015.00 | | | $1,015.00 |
| | | | | | | Customer Totals: | $1,015.00 | | | $1,015.00 |
| POWE | | POWER MACHINERY, INC. | | | | Contact: FRANK MORGAN | Ph: 713-462-3176 | | | |
| | | | | | | Terms: NET 30 | Fax: 713-462-4097 | | | |
| INV | 56455 | 6302732 | 30-May-19 | 29-Jun-19 | 7 | $1,800.00 | | | | $1,800.00 |
| | | | | | | Customer Totals: | $1,800.00 | | | $1,800.00 |
| PPEI | | PLANT PROCESS EQUIP. INC. | | | | Contact: AMY PRANGE | Ph: (713) 332-2509 | | | |
| | | | | | | Terms: NET 30 | Fax: (000) 000-0000 | | | |
| INV | 56294 | 2303-30-0133 | 02-Apr-19 | 02-May-19 | 65 | | | $5,850.00 | | $5,850.00 |
| | | | | | | Customer Totals: | | | $5,850.00 | $5,850.00 |
| R&J | | R&J PRECISION WELDING | | | | Contact: | Ph: (713) 946-5685 | | | |
| | | | | | | Terms: C.O.D. | Fax: (713) 946-1060 | | | |
| CM | 56061 | | 17-Dec-18 | 17-Dec-18 | 171 | | | | ($50.00) | ($50.00) |
| | | | | | | Customer Totals: | | | ($50.00) | ($50.00) |
| ROBO | | ROBOWELD | | | | Contact: | Ph: 713-829-3612 | | | |
| | | | | | | Terms: TO BE DETERMINED | Fax: | | | |
| INV | 56442 | PO62 | 23-May-19 | 23-May-19 | 14 | $900.00 | | | | $900.00 |
| | | | | | | Customer Totals: | $900.00 | | | $900.00 |
| RONA | | RONNIE ANDREWS | | | | Contact: | Ph: 512-635-5213 | | | |
| | | | | | | Terms: C.O.D. | Fax: | | | |
| INV | 56371 | COD | 29-Apr-19 | 29-Apr-19 | 38 | $61.88 | | | | $61.88 |
| | | | | | | Customer Totals: | $61.88 | | | $61.88 |
| RYERSON | | RYERSON INC | | | | Contact: ADAM PICKETT | Ph: (770) 368-4310 | | | |
| | | | | | | Terms: NET 30 | Fax: (770) 368-4288 | | | |
| CM | 55688 | | 25-Jul-18 | 24-Aug-18 | 316 | | | | ($500.00) | ($500.00) |
| | | | | | | Customer Totals: | | | ($500.00) | ($500.00) |

06-Jun-19  1:24PM  
BENDCO, INC

**AR Aging**  
Aging As Of: 6/6/2019

Page 7 of 9  
by Document Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| SERVICE | | SERVICE STEEL WAREHOUSE | | Contact: AMY MALONE | | | Ph: (713) 675-2631 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 672-7559 | | | |
| INV | 56432 | A562042 | 21-May-19 | 20-Jun-19 | 16 | $370.00 | | | | $370.00 |
| | | | | Customer Totals: | | $370.00 | | | | $370.00 |
| SMITH | | SMITH TANK & STEEL, INC. | | Contact: ADAM SAUCIER | | | Ph: (225)644-8747 | | | |
| | | | | Terms: NET 30 | | | Fax: (225) 698-1402 | | | |
| INV | 56398 | 2738-89749 | 07-May-19 | 06-Jun-19 | 30 | $6,650.00 | | | | $6,650.00 |
| INV | 56416 | 2652-89690 | 14-May-19 | 13-Jun-19 | 23 | $2,500.00 | | | | $2,500.00 |
| | | | | Customer Totals: | | $9,150.00 | | | | $9,150.00 |
| SSF | | SOUTHERN STL. FABRICATORS | | Contact: ALBERT | | | Ph: (956) 464-7766 | | | |
| | | | | Terms: NET 30 | | | Fax: (956) 464-8046 | | | |
| INV | 56425 | 55849 | 17-May-19 | 16-Jun-19 | 20 | $6,430.00 | | | | $6,430.00 |
| | | | | Customer Totals: | | $6,430.00 | | | | $6,430.00 |
| SSI6NED | | SOUTHWEST STAINLESS (Nederland) | | Contact: ANTHONY JAMES | | | Ph: | | | |
| | | | | Terms: NET 30 | | | Fax: | | | |
| INV | 56341 | 717752-00 | 16-Apr-19 | 16-May-19 | 51 | | $2,285.00 | | | $2,285.00 |
| | | | | Customer Totals: | | | $2,285.00 | | | $2,285.00 |
| SSLP | | SOUTHWEST SHIPYARD, L.P. | | Contact: ADRIAN | | | Ph: (281) 860-3200 | | | |
| | | | | Terms: NET 30 | | | Fax: (281) 860-3215 | | | |
| INV | 56322 | 105550MV BI | 11-Apr-19 | 11-May-19 | 56 | | $3,080.00 | | | $3,080.00 |
| INV | 56361 | 104090BI | 26-Apr-19 | 26-May-19 | 41 | | $9,230.00 | | | $9,230.00 |
| INV | 56413 | 106186GL | 13-May-19 | 12-Jun-19 | 24 | $2,470.00 | | | | $2,470.00 |
| INV | 56420 | 106187GL | 15-May-19 | 14-Jun-19 | 22 | $2,470.00 | | | | $2,470.00 |
| | | | | Customer Totals: | | $4,940.00 | $12,310.00 | | | $17,250.00 |
| TOTAL | | BAYPORT PLYMERS LLC. former TOTAL PET | | Contact: CAMERON GORE | | | Ph: | | | |
| | | | | Terms: NET 30 | | | Fax: | | | |
| INV | 56254 | 650114 | 29-Mar-19 | 28-Apr-19 | 69 | | | $6,110.00 | | $6,110.00 |
| INV | 56378 | WO 1458850/1452935 | 01-May-19 | 31-May-19 | 36 | $1,700.00 | | | | $1,700.00 |
| | | | | Customer Totals: | | $1,700.00 | | $6,110.00 | | $7,810.00 |
| TRE&C | | TRCW/T-REX | | Contact: ANGELA SMOOT | | | Ph: (281)860-8175 | | | |
| | | | | Terms: NET 30 | | | Fax: 281-452-6239 | | | |
| INV | 56362 | TR-18972 | 26-Apr-19 | 26-May-19 | 41 | $900.00 | | | | $900.00 |
| | | | | Customer Totals: | | $900.00 | | | | $900.00 |
| TSSSC | | TRIPLE S STEEL SUPPLY CO. | | Contact: ANTHONY | | | Ph: (713) 697-7105 | | | |
| | | | | Terms: NET 30 | | | Fax: (713) 697-7335 | | | |
| INV | 56410 | HOU-184889 | 13-May-19 | 12-Jun-19 | 24 | $3,385.00 | | | | $3,385.00 |
| | | | | Customer Totals: | | $3,385.00 | | | | $3,385.00 |

06-Jun-19  1:24PM
BENDCO, INC

**AR Aging**
Aging As Of: 6/6/2019

Page 8 of 9
by Document Date

| Type | Document | Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|------|----------|-------------|----------|----------|-----------|--------|---------|---------|---------|-----------|
| UDS | | UNITED DYNAMIC SERVICES, LLC | | | Contact: ALLEN HARRISON | | Ph: 281-741-5835 | | | |
| | | | | | Terms: NET 30 | | Fax: 713-583-0782 | | | |
| INV | 56345 | 21139 | 18-Apr-19 | 18-May-19 | 49 | | $4,500.00 | | | $4,500.00 |
| | | | | Customer Totals: | | | $4,500.00 | | | $4,500.00 |
| UNIV | | UNIVERSAL PLANT SERVICES | | | Contact: ADOLFO LEYVA | | Ph: (281) 694-6000 | | | |
| | | | | | Terms: NET 30 | | Fax: (281) 694-6001 | | | |
| INV | 56401 | 310925 | 09-May-19 | 08-Jun-19 | 28 | $5,800.00 | | | | $5,800.00 |
| | | | | Customer Totals: | | $5,800.00 | | | | $5,800.00 |
| UNW | | UNITED WORKS STEEL | | | Contact: | | Ph: 225-828-6023 | | | |
| | | | | | Terms: NET 30 | | Fax: | | | |
| INV | 56435 | 30-0925 | 21-May-19 | 20-Jun-19 | 16 | $1,625.00 | | | | $1,625.00 |
| | | | | Customer Totals: | | $1,625.00 | | | | $1,625.00 |
| US | | URIBE STEEL | | | Contact: DELMA | | Ph: (281) 452-5696 | | | |
| | | | | | Terms: NET 30 | | Fax: (281) 452-5698 | | | |
| INV | 56387 | 2190504 | 03-May-19 | 02-Jun-19 | 34 | $200.00 | | | | $200.00 |
| | | | | Customer Totals: | | $200.00 | | | | $200.00 |
| WGM | | WATSON GRINDING & MFG. | | | Contact: JASON WHITE | | Ph: 713-466-3053 | | | |
| | | | | | Terms: NET 30 | | Fax: 713-466-8992 | | | |
| INV | 56301 | 0046315-00 | 06-Apr-19 | 06-May-19 | 61 | | | $900.00 | | $900.00 |
| | | | | Customer Totals: | | | | $900.00 | | $900.00 |
| WHM | | WHM CUSTOM SERVICES, INC. / EPIC COMP/ | | | Contact: PHILIP FRAZIER | | Ph: 281-420-1200 | | | |
| | | | | | Terms: NET 30 | | Fax: 281-422-4158 | | | |
| INV | 56436 | 102162 | 21-May-19 | 20-Jun-19 | 16 | $1,623.75 | | | | $1,623.75 |
| | | | | Customer Totals: | | $1,623.75 | | | | $1,623.75 |
| WIG | | WOLSELEY INDUSTRIAL GROUP | | | Contact: 757-874-7795 AP | | Ph: 843-744-4948 | | | |
| | | | | | Terms: NET 30 | | Fax: | | | |
| INV | 56291 | W2093-5597 | 29-Mar-19 | 28-Apr-19 | 69 | | $5,000.00 | | | $5,000.00 |
| | | | | Customer Totals: | | | $5,000.00 | | | $5,000.00 |
| WWI | | WW INDUSTRIES | | | Contact: AMANDA LAUMEN | | Ph: 1-713-896-4391 | | | |
| | | | | | Terms: NET 30 | | Fax: 1-713-896-6870 | | | |
| INV | 56266 | 13314 | 22-Mar-19 | 21-Apr-19 | 76 | | $290.00 | | | $290.00 |
| | | | | Customer Totals: | | | $290.00 | | | $290.00 |
| ZEE | | ZEECO, INC. | | | Contact: ADRIANA MALDONADO RAMIREZ | | Ph: 442-296-7206 | | | |
| | | | | | Terms: NET 30 | | Fax: | | | |
| INV | 55994 | 8349 | 20-Nov-18 | 20-Dec-18 | 198 | | | | $225.00 | $225.00 |
| INV | 56069 | 8712 | 20-Dec-18 | 19-Jan-19 | 168 | | | | $350.00 | $350.00 |
| | | | | Customer Totals: | | | | | $575.00 | $575.00 |

06-Jun-19   1:24PM
BENDCO, INC

**AR Aging**
Aging As Of: 6/6/2019

Page 9 of 9
by Document Date

| Type Document   Customer PO | Doc Date | Due Date | Days Open | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 | Total Due |
|---|---|---|---|---|---|---|---|---|
| Report Totals: | | | | $164,108.54 | $51,559.57 | $64,825.00 | $53,106.21 | $333,599.32 |

**Schedule 1.1(d)**

**Equipment/Machines/Office Furniture**

See attached descriptions

| Machine | Model# | Serial# | Description |
|---|---|---|---|
| Hummer | Ajax | HK76280 | Induction Machine |
| SP-4 | Ajax | N/A | Induction Machine |
| Lathe | 111-1445 | N/A | Lathe |
| Vertical Mill | ENCO | N/A | Vertical Mill |
| Pines #2 | Pines | 123581003 | Draw Bender |
| AMOB | MAH601AC | 3211 | Radius Bender |
| Miller Weld | Deltaweld 452 | KJ260430 | Wire Welder |
| Z-33 Roundo | Z33 | N/A | Radius Bender |
| Z-33 Roundo | Z33 | N/A | Radius Bender |
| R6 Roundo | R6S | 062560 | Radius Bender |
| Band Saw WELLSAW | 1318 | N/A | Band Saw |
| T67 | T67 | N/A | Radius Bender |
| Z41 | Z41 | N/A | Radius Bender |
| G&L Mill | 340 Giddings Lewls | 4971 | Horizantal Mill |
| G&L Mill | 350t Giddings Lewis | 5860 | Horizantal Mill |
| Overhead Crane | N/A | N/A | 5 ton |
| Overhead Crane | N/A | N/A | 5 ton |
| Overhead Crane | N/A | N/A | 10 ton |
| AKBend | APK 300 | 300018 | Radius Bender |
| Boldrini | A40 | 4468 | Radius Bender |
| Boldrini | A40 | 4468 | Radius Bender |
| R72 Roundo | R72S | 088470 | Radius Bender |
| R5 Roundo | R5S | 08889 | Radius Bender |
| Pine #4 | 150021 | 1439-6500 | Draw Bender |
| Overhead Crane | N/A | N/A | 5 ton |
| Overhead Crane | N/A | N/A | 20 ton |
| Coast | Coast Iron & Machine wol | N/A | Draw Bender |
| Bulldog | 760 ton | 001 | Camber Machine |
| Miller Weld | Goldstar 302 | LF470130C | Wire Welder |
| Miller Weld | Deltaweld302 | CH0903501 | Wire Welder |
| Miller Weld | Deltaweld302 | XXXXXX870 | Wire Welder |
| WellSaw | 1013 | 35D11-75461 | Band Saw |
| Wallace 8 | 8 | N/A | Draw Bender |
| B-24 | MFP400 | 1306R630 4005 | Induction Machine |
| B-36 | N/A | N/A | Induction Machine |
| SP-8 | SP-8 | 001 | Induction Machine |
| Overhead Crane | N/A | N/A | 20 ton |
| Overhead Crane | N/A | N/A | 5 ton |
| Overhead Crane | N/A | N/A | 5 ton |
| Gene | S-60 | 5983 | Manlift |
| Cherrypicker | 150 FA Galion | 8015 | Cherrypicker |
| Nissan Forklift | N/A | N/A | Forklift |
| C8 | N/A | N/A | Section Bender |

| | | |
|---|---|---|
| 2011 Ford F450 4X2 | VIN: 1FD0W4GT0BEC31682 | Flatbed Truck |
| 2004 Ford F350SD | VIN: 1FDWW36S64EA93274 | Flatbed Truck |
| 1997 Utility Trailer | VIN: 432SD1627V1000274 | Trailer |
| 1980 Flatbed Trailer | VIN: 801222G | Trailer |
| 1996 Trailer | VIN: AV0487972_000001 | Homemade Trailer |
| 2005 Utility Trailer | VIN: 1R9GD402X5M356804 | Trailer |

Akyapak AK BEND Hydraulic Section Bending Machine, Model APK-300 that is the subject of a lift
stay Order entered May 16, 2018 appearing at Docket No. 48

**Office Funiture and Fixtures**

| Item | Quantity |
| --- | --- |
| Desks | 35 |
| Chairs | 30 |
| File Cabinets | 30 |
| Fridges | 3 |
| | |
| Computers | 13 |
| Printers | 4 |
| Time Clock | 1 |
| Phones | 15 |
| TV's | 2 |

**Schedule 1.1(e)**

**Real Property Description for 801 Houston Ave**

See attached legal description

## EXHIBIT "A"
## LEGAL DESCRIPTION

A TRACT OR PARCEL OF LAND CONTAINING 4.8241 ACRES BEING KNOW AS
TRACTS 50, 51, 63A, 64, 65, 66 AND 66A OF WARD ACRES BEING AN UNRECORDED
SUBDIVISION IN THE CITY OF PASADENA IN THE THOMAS O. MEAUX SURVEY,
ABSTRACT 595 AND SHOWN PLAT RECORDED IN VOLUME 487, PAGE 441 OF THE
DEED RECORDS OF HARRIS COUNTY, TEXAS, SAID 4.8241 ACRE TRACT BEING
MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS TO-
WIT:

BEGINNING at a 3/8 inch iron rod set marking the Southwest corner of the herein described
4.8241 acre tract in the North right-of-way line of East Houston Avenue (60 ft. right-of-way) and
located East a distance of 200.00 ft. from the intersection of the East right-of-way line of Wafer
Street with the North right-of-way line of said East Houston Avenue and marking the Southeast
corner of a called 0.4821 acre tract conveyed to the Estates of William H. Venable and shown in
Harris County Clerk's File No. 20110456876 of the Official Public Records of Harris County;

THENCE North 00 degrees 12 minutes 14 seconds West with the East boundary of Tract 66 and
East boundary of said Venable Tract a total distance of 299.20 ft. to a ½ inch iron rod found at
the Northwest corner of Tract 65 and the Northeast corner of Tract 66 being the Southeast corner
of a called 0.7603 acre tract conveyed to Gustavo Jiminez in Harris County Clerk's File No.
X015845 of the Official Public Records of Harris County;

THENCE South 89 degrees 38 minutes 10 seconds East with the South boundary of Tract 49 and
said Jiminez Tract a distance of 70.00 ft. to a ½ inch iron rod found at a re-entrant corner of the
herein described tract and marking the Southeast corner of said Tract 49 and said Jiminez Tract;

THENCE North 00 degrees 45 minutes 27 seconds East with the East boundary of said Jiminez
Tract and the East boundary of Tract 49 and the West boundary of Tract 50 a distance of 193.50
ft. and continuing with the East boundary of a tract conveyed to Luis and Sandra E. Hinojosa and
recorded in Clerk's File No. T667235 of the Official Public Records of Harris County a total
distance of 299.98 ft. to a ½ inch iron rod found at the Northwest corner and being in the South
right-of-way line of East Curtis Avenue and located South 89 degrees 26 minutes 00 seconds
East a distance of 270.00 ft. from a 5/8 inch iron rod found with cap at the intersection of the
South right-of-way line of East Curtis Avenue with the East right-of-way line of Wafer Street;

THENCE South 89 degrees 26 minutes 00 seconds East with the South right-of-way line of East
Curtis Avenue a distance of 280.00 ft. to a 3/8 inch iron rod set marking the Northeast corner of
the herein described tract and marking the Northeast corner of Tract 51 and the Northwest corner
of Tract 52 and the Northwest corner of a called 0.2410 acre tract conveyed to Iglesia Del Pueblo
and recorded in Harris County Clerk's File No. T846084 of the Official Public Records of Harris
County;

THENCE South 00 degrees 09 minutes 35 seconds West with the East boundary of Tract 51 and the West boundary of Tract 52 a distance of 298.98 ft. to a 5/8 inch iron rod found with cap marking the Southwest corner of Tract 52 and a re-entrant corner of the herein described tract;

THENCE North 87 degrees 30 minutes 43 seconds East with the division line between Tracts 63 and 52 a distance of 70.00 ft. to a 3/8 inch iron rod set marking the Southerly Northeast corner of the herein described tract and the West ½ of Tract 63 and the Northwest corner of a called 0.8127 acre tract conveyed to La Iglesia Del Pueblo as recorded in Harris County Clerk's File No. S498579 of the Official Public Records of Harris County;

THENCE South 00 degrees 11 minutes 56 seconds West with the mid line of Tract 63 and the West boundary of said called 0.8127 acre tract a distance of 300.00 ft. to a ½ inch iron rod found at the Southeast corner of the herein described tract and the Southwest corner of said 0.8127 acre tract in the North right-of-way line of East Houston Avenue;

THENCE West with the North right-of-way line of East Houston Avenue and basis for bearing a distance of 420.95 ft. to the PLACE OF BEGINNING and containing 4.8241 acres of land and being known as 801 East Houston Avenue, Pasadena, Texas 77502.



## EXHIBIT "B"
### Permitted Encumbrances

1. Standby fees, taxes and assessments by any taxing authority for the year 2012 and subsequent years.

2. Rights of tenants, as tenants only, under unrecorded leases or rental agreements, including that tenant evidenced by instruments recorded under Harris County Clerk's File Nos. W772928, Z101465 and 20090586855 both of the Official Public Records of Harris County, Texas.

3. All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records.

4. Public utility easement five (5) feet wide located along the West property line of Lot 50, granted to the City of Pasadena, by instrument recorded in Volume 4360, Page 260, of the Deed Records of Harris County, Texas.

5. Public utility easement five (5) feet wide located along the West property line of Lot 65, granted to the City of Pasadena, by instrument recorded in Volume 4637, Page 67, of the Deed Records of Harris County, Texas.

6. Easement granted to Houston Lighting & Power Company as set forth in instrument recorded under Clerk's File No. S498579, in the Official Records of Harris County, Texas.



**Schedule 1.1(j)**

**Specified Equipment Contracts**

1. TCF Equipment
2. US Bancorp

**Schedule 1.6(b)**

**Bank of America Indebtedness**

See attached Bank of America payoff letter

**MaryAnn Bartee**

| | |
|---|---|
| **From:** | Electronic Court Filing |
| **Sent:** | Thursday, June 6, 2019 1:56 PM |
| **To:** | Richard Fuqua; MaryAnn Bartee |
| **Subject:** | FW: Bendco |

**From:** Tom Kirkendall <bigtkirk@kir.com>
**Sent:** Thursday, June 6, 2019 1:55 PM
**To:** Electronic Court Filing <fuqua@fuqualegal.com>
**Subject:** Fwd: Bendco

See below.

--------- Forwarded message ---------
**From: Richard Dafoe** <rdafoe@vinlaw.com>
Date: Thu, Jun 6, 2019, 11:33 AM
Subject: RE: Bendco
To: Tom Kirkendall <bigtkirk@kir.com>
Cc: Richard Fuqua <RLFuqua@fuqualegal.com>

Tom- I have discussed your request with the Bank. Bank of America will accept $2.2 million (no deductions) for full satisfaction of its claims against Bendco and 801 Houston and release of liens. However, this figure is a floor number. If there is higher bids by any other parties or MAJD before or after a Motion for Sale or Plan, then the Bank will receive any increases in the sale price. In addition, it was contemplated that this sale motion was on a fast track. Bank of America expected to receive the $2.2 million by June 30, 2019. The Bank requires a closing at or very close to that date to keep the above payoff number in place.

*Richard G. Dafoe*

Vincent Serafino Geary Waddell  Jenevein, P.C.
1601 Elm Street, Suite 4100
Dallas, TX 75201

✍ rdafoe@vilolaw.com

☎  Direct: 214-979-7427

●  Main:   214-979-7400

🖳 Fax:   214-979-7402

This e-mail may contain PRIVILEGED COMMUNICATIONS. If you are not one of the intended recipients, please immediately delete all copies of this message and notify the sender so that we may take the necessary actions to prevent any further inadvertent disclosures.

**Schedule 2.2(f)**

**Required Consents**

      Duly authorized agent of TCF Equipment Finance

      Duly authorized agent of US Bancorp

      Duly authorized agent of Entrust Energy

      Duly authorized agent of any other contract to be assumed by Buyers

**Schedule 2.4(a)**

**Pre-Closing Transactions/ Indebtedness Outside Ordinary Course of Business**

None

**Schedule 3.3**

**Conflicts**

None known to Sellers

**Schedule 3.5**
**Exceptions to Financial Statements**

Any acts and omissions of John Tharp in his former capacity as President of Bendco including his admitted embezzlement of funds.  Further, breach of contract by G&A Partners resulting in damages to Bendco including those reflected in the IRS proof of claim filed in Bendco's proceeding.

**Schedule 3.6**

**Licenses, Permits**

None

**Schedule 3.7(b)**
**Liens**

Bank of America

UCC-1's filed of record as of Closing Date

**Schedule 3.10**

**Material Contracts**

      Bank of America Cash Collateral Agreement

      TCF Equipment Finance Agreed Order

      Omnipotech Agreed Order

      Comcast

      Entrust

      Go Daddy

      Adobe Business Catalyst



ENTERED
03/29/2018

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BENDCO, INC. | § | **CASE NO. 18-30849** |
| | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

**AGREED ORDER FOR USE OF CASH COLLATERAL PURSUANT TO
SECTION 363 OF THE BANKRUPTCY CODE AND PROVIDING ADEQUATE
PROTECTION AND GRANTING LIENS AND SECURITY INTERESTS**
(Docket No. 26)

Upon the Motion for Use of Cash Collateral (the "Motion") pursuant to Sections 105, 361, 363 and 364 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 4001, filed by Bendco, Inc. ("Debtor"), subject to the terms and conditions set forth herein, including the (i) granting of replacement mortgages, security interests, liens and claims for the benefit of Bank of America (the "Secured Lender"), Post-petition which are co-extensive with their Pre-petition liens (to the extent of such liens, if any) and (ii) grant of such replacement mortgages, security interests, liens and claims in order to provide adequate protection to the Secured Lender as more fully set forth herein, and upon the proceedings held before this Court and good and sufficient cause appearing therefore,

THE COURT HEREBY FINDS:

A.     On February 28, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is now operating its business and managing its property as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no official committee has yet been appointed.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      An immediate and critical need exists for the Debtor to obtain funds in order to continue the operation of its business. Without such funds, the Debtor will not be able to pay its direct operating expenses and obtain goods and services needed to carry on its business during this sensitive period in a manner that will avoid irreparable harm to the Debtor's estate.  At this time, the Debtor's ability to use Cash Collateral is vital to the confidence of the Debtor's vendors and suppliers of the goods and services, to the customers and to the preservation and maintenance of the going concern value of the Debtor's estate.

D.      Secured Lender may claim that substantially all of the Debtor's assets are subject to the Prepetition Liens of the Secured Lender, including a lien on accounts receivable relevant to the Motion.

E.      The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The permission granted herein to allow the Debtor to obtain the use of Cash Collateral financing is necessary to avoid immediate and irreparable harm to the Debtor. This Court concludes that entry of this Order is in the Debtor's best interest and its estate and creditors as its implementation will, among other things, allow for the continued operation and rehabilitation of the Debtor's existing business.

**THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that the Debtor be, and hereby is, authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the protections and consideration described in this Order in the amounts and for the expenses set forth on the monthly budget

attached hereto. The Debtor, without the prior written approval of the Secured Lender should not incur expenses for any line item for an amount that exceeds the lesser of the amount for such line item in the budget and the actual expenditure for such line item plus 10%. The Debtor is authorized to collect and receive all cash funds. The Debtor shall account each month to the Secured Lender for all funds received. There shall be no payment of accrued professional fees without a prior court order. For purposes of this Order, "proceeds" of any of the Secured Lender's collateral shall mean Proceeds (as defined in the Uniform Commercial Code) of such collateral security for all Cash Collateral permitted to be used hereunder by the Debtor. The Secured Lender is hereby granted valid, binding, enforceable, and perfected liens (the "Post-petition Liens") co-extensive with the Secured Lender's pre-petition liens in all currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising in all proceeds and products, including, without limitation, all accounts receivable, general intangibles, inventory, and deposit accounts coextensive with their pre-petition liens. Nothing herein shall grant a lien on, interest in or claim on Chapter 5 causes of action. Nothing herein shall prime the liens of the taxing authorities. The Debtor is permitted to pay U.S. Trustee fees incurred during this case; it is further

**ORDERED** that as adequate protection for the diminution in value of the interests of the Secured Lender, the Secured Lender is hereby granted replacement liens and security interests, in accordance with Bankruptcy Code Sections 361, 363, 364(c)(2), 364(e), and 552, co-extensive with its pre-petition liens; it is further

AGREED ORDER ON DEBTOR'S MOTION FOR USE OF CASH COLLATERAL
Page 3
435003

**ORDERED** that the replacement liens granted to the Secured Lender in this Order are automatically perfected without the need for filing of a UCC-1 financing statement with the Secretary of State's Office or any other such act of perfection; it is further

**ORDERED** that all cash accounts of Debtor and all accounts receivable collections by Debtor post-petition shall be deposited in a separate cash collateral account, being Debtor's debtor-in-possession accounts; it is further

**ORDERED** that as adequate protection in accordance with Section 363(e) of the Bankruptcy Code, the Debtor shall pay to the Secured Lender on the 1st day of the month the monthly contractual amount due on the debt totaling $10,000.00. Those continued monthly payments will adequately protect Bank of America for use of cash collateral. The use of cash collateral and the adequate protection payments should continue subject to further Order of this Court; it is further

**ORDERED** that from and after the Petition Date, the proceeds of the Pre-petition Collateral and the Post-petition Collateral shall not, directly or indirectly, be used to pay expenses of the Debtor or otherwise disbursed except for those expenses and/or disbursements that are expressly permitted herein and as shown on the Debtor's Budget attached hereto as **Exhibit "1"** plus 10% per line item. During the pendency of this order, the Debtor will maintain insurance on the Secured Lender's collateral and pay taxes when due. The automatic stay under Section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the Secured Lender to retrieve, collect and apply payments and proceeds in respect of the Pre-petition Collateral and Post-petition Collateral in accordance with the terms and provisions of this Order. The Debtor shall execute and deliver to the Secured Lender all such agreements, financing statements, instruments and other documents as the Secured Lender

may reasonably request to evidence, confirm, validate or perfect the liens granted pursuant hereto. The Debtor shall deliver a copy of its Monthly Operating Report to the Secured Lender's counsel by the 20th day of each month for the prior month. Lender may audit the books and records on site monthly with reasonable notice to the Debtor and its counsel; it is further

**ORDERED** that the provisions of this Order shall be binding upon and inure to the benefit of the Secured Lender and the Debtor. However, nothing herein shall prevent the Secured Lender from seeking any form of relief under the Bankruptcy Code. The Debtor shall serve by U. S. mail, first class postage prepaid, copies of the Motion, this Order on (a) the Office of the U. S. Trustee; (b) counsel to Bank of America; (c) all creditors in this case on the Matrix and (d) all parties requesting notice in this case. Copies of the Motion, this Order shall be served upon all persons requesting service of papers pursuant to Bankruptcy Rule 2002 by U. S. mail, first class postage prepaid, within one business day following the receipt of such request.

# # # END OF ORDER # # #

Signed: March 29, 2018.

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Agreed:

/s/ Richard L. Fuqua, II
Richard L. Fuqua, II
State Bar No.
Fuqua & Associates, PC
5005 Riverway, Ste. 250
Houston, TX 77056
Proposed Attorney for Debtor

AGREED ORDER ON DEBTOR'S MOTION FOR USE OF CASH COLLATERAL
Page 5
435003

/s/ Richard Dafoe
Richard Dafoe
State Bar No. 05309500
Vincent Serafino Geary Waddell Jenevein, P.C.
1601 Elm Street, Suite 4100
Dallas, TX 75201
Attorneys for Bank of America

# EXHIBIT 1

# BENDCO INC.
## EXPENSES
## MARCH 2018 - PAGE 1

| | | |
|---|---|---|
| **PROJECTED SALES** | $ | 250,000.00 |
| | | |
| ADVERTISING | $ | 200.00 |
| MEALS & ENTERTAINMENT | $ | 500.00 |
| MILEAGE REIMBURSEMENT | $ | 200.00 |
| TECH BOOKS | $ | 200.00 |
| JOB BOSS | $ | 300.00 |
| WORKERS COMP | $ | 5,000.00 |
| INSURANCE – LIABILITY BUILDING | $ | 7,500.00 |
| CONSULTING FEES | $ | 1,000.00 |
| OFFICE SUPPLIES | $ | 700.00 |
| UNIFORM EXPENSE | $ | 300.00 |
| ACCRUED PROPERTY TAXES | $ | 11,000.00 |
| ACCRUED FRANCHISE TAXES | $ | 2,000.00 |
| CELL PHONES | $ | 500.00 |
| JANITORIAL | $ | 1,000.00 |
| SALARIES - SALES | $ | 13,000.00 |
| SALARIES - ACCOUNTING | $ | 10,500.00 |
| SALARIES - OFFICERS | $ | 12,000.00 |
| SALARIES - SHOP | $ | 95,000.00 |
| BANK LOAN – PAYABLE TO BOA AS ADEQUATE PROTECTION | $ | 10,000.00 |
| BANK CHARGES FOR DIP ACCOUNT | $ | 100.00 |
| LEGAL & PROFESSIONAL | $ | 15,000.00 |

# BENDCO INC.
## EXPENSES
## MARCH 2018 - PAGE 2

| | | |
|---|---|---|
| JOB PURCHASES | $ | 1,500.00 |
| CONTRACT SERVICES | $ | 10,000.00 |
| SHOP SUPPLIES | $ | 5,000.00 |
| AUTO EXPENSE | $ | 1,500.00 |
| DELIVERY & FREIGHT | $ | 500.00 |
| R & M OFFICE BUILDING | $ | 1,000.00 |
| R & M TRANSPORTATION | $ | 550.00 |
| EQUIPMENT RENTAL | $ | 6,000.00 |
| R & M EQUIPMENT | $ | 3,000.00 |
| R & M CRANES | $ | 1,000.00 |
| R & M SHOP BUILDING | $ | 500.00 |
| UTILITIES - ELECTRIC, WATER, PHONE & GAS | $ | 17,000.00 |
| COMPUTER EXPENSES | $ | 2,000.00 |
| COPY MACHINE LEASE | $ | 2,000.00 |
| POSTAGE MACHINE LEASE | $ | 1,500.00 |
| R-7 MACHINE #1 | $ | 3,000.00 |
| R-5 MACHINE | $ | 2,500.00 |
| AKYAPAK | $ | 5,000.00 |
| | | |
| **TOTAL EXPENSES** | $ | 249,550.00 |
| | | |
| **TOTAL PROFIT** | $ | **450.00** |



ENTERED
06/06/2018

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 18-30849 |
| BENDCO, INC. | § | |
| | § | Chapter 11 |
| Debtor | § | |

### STIPULATION AND AGREED ORDER ON MOTION FOR ENTRY OF RULE 4001 STIPULATION AND AGREED ORDER FOR ADEQUATE PROTECTION BETWEEN DEBTOR AND TCF EQUIPMENT FINANCE, A DIVISION OF TCF NATIONAL BANK
### (This Order Resolves Docket # 47 )

The Court has considered the Motion for Entry of Rule 4001 Stipulation and Agreed Order for Adequate Protection between Debtor and TCF Equipment Finance, a Division of TCF National Bank ("TCF") concerning the equipment set forth below.  The Court finds that (a) the court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 157 and 1334; and (b) notice of the Motion was sufficient and in accordance with Local Bankruptcy Rule 4001.  The Court finds further that no objection or other response to the Motion was timely filed and the allegations in the Motion stand unopposed and the Court is of the opinion that this Stipulation and Agreed Order should be approved.

**IT IS THEREFORE STIPULATED, AGREED AND ORDERED THAT:**

(1)     TCF, as assignee to Balboa Capital Corporation, financed Debtor's purchase of a Roundo section bending machine Model R-5S, s/n 08889 with standard equipment and digital readouts (the "Equipment").    TCF is owed a total of $29,498.59 plus additional interest and attorney's fees pursuant to § 506(b).  Debtor requires the use of the Equipment for its operations. Debtor has made no post-petition payments to TCF.

1

(2)     Debtor shall remain in possession of Equipment, and the stay provided by 11 U.S.C. § 362 shall remain in effect as to TCF and the Equipment, provided Debtor complies with the following conditions:

    (a)     Debtor shall make monthly adequate protection payments in the amount of $2,500.00 to TCF with the first being due May 15, 2018, and thereafter on the 15th day of each month until otherwise ordered by the court; payment should be made payable to TCF Equipment Finance and sent to:

        TCF Equipment Finance
        11100 Wayzata Blvd, Suite 801
        Minnetonka, MN 55305

    (b)     Debtor agrees to keep Equipment fully insured and list TCF as the loss payee on such insurance until such time as TCF is paid in full; and provide TCF with proof of such insurance; and

    (c)     Debtor agrees to maintain Equipment in good working condition; and

    (d)     Debtor shall pay TCF's remaining claim in full under any plan it proposes.

(3)     Should Debtor default on any of the terms of this Stipulation and Agreed Order, TCF shall mail notice of the default to the Debtor and his counsel.  If the Debtor fails to cure the default within ten (10) days of the date TCF mails notice of the default, the automatic stay of 11 U.S.C § 362 shall be and is hereby terminated to allow TCF, its successors or assigns, to pursue its statutory and contractual rights and remedies including the right to gain possession, and dispose of the Equipment without further notice to the Debtor or any further action by this Court.

(4)     Debtor's right to default notice and cure within the prescribed ten (10) day period is limited to one (1) such event.  If Debtor defaults a second time, it is not entitled to notice and an opportunity to cure and upon such second default, the automatic stay of 11 U.S.C § 362 shall be and is hereby terminated to allow TCF, its successors or assigns, to pursue its statutory and contractual

2

rights and remedies including the right to gain possession, and dispose of the Equipment without

further notice to the Debtor or any further action by this Court.

(5)     This Stipulation and Agreed Order shall remain in effect further order of the Court.


**Signed:  June 05, 2018.**

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE


AGREED AND APPROVED AS TO SUBSTANCE AND FORM:

LAW OFFICES OF T.H. KELLEY, P.C.                FUQUA & ASSOCIATES, P.C

*/s/ Teri H Kelley*
Teri H. Kelley                                              Richard L. Fuqua
State Bar No. 10176900                            State Bar No. 07552300
6750 West Loop South, Suite 920            5005 Riverway, Ste 250
Houston, Texas 77401                             Houston, TX  77056
832.485.3515                                          713.960.0277
832.485.3517 Facsimile                          713.960.1064 Facsimile
tk@thkelleylaw.com                               rlfuqua@fuqualegal.com

**ATTORNEY FOR TCF**                          **ATTORNEY FOR DEBTOR**

3

## CONTRACT MODIFICATION

THE STATE OF TEXAS       §
                              §

COUNTY OF HOUSTON       §

       This Contract Modification, ("Agreement") is entered into effective as of July 10, 2018 by and between Bendco, Inc. a Texas corporation, whose address is 801 Houston Avenue, Pasadena, Texas 77502 ("Bendco"), and OMNIPOTECH, LTD ("Omnipotech"), whose address if 11422A Craighead Drive, Houston, Texas 77025.

### RECITALS:

      A.     On July 27, 2015, Bendco and OMNIPOTECH entered into the following contracts: 1) On Premises Infrastructure Project and Services Order Form ("Infrastructure Services Order Form"), 2) Project and Services Order Form for Bendco ("Services Order Form"), and 3) Masters Services Agreement for Bendco ("MSA"). (Hereinafter the Infrastructure Services Order Form, the Services Order Form, and the MSA are collectively referred to as the "Contracts"). Under the Contracts, OMNIPOTECH sold certain equipment to Bendco and provides monthly services to Bendco including, but not limited to email, internet, data backup and phone services.

      B.     Bendco is accepting the Contracts in full force and effect, as modified by the Agreement.

      C.     Bendco requested a reduction in monthly services under the Contract.

      D.     Bendco and Omnipotech reached an Agreement on the terms of such Modification and have entered into an Agreed Order dated _____ in case No. 18-30849; In re Bendco; pending in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy").

### AGREEMENT:

      NOW, THEREFORE, for and in consideration of the promises contained herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Bendco and OMNIPOTECH agree as follows:

      1.     Bendco accepts all existing Contracts between Bendco and OMNIPOTECH in the Bankruptcy subject only to the modification in this Agreement.

      2.     The existing Contracts are modified so that OMNIPOTECH will provide the following services to Bendco

| Monthly Recurring Services | Qty | Amt | Total |
|---|---|---|---|

**USER WITH TERMINAL SERVER ACCESS**

| | Qty | Amt | Total |
|---|---|---|---|
| - Microsoft Windows Server Standard R2 SPLA SAL<br>- Microsoft Remote Desktop Services SPLA SAL<br>- Microsoft Office Standard SAL (Word, Excel,<br>    PowerPoint & Outlook)<br>- Microsoft Exchange Standard<br>- Microsoft SQL Server SAL (Required for JobBoss) | 8 | 58.95 | 471.60 |

Terminal Works TSPrint - terminal server printing, file
transfer, and PDF creation (per terminal server)

**PROACTIVE MAINTENANCE AND SECURITY**

| | Qty | Amt | Total |
|---|---|---|---|
| OMNI-Desktop Care for Windows-based desktops<br>    and laptops | 5 | 20.00 | 100.00 |
| OMNI-Managed Security per user - manage anti-virus,<br>    anti-malware, anti-spyware and URL filtering<br>    per device | 5 | 5.00 | 25.00 |
| OMNI-Server Care Remote Server Watch for<br>Windows-based servers | 3 | 59.00 | 177.00 |
| OMNI-Managed Security Server - manage anti-virus,<br>    anti-malware, anti-spyware and URL filtering | 3 | 20.00 | 60.00 |
| OMNI-Firewall Monitoring (free with combined<br>    OMNI-Care Desktop & Server services) | 2 | Included | Included |

**EMAIL SECURITY**

| | Qty | Amt | Total |
|---|---|---|---|
| OMNI-Email Security Services for Exchange Server<br>    with secure outbound relay<br>- 1 mailbox per Exchange mailbox with up to 2 aliases;<br>    i.e., cgarcia, carlos.garcia, etc.<br>- 1 distribution list (up to 2 aliases each)<br>- Individual spam filtering, antivirus and antimalware<br>    for email<br>- 60 days rolling email retention for email continuity<br>    and online access<br>- Secure outbound relay to prevent Exchange server<br>    blacklisting | 11 | 6.50 | 71.50 |

## BACKUP, BUSINESS CONTINUITY, AND OFFSITE DISASTER RECOVERY

| | | | |
|---|---|---|---|
| OMNI-Backup Appliance for physical or virtual servers and up to 4 host servers protected | 1 | 375.00 | 375.00 |
| - No storage commitment required. Invoiced at $1/Gb for total data stored offsite | | | |
| OMNI-Backup license per non-SBS server with ImageManager Intelligent Transfer & HSR | 3 | 75.25 | 225.75 |

## OTHER HOSTING SERVICES

| | | | |
|---|---|---|---|
| OMNI-Shared Hosting for Websites (Hosting for up to one static, non-database driven website) | 1 | Included | |
| | | Included | |
| OMNI-DNS Services (Hosting for all domain names) - bendco.com | 1 | Included | Included |

## OMNI-PBX (PBX-AS-A-SERVICE)

| | | | |
|---|---|---|---|
| - One On-Premises Phone System with Datacenter Failover to Hosted PBX | | | |
| - Datacenter PBX located in SSAE16 datacenter | | | |
| - Datacenter failover system on dedicated virtual phone system on clustered servers | 1 | 221 | 221.00 |
| - Datacenter Bandwidth dedicated to VoIP traffic | | | |
| - Client owns Polycom handsets and OMNIPOTECH owns the phone system servers | | | |
| - Client pays telecom provider directly for phone lines and internet | | | |
| OMNI-PBX Extensions (any Polycom, virtual cell phones, softphones, etc.) - estimated quantity | 13 | 4.00 | 52.00 |

## REMEDIATION

| | | |
|---|---|---|
| Per Rate Schedule Agreement on Page 10 of the Contract | | |
| **MONTHLY TOTALS** | | 1778.85 |

3.      Bendco shall pay base amount of $1,778.85 each month plus applicable sales tax and adjusted for actual usage during the month.  The first payment is due on or before July 10, 2018. Remediation will be billed according to the Rate Schedule Agreement located on page 10 of the Services Order Form.

4.      OMNIPOTECH, at the request of Bendco, shall purge the offsite data backup held in OMNIPOTECH'S data center on June 29, 2018, or such other date as the Bankruptcy Court may allow.

5.      BENDCO consents to the removal of the data backup held in OMNIPOTECH's data center and acknowledges the possible consequences of the removal of the offsite data backup held in OMNIPOTECH'S data center.  Bendco understands that the offsite disaster recovery option is an additional layer of protection in the event the OMNI-Backup Appliance located at Bendco's office fails.  Bendco acknowledges that purging the offsite data backup cannot be reversed and the data will not be recoverable by any means.  Bendco understands that the only backup protection will be contained within Bendco's offices and stored on the OMNI-Backup Appliance.  Bendco acknowledges that if the OMNI-Backup Appliance hardware fails, the data is compromised or its data is irretrievable for any reason, OMNIPOTECH may not be able to restore one or more of its virtual servers; meaning, that Bendco may experience data lost.  Bendco acknowledges and accepts this risk.  Bendco further acknowledges that it will have the option to resume the offsite data backup at OMNIPOTECH's rate at the time of request, but if requested, the monthly payments as set forth in Paragraph 7(ii) above will be to the existing monthly amount.

-4-

6.    The remainder of the Contracts remain in full force and effect.

7.    Whenever the context so requires, references herein to the singular number shall include the plural, and likewise the plural shall include the singular; words denoting gender shall be construed to include the masculine, feminine, and neuter, where appropriate. If Borrower consists of more than one party, the obligations of each party constituting Borrower hereunder shall be joint and several.

a.    This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, all of which will constitute one and the same agreement.

b.    **THIS AGREEMENT, THE CONTRACTS, AND THE AGREED ORDER REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED effective for all purposes as of the date first above written.

**BENDCO, INC.**

By: _____
      John Tharp
      President

**OMNIPOTECH, LTD**

By: _____
      Robert Kyslinger
      General Managing Partner

STATE OF TEXAS        §
                            §
COUNTY OF HOUSTON    §

-5-

This instrument was acknowledged before me on the $\underline{26}$ of $\underline{\text{July}}$ , 2018, by John Tharp, President of Bendco, Inc. for and on behalf of Bendco, Inc.

BETHANY REBEKAH HUNTER
Notary ID #131453568
My Commission Expires
February 15, 2022

_Bethany Rebekah Hunter_
NOTARY PUBLIC, STATE OF TEXAS

STATE OF TEXAS              §
                           §
COUNTY OF HOUSTON          §

This instrument was acknowledged before me on the _____ of _____, 2011, by Robert Kyslinger, Managing General Partner for and on behalf of OMNIPOTECH, LTD, a Texas limited partnership.

_____
NOTARY PUBLIC, STATE OF TEXAS

-6-

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

# Comcast Business Address Correction

# COMCAST BUSINESS

## Billing Account #: 8777701840015009

Please update the service address on record. I am an authorized representative of the business listed above and authorize to ask Comcast to make this change to the above account.

### Service/Billing Address on Record:

802 HOUSTON AVE

*Address Line 1*

BENDCO INC

*Address Line 2*

PASADENA, TX 77502

*City*                              *State*                              *Zip*

CR Ticket #: _____n/a_____

### Updated Service/Billing Address:

801 HOUSTON AVE

*Address Line 1*


*Address Line 2*
Pasadena, TX 77502

*City*                              *State*                              *Zip*

DocuSigned by:
*Bethany Hunter*
72D6AB5453...                                                    7/6/2018

**Authorized Signature**                                      **Date of Request**

Bethany Hunter                              (      )      -

**Print Name**                    **Title**          **Contact Telephone Number**

This form is to be utilized to update or correct an address on a Comcast account. This form must be filled out in its entirety to ensure proper handling. Please allow 7-10 business days for processing of this request.

**How to send your form back to Comcast Business for processing:**

**Email:**  WSTBSG_TransferEscalations@comcast.com

Version 3: 08/09/2017

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

# Comcast Business Address Correction

COMCAST
**BUSINESS**

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

**COMCAST BUSINESS**

## BUSINESS SERVICE ORDER AGREEMENT

Account Name: **BENDCO INC**                                                    ID#: **19852519**

### CUSTOMER INFORMATION (Service Location)

| | | | |
|---|---|---|---|
| Address 1 | 801 HOUSTON AVE | City | PASADENA |
| Address 2 | | State | TX |
| Primary Contact Name | Bethany Hunter | ZIP Code | 77502 |
| Business Phone | (713) 473-1557 | County | |
| Cell Phone | | Email Address | b.bendco@gmail.com |
| Pager Number | | Primary Fax Number | |
| Technical Contact Name | | Tech Contact On-Site? | No |
| Technical Contact Business Phone | | Technical Contact Email | |
| Property Manager Contact Name | | Property Mgr. Phone | |

### COMCAST BUSINESS SERVICES

| | Selection (X) |
|---|---|
| **Business Voice** | X |
| **Business Internet** | X |
| **Business TV** | X |

| | |
|---|---|
| **Service Term (Months)** | 36 |

### COMCAST BUSINESS SERVICES DETAILS

**Business Voice***

| VOICE SELECTIONS | Quantity | Unit Cost | Total Cost |
|---|---|---|---|
| Mobility Lines | 1 | $44.95 | $44.95 |
| 4+ Mobility Lines | 0 | $29.95 | $0.00 |
| Full Feature Voice Lines | 0 | $59.95 | $0.00 |
| 4+ Lines | 0 | $24.95 | $0.00 |
| Basic Lines | 0 | $24.95 | $0.00 |
| Toll Free Numbers | | | |
| Equipment Fee | 1 | N/A | $14.95 |

| VOICE OPTIONS | Selection(X) | Total Cost |
|---|---|---|
| Voicemail | 0 | $0.00 |
| Published | X | $0.00 |
| Enhanced Listings | | |
| Auto-Attendant | | |

* Voice offers & options not available in all markets

**Comcast Business Packages**

| Package Name: | West:MP_$389.95BI500_3yr |
|---|---|
| **PACKAGE DESCRIPTION** | |

$10 MRC Discount off Business Internet 500 for discounted rate of $389.95 with purchase of Business Voice. MRC Discounts rolls to rate card in month 37. Minimum 1 Mobility Line or 3 VoiceEdge Seats required. 3 year term required. Taxes, Usage, Fees, Equipment are Extra.

**VoiceEdge Select Selections***

| Voice Selections | Quantity | Unit Price(MRC) | Total Price(MRC) | Unit Price(NRC) | Total Price(NRC) |
|---|---|---|---|---|---|
| VoiceEdge Select Seats | 0 | $39.95 | $0.00 | $29.95 | $0.00 |
| Cordless Handset | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cordless Deskphone | 0 | $0.00 | $0.00 | $0.00 | $0.00 |

*Bundle include : Auto attendant, Hunt Group and Base station

**Business Internet***

| INTERNET SELECTIONS | Selection(X) | Total Cost |
|---|---|---|
| Speed - Business Internet 500 | X | $399.95 |
| Equipment Fee | X | $0.00 |

*Business Internet speed tier selections not available in all markets.
*Internet selections & options not available in all markets

| INTERNET OPTIONS | Selection(X) | Total Cost |
|---|---|---|
| Static IP V4/V6 - 5 | X | $24.95 |
| Wi-Fi - Business Wifi Standard | X | $0.00 |

**Business TV***

| TV SELECTIONS | Selection | Total Cost |
|---|---|---|
| TV Variety | X | $29.95 |
| HD Technology Fee | | |

| TV OPTIONS | Selection | Total Cost |
|---|---|---|
| Sports Pack** | | |
| Canales Selecto | | |
| Music Choice W/Comcast Business TV | | |
| Other | | |
| Other | | |

| TV CONFIGURATION DETAILS | Quantity | Unit Cost | Total Cost |
|---|---|---|---|
| Primary Outlet - TV Box + Remote | 1 | $2.70 | $2.70 |
| TV Box + Remote | 0 | $0.00 | $0.00 |
| TV Adaptor | 0 | $0.00 | $0.00 |

| mini mDTA/mDTA Type | # of Outlets | NRC | MRC |
|---|---|---|---|
| | | | |

*** Not available in home offices or private view establishments. TV selections & options not available in all markets. Customer acknowledges and understands Customer may be responsible for additional music licensing or copyright fees for music contained in any or all of the Services, including, but not limited to Video and/or Public View Video.
** Available as add-on to Digital Standard & Digital Deluxe TV Selections only

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

**COMCAST BUSINESS**

## BUSINESS SERVICE ORDER AGREEMENT

**Account Name:**   BENDCO INC

**ID#:** 19852519

### COMCAST BUSINESS  TOTAL SERVICE CHARGES

| Comcast Business | Selection(X) | Quantity | Unit Cost | Total Cost |
|---|---|---|---|---|
| Business Internet/TV/Voice Installation Fee | X | | $0.00 | $0.00 |
| Voice Activation Fee* | X | | $29.95/Line | $29.95 |
| Auto-Attendant Setup Fee | | | | |
| Toll Free Activation Fee | | | | |
| Directory Listing Suppression Fee | | | | |
| VoiceEdge Select Seat Activation Fee** | | | | |

\* Per line activation fee, up to four (4) line maximum charge.
\*\* Bundle includes  Auto attendant, Hunt Group and Base Station.

| | |
|---|---|
| Total Monthly Service Charge | $517.45 |
| Promotional Code (if applicable) | $24.95MOB_WVI |
| Discount On Internet (if applicable) | 10.00 |
| Discount On Video (if applicable) | |
| Discount On Voice (if applicable) | 20.00 |
| Discount On VoiceEdge Select Seats (if applicable) | |

Total Discount        $30.00

**Total Recurring Monthly Bill:**\*    $487.45

**Total Installation Charges:**\*    $29.95

\* Does not include Custom Installation Fees.

\* Applicable federal, state, and local taxes and fees may apply.

### GENERAL SPECIAL INSTRUCTIONS

Promotion Code $24.95MOB_WVI - $20 MRC Discount off Business Voice Mobility Lines 1-3 ($44.95) for discounted rate of $24.95 each. Mobility Voice Line MRC Discounts roll to rate card at end of original term. Starter Business Internet or higher required. Minimum 2 Year Term Required. Standard install waived. Taxes, Usage, Fees, and Equipment are extra.

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

**COMCAST BUSINESS**

**BUSINESS SERVICE ORDER AGREEMENT**

Account Name: **BENDCO INC**                    ID#: 19852519

| COMCAST BUSINESS INTERNET CONFIGURATION DETAILS | | | |
|---|---|---|---|
| Transfer Existing Comcast.net Email | No | Equipment Selection | DOCSIS 3.1 Device |
| Number of Static IPs* | 5 | Business  Web Hosting | No |

### COMCAST BUSINESS TV CONFIGURATION DETAILS

| Outlet Details | Location | Outlet Type |
|---|---|---|
| Outlet 1 - Primary | Outlet - 1 | TV Box + Remote |
| Outlet 2 - Additional | . | |
| Outlet 3 - Additional | | |
| Outlet 4 - Additional | | |
| Outlet 5 - Additional | | |
| Outlet 6 - Additional | | |
| Outlet 7 - Additional | | |
| Outlet 8 - Additional | | |

**Additional Comments:**

| OUTLETS 9 & UP | QUANTITY |
|---|---|
| TV Box + Remote | 0 |
| TV Adaptor | 0 |

### COMCAST BUSINESS VOICEEDGE SELECT CONFIGURATION DETAILS

| Phone # | Type |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

### COMCAST BUSINESS  VOICE CONFIGURATION DETAILS

| Phone # | Type | HG1 Seq | HG2 Seq | Voicemail | Customer Equipment |
|---|---|---|---|---|---|
| 7134755959 | Mobility Lines | None | None | No | Phone System Type ( Key System, PBX, Other) |
| | | | | | |
| | | | | | Phone System Manufacturer |
| | | | | | |
| | | | | | Fax Machine Manufacturer |
| | | | | | |
| | | | | | Alarm System Vendor |
| | | | | | |
| | | | | | Point of Sale Device |
| | | | | | |
| | | | | | Telco Closet Location |
| | | | | | |
| | | | | | **Hunt Group Configuration Details** |
| | | | | | Hunt Group Features Requested (Yes/No) |
| | | | | | No |
| | | | | | Hunt Group 1 Configuration Type |
| | | | | | |
| | | | | | Hunt Group 2 Configuration Type |
| | | | | | |
| | | | | | Hunt Group 1 Pilot Number |
| | | | | | |
| | | | | | Hunt Group 2 Pilot Number |
| | | | | | |

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

**COMCAST BUSINESS**

**BUSINESS SERVICE ORDER AGREEMENT**

Account Name:   BENDCO INC                                                    ID#: 19852519

| Toll Free # | Calling Origination Area | Associated TN |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Directory Listing Details**

| Directory Listing (Published, Non-Published, Unlisted) | Published |
|---|---|
| Directory Listing Phone Number | 7134755959 |
| Directory Listing Display Name | BENDCO INC |
| DA/DL Header Text Information | PIPE BENDING & FABRICATING |
| DA/DL Header Code Information | 115570 |
| Standard Industry Code Information | |

**Additional Voice Details**

| Caller ID (Yes/No) | Yes |
|---|---|
| Caller ID Display Name (max 15 char.) | BENDCO INC |
| International Dialing (Yes/No) | No |
| Call Blocking (Yes/No) | No |
| Auto-Attendant (Yes/No) | No |

---

**COMCAST BUSINESS VOICE EDGE CONFIGURATION DETAILS**

**Voice Edge Directory Listing Details**

| Directory Listing     (Published, Non-Published, Unlisted) | |
|---|---|
| Directory Listing Phone Number | |
| Directory Listing Display Name | |
| DA/DL Header Text Information | |
| DA/DL Header Code Information | |

**Voice Edge Additional Voice Details**

| Caller ID (Yes/No) | |
|---|---|
| International Dialing (Yes/No) | |
| Caller ID Display Name (max 15 characters) | |
| Call Blocking (Yes/No) | |

| Enterprise Extension Dialing? | |
|---|---|

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

**COMCAST BUSINESS**

**BUSINESS SERVICE ORDER AGREEMENT**

Account Name:   **BENDCO INC**

ID#: **19852519**

| CUSTOMER BILLING INFORMATION | | | |
|---|---|---|---|
| Billing Account Name | BENDCO INC | City | PASADENA |
| Billing Name (3rd Party Accounts) | | State | TX |
| Address 1 | 802 HOUSTON AVE | ZIP Code | 77502 |
| Address 2 | | Billing Contact Email | b.bendco@gmail.com |
| Billing Contact Name | Bethany Hunter | Billing Contact Phone | (713) 473-1557 |
| Tax Exempt?* | No | Billing Fax Number | |
| | *If yes, please provide and attach tax exemption certificate.* | | |

## AGREEMENT

1. This Comcast Business Service Order Agreement sets forth the terms and conditions under which Comcast Cable Communications Management, LLC and its operating affiliates ("Comcast") will provide the Services to Customer. This Comcast Business Service Order Agreement consists of this document ("SOA"), the standard Comcast Business Terms and Conditions ("Terms and Conditions"), and any jointly executed amendments ("Amendments") entered under the Agreement. In the event of inconsistency among these documents, precedence will be as follows: (1) Amendments, (2) Terms and Conditions, and (3) this SOA. This Agreement shall commence and become a legally binding agreement upon Customer's execution of the SOA. The Agreement shall terminate as set forth in the Terms and Conditions (http://business.comcast.com/terms-conditions/index.aspx). All capitalized terms not defined in this SOA shall reflect the definitions given to them in the Terms and Conditions. Use of the Services is also subject to the then current High-Speed Internet for Business Acceptable Use Policy located at http://business.comcast.com/terms-conditions/index.aspx (or any successor URL), and the then current High-Speed Internet for Business Privacy Policy located at http://business.comcast.com/terms-conditions/index.aspx (or any successor URL), both of which Comcast may update from time to time.

2. Comcast Business Voice, Internet, TV, and Comcast Business SmartOffice™ Services ("Service") carry a 30 day* money back guarantee**. If, within the first 30 days following Service installation, Customer is not completely satisfied, Customer may cancel Service and Comcast will issue a refund for the monthly recurring fee paid for the first 30 days of service, excluding installation charges, fees, taxes and voice usage charges, however, Customer will be charged any remaining payments owed for non-refundable fees (including installation) and other charges. In order to be eligible for the refund, Customer must cancel Service within 30 days after installation and return any Comcast-provided equipment in good working order. In no event shall the refund exceed $500.00.

*Comcast Business Trunks and Comcast Business VoiceEdge™ carry a 60 day money back guarantee, subject to the above terms.

**The money back guarantee does not apply to Hospitality Video or Ethernet Services.

3. To complete a Voice order, Customer must execute a Comcast Letter or Authorization ("LOA") and submit it to Comcast, or Comcast's third party order entry integrator, as directed by Comcast.

4. New telephone numbers are subject to change prior to the install. Customers should not print their new number on stationery or cards until after the install is complete.

5. Modifications: All modifications to the Agreement, if any, must be captured in a written Amendment, executed by an authorized Comcast Senior Vice President and the Customer. All other attempts to modify the Agreement shall be void and non-binding on Comcast. Customer by signing below, agrees and accepts the Terms and Conditions of this Agreement.

**6. IF CUSTOMER IS SUBSCRIBING TO COMCAST'S BUSINESS DIGITAL VOICE SERVICE, CUSTOMER, BY SIGNING BELOW, ACKNOWLEDGES RECEIPT AND UNDERSTANDING OF THE FOLLOWING 911 NOTICE:**

### 911 NOTICE

Comcast Business Digital Voice service ("Voice Service") may have the 911 limitations specified below:

• In order for 911 calls to be properly directed to emergency services using Voice Service, Comcast must have the correct service address for the telephone number used by the Company. If the Voice Service or any Voice Service device is moved to a different location without Company providing an updated service address, 911 calls may be directed to the wrong emergency authority, may transmit the wrong address, and/or Voice Service (including 911) may fail altogether. Customer's use of a telephone number not associated with its geographic location may also increase these risks.

• The Voice Service uses electrical power in the Company's premises. If there is an electrical power outage, 911 calling may be interrupted if a battery back-up is not installed in the voice modem, fails, or is exhausted.

• Calls using the Voice Service, including calls to 911, may not be completed if there is a problem with network facilities, including network congestion, network/equipment/power failure, a broadband connection failure, or another technical problem.

• Customer should call Comcast at 1-888-824-8104 if it has any questions or needs to update a service address in the 911 system. Delays in updating the service address may also impact 911.

• **BY SIGNING BELOW, CUSTOMER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE FOREGOING 911 NOTICE AND THE 911 LIMITATIONS OF THE VOICE SERVICE.**

| CUSTOMER SIGNATURE | FOR COMCAST USE ONLY |
|---|---|
| By signing below, Customer agrees and accepts the Terms and Conditions of this Agreement. General Terms and Conditions can be found at http://business.comcast.com/terms-conditions/index.aspx. | Sales Representative: Inaya Pyles |
| | Sales Representative Code: |
| Signature: *Bethany Hunter* | Sales Manager/Director Name: Richard Smith |
| Print: F02407206A0540 Bethany Hunter | Sales Manager/Director Approval: |
| Title: Cost Control Manager | Division: West |
| Date: 7/6/2018 | SmartOffice License Number: |

DocuSign Envelope ID: 11F17E03-0817-4AD7-92D9-450C5F27B356

COMCAST
BUSINESS

**BUSINESS SERVICE ORDER AGREEMENT**

**Account Name:** BENDCO INC

**ID#:** 19852519

### LETTER OF AGENCY

Please print or type the following       **All blank spaces must be completed.**

Billing Name ("Company"):   **BENDCO**

Billing Address:   **801 HOUSTON AVE**

City:   **PASADENA**       State: **TX**     Zip: **77502**

If Company is switching its current phone number(s) to Comcast, please print the telephone number(s) and the name(s) of Company's current local and long distance phone service providers in the spaces below.

Area code(s) and telephone number(s) Company wants switched to Comcast (you may also insert a number range, e.g., 215-555-0000 thru 215-555-9999):

| Telephone Number | Current Local Provider | | Telephone Number | Current Local Provider |
|---|---|---|---|---|
| 7134755959 | AT and T | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Please read the following information:**

The undersigned is an authorized representative of the Company. Company chooses Comcast for all its landline calling needs across town, across the country, and worldwide for the telephone number(s) listed above (if applicable). Company understands that Comcast will take the place of its current landline phone service provider(s) for local, local toll, and long distance services. Company understands that, for each of these services, it may designate only one provider per service for any one telephone number. Company also understands that the service provided by Comcast includes all distances, which means that Company may only designate one provider for all of its calling needs for any one telephone number.

The undersigned signature on this form authorizes Comcast to act as Company's agent in making the changes from Company's current service provider(s), and to switch Company's telephone number(s), listed above (if applicable), to Comcast. Company understands that its current service provider(s) may charge a fee to switch its service to Comcast

**Please sign here:**

Authorized Representative's Signature:   *Bethany Hunter*    Date: 7/6/2018
                                                               F024072D6AB5453

Authorized Representative's Name (Print):       Bethany Hunter

Authorized Representative's Title (Print):        Cost Control Manager



## POWER SALES AGREEMENT ("PSA") – ERCOT INDEX RATE WITH PASS-THROUGH CHARGES

### BUYER INFORMATION

**Full Business Name:** Bendco

**DBA (if applicable):**

**Term:** 6    month(s)

**Deposit Required:** ☒ No
☐ Yes, Amount: $

**Effective Date:** May 9, 2019

**Monthly Customer Charge:** $ 0.00    per month

**Total Estimated Annual Usage:**

### Buyer Accounts:

| Service Address(es) | TDU | Modified Start Date, if applicable | Modified End Date, if applicable | ESI ID Number(s) |
|---|---|---|---|---|
| 801 HOUSTON AVE A PASADENA TX 77502 | | | | 1008901024900812040114 |
| | | | | |
| SEE ATTACHMENT | | | | |
| | | | | |

Buyer's Contract Price will be fixed at: $0.008    (dollars per kWh).

The contract price does not include all Pass-Through Charges.  Pass-Through Charges are passed through at cost and are also the responsibility of the Buyer.  ERCOT Energy will be passed through at the "Index Rate" which means the real-time 15-minute interval load zone settlement price as published by ERCOT (which is multiplied by Buyer's corresponding real-time load to determine Energy Charges).

**Contract Price:**

The Contract Price covers the following included charges: Seller's administrative and margin costs incurred to provide energy to Buyer.

**Pass-Through Charges:**

The Pass-Through Charges includes: ERCOT Energy, Transmission and Distribution Line Losses, Unaccounted for Energy, Ancillary Services, ERCOT Fees, Congestion, Renewable Portfolio Standard, TDU Charges, Public Utility Commission of Texas Fees, System Benefit Fee, Transition Charges, Taxes, Municipal Franchise Fees.

### Buyer Notices, Invoices & Tax Information:

**Name:** BENDCO

**Street Address:** 801 HOUSTON AVE A

**City, State, Zip:** PASADENA, TX 77502

**Fax:**

**Email:**

**Federal Tax ID:** 760223355

**Phone:** 713-473-1557

**Cell Phone:**



## POWER SALES AGREEMENT ("PSA") – ERCOT INDEX RATE WITH PASS-THROUGH CHARGES

### Attachment A

**BUYER INFORMATION**

Full Business Name:  **BENDCO**

DBA (if applicable):

Term: _6_ month(s)

Deposit Required:  ☒No

☐Yes, Amount: $

Effective Date: MAY 9, 2019

Monthly Customer Charge: $ 0.00 per month

Total Estimated Annual Usage:

1. 801 HOUSTON AVE PASADENA, TX 77502 – 1008901009130012864100
2. 807 HOUSTON AVE PASADENA, TX 77502 – 1008901023800733690100
3. 801 HOUSTON AVE PASADENA, TX 77502 – 1008901009130012864200
4. 805 HOUSTON AVE PASADENA, TX 77502 – 1008901023800244640100
5. 807 HOUSTON AVE PASADENA, TX 77502 – 1008901023800733690200

**IN WITNESS WHEREOF**, the Parties have executed this Agreement effective as of the Effective Date.

BUYER: **BENDCO**

By: _____

Name: **BETHANY HUNTER**

Title:

Date: MAY 9, 2019

Seller: Entrust Energy, Inc.

By: _____

Name:  Wayne Morgan

Title:  President & CEO

Date:  05/9/2019

Identification Number: Texas Lg. Commercial Agmt. PSA Fixed_11.30.17

Page 1 of 2



**Tax Exemption Notice:** If Entrust does not receive the proper tax exemption documentation within 30 days of Effective Date, Buyer must petition the State of Texas for any tax refunds due.

☐ No, the Delivery Points are not tax exempt          ☒ Yes, the Delivery Points are tax exempt

**Authorized Agent:**

If completed, the persons listed below shall have full authority to take actions on behalf of Buyer under this Agreement as an Authorized Agent for the relevant Service Addresses including, but not limited to, adding or deleting Service Addresses.

Name and Title
1.
2.

In order to be binding, any changes to the Authorized Agent list must be made in writing either by sending a fax to 866.299.2097 or email to *contracts@entrustenergy.com.*

This PSA together with Seller's Terms and Conditions ("T&Cs") attached hereto, shall form a single integrated agreement between Seller and Buyer (collectively, the "Agreement"). Terms used herein which are not defined shall have the meaning ascribed to them in the T&Cs. Once the Agreement is fully executed by both Parties, it shall be binding on Buyer and Seller.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

| BUYER: BENDCO | SELLER: | Entrust Energy, Inc. |
|---|---|---|
| By: | By: | |
| Name: BETHANY HUNTER | Name: | Mike Beck |
| Title: | Title: | President & CEO |
| Date: MAY 9, 2019 | Date: | |



---

## TERMS AND CONDITIONS

These Terms and Conditions ("T&Cs") and the attached Power Sales Agreement ("PSA") shall form a single integrated agreement ("Agreement") between Entrust Energy, Inc. ("Seller") and the Buyer stated in the PSA, as of the Effective Date stated therein. Buyer and Seller shall individually be referred to as a "Party" and collectively the "Parties". Terms used herein which are not defined shall have the meaning ascribed to them in the PSA.

### ARTICLE 1: SCOPE

1.1 **Term.** The supply of electricity shall commence for each Buyer Account on the next available Switch Date immediately following the Effective Date that can be reasonably effectuated by ERCOT and Buyer's TDU (the "Start Date"), and shall continue until the regularly scheduled electric meter read date which is approximately the number of month(s) as indicated in the PSA following the Start Date (the "End Date"). Notwithstanding the preceding sentence, this Agreement shall continue to apply to both Parties until all obligations are completed. Thereafter, the Term shall be deemed to continue until Buyer's new REP has scheduled a switch for all of the Buyer Accounts which are the subject of the relevant PSA. Once this condition precedent is fulfilled, the final date for supply of Energy by Seller shall be the date of the switch to Buyer's new REP.

1.2 **Buyer Account(s).** The Buyer Account(s) will be as set forth in the PSA. Buyer shall assist Seller in taking all actions necessary to effectuate the supply of electricity to Buyer. Buyer represents that to the best of Buyer's knowledge, the Buyer Account Information is true and accurate as of the date furnished to Seller. Alternate Start and End Dates for individual Buyer Accounts require Seller consent and shall be specified in the PSA. Buyer is responsible for any TDU fees related to special or non-standard Start and End Dates.

### ARTICLE 2: PURCHASE AND SALE OF ENERGY

2.1 **Purchase and Sale.** Seller shall provide Energy necessary to meet the Energy Requirements of each Buyer Account(s) to the applicable Delivery Point(s) for the Term, and Buyer shall be responsible for the payment of the Monthly Customer Charge (as specified in the PSA), Energy Charges and Pass-Through Charges as set forth in the PSA.

"Energy Charges" means the product of the Contract Price(s) multiplied by the Actual Consumption for each Buyer Account.

"Contract Price" means the Contract Price for a Service Address specified in the applicable PSA (in dollars per kWh) during the Term and will include the costs of the Included Charges listed in the PSA. The Contract Price does not include, and Buyer will be responsible for paying Seller for, the Pass-Through Charges listed in the PSA and, upon the occurrence of an Event of Default, any additional costs or charges imposed or associated with the delivery of the Actual Consumption to the extent that such additional costs or charges would not have been incurred but for the Event of Default by Buyer.

2.2 **Load Change.** If during the Term: A) there is any event or circumstance which is likely to cause a significant change to Buyer's aggregated usage patterns including, but not limited to, Buyer's plans for construction or demolition, facility replacement or equipment modification, changes in production, planned closures, or new environmental limits, or B) the Actual Consumption for Buyer's aggregated Accounts materially deviates (as determined in Seller's sole discretion) from previous usage periods, such event shall be termed a "Load Change". If Seller or Buyer becomes aware of a Load Change, such Party shall promptly notify the other in writing. In such event, Buyer and Seller agree to meet and discuss the impact of the Load Change and after such discussion, Seller shall have the right to amend the Contract Price to reflect the impact of the Load Change by written notification to Buyer. The revised Contract Price shall be effective as of the date specified in Seller's notice and, at Seller's sole discretion, may apply to elapsed periods of time during which the usage changes occurred.

2.3 **Contract Price after the Agreement is terminated or expires.** The Contract Price for any quantity of Energy delivered by Seller during the period of time after this Agreement is terminated or expires shall be a variable rate expressed in $/kWh and determined each calendar month by Seller based on expected Included Charges for the delivery zone in which the load is served and will include an administrative cost component ("retail adder") for Seller that will not exceed $0.030 per kWh. The Contract Price applicable to usage in a calendar month will be posted on www.entrustenergy.com/commvariablepricehistory no later than 3 p.m. CPT of the last business day in the preceding month.

---





2.4 **Title and Risk of Loss.** Title, liability and risk of loss associated with the Energy purchased and sold shall pass from Seller to Buyer at the Delivery Point. The Party with title to the Energy shall indemnify the other Party from any Claims arising from any incident with respect to the Energy supplied when such Party is in possession of the Energy. The foregoing indemnities shall apply without regard to the causes related thereto, including the negligence of any Party, whether sole, joint, or concurrent, or active or passive. Buyer and Seller recognize that neither Party controls the Energy sold hereunder while such Energy is on the TDU system. Neither Party will be responsible for indemnifying the other Party for any Claims or incidents arising with respect to the Energy supplied when such Energy is on the TDU system.

2.5 **Outage Reporting to the TDU.** In the event of a service outage, please call your TDU directly: AEP Texas North and AEP Texas Central: (866) 223-8508; CenterPoint Energy: (800) 332-7143; Oncor Electric Delivery: (888) 313-4747; Texas-New Mexico Power: (888) 866-7456.

### ARTICLE 3: INVOICING, NETTING, CREDIT, DEPOSITS AND METERING

3.1 **Invoicing.** As soon as practicable following the receipt of invoices detailing charges from ERCOT, the TDU and any other necessary data relating to the supply of Energy to the Buyer Account(s), Seller shall deliver to Buyer an invoice to the address specified in the PSA. Such invoice shall set forth all charges due for the billing period, including any applicable Taxes. Seller may use estimated data for billing purposes provided that such estimates shall be subject to future reconciliation upon receipt of final data regarding the actual quantity of Energy consumed for the applicable billing period. Payment shall be made by check or other means agreeable to Seller, on or before the sixteenth (16th) calendar day after the date set forth on Seller's invoice or, if such day is not a Business Day, the immediately succeeding Business Day ("Due Date") to the payment address provided by Seller. Overdue payments shall accrue interest at the Interest Rate applicable to each overdue day from and including the Due Date up to but excluding the date payment is received by Seller. Seller will charge a $25.00 fee for each payment transaction that is not processed due to insufficient funds. Seller shall also be entitled, at its option, to charge a late payment fee of 5% on any overdue amount. Regardless of whether any amount of an invoice is disputed by Buyer, the entire invoice shall be paid when due. Any disputed amounts paid that are ultimately determined to be owed to Buyer shall be repaid by Seller with interest accrued at the Interest Rate from and including the date of the overpayment up to but excluding the date the refund payment is received by Buyer. If an additional amount is determined to be correct, Buyer shall pay to Seller the additional amount within five (5) Business Days of such determination. Any invoice dispute or adjustment shall be made in accordance with Section 3.2 below.

3.2 **Reconciliation.** The Parties agree that notwithstanding the provisions above, the expiration of the Term or the termination of this Agreement, Seller shall be permitted in its reasonable discretion to adjust any invoice as necessary to correct any errors by Seller or third-party, within twelve months of the date such invoice or adjustment to such invoice was rendered. Any amounts payable by a Party as a result of such adjustment shall be paid by the Party who owes it within twenty (20) calendar days of the date set forth on the relevant invoice.

3.3 **Payment Netting.** The Parties agree that they shall discharge mutual debts and payment obligations due and owing to each other pursuant to this Agreement through netting, in which case all amounts owed by each Party to the other Party, including any related damages calculated pursuant to Section 6.3 below, and interest, payment or credits, shall be netted so that only the excess amount remaining due shall be paid by the Party who owes it.

3.4 **Credit.** Seller's obligation to sell Energy to Buyer is conditioned upon Seller's ongoing review and approval of Buyer's creditworthiness. Buyer will, at Seller's request, from time to time: (i) provide financial information, and (ii) if Buyer's creditworthiness declines, as determined by Seller in its reasonable discretion, Buyer will provide performance assurance (including, but not limited to, additional Deposits) in an amount reasonably satisfactory to Seller.

3.5 **Deposits.** If Seller determines that as a condition precedent to entering into the Agreement, Buyer is required to post an initial cash deposit ("Deposit"), such amount shall be specified in the PSA and shall be processed by Seller using the payment method specified by Buyer in the PSA. Seller shall be entitled to apply such Deposit to any past due amounts owing by Buyer and shall be permitted to retain such Deposit until all amounts owed to Seller by Buyer under the Agreement are fully and finally paid.

3.6 **Disconnection/Reconnection.** If an electric service disconnection transaction is processed by Seller, Buyer will be charged a $50.00 disconnection fee. This fee will be assessed regardless of whether Buyer's electric service is actually disconnected or not. In addition, Buyer will be charged a $25.00 reconnection fee in the event that Seller processes a reconnection transaction for Buyer's account which will be in addition to any other outstanding fees and charges due, and Buyer may be required, at Seller's sole discretion, to re-contract for service and pay a deposit. The fees above are in addition to those disconnection and reconnection fees that may be



assessed by Buyer's TDU. Disconnection of Buyer's electric service from Seller will not excuse Buyer from paying any outstanding amounts owed to Seller.

## ARTICLE 4: NOTICES

All notices required or permitted to be given shall be in writing and deemed to be properly delivered if sent to a Party at its specified address: (a) in person, (b) by facsimile, (c) by United States certified mail with first class postage prepaid, (d) by private, prepaid courier (such as FedEx), or (e) by any other mutually acceptable means; provided, however, notices of interruption and communications to a TDU shall be given by Buyer directly to the TDU. Notices delivered in person, by facsimile, courier or email shall be deemed to have been received by the close of the Business Day on which it was delivered (unless transmitted or hand delivered after 5:00 p.m. local time in the place of delivery, in which case it shall be deemed received on the next Business Day). Notices delivered by mail shall be deemed to have been received two (2) Business Days after the day such notice was sent. A Party may change its address by providing written notice to the other Party, or to such other address as a Party shall from time to time designate. Please refer to the information shown below for all notices to Seller.

Seller Notices:    Entrust Energy, 1301 McKinney, Suite 2950, Houston, TX 77010, Attn: General Counsel
Phone Number(s): 800.934.6688 or 866.921.6476
Fax: 866.299.2097

## ARTICLE 5: FORCE MAJEURE

**Force Majeure.** If a Party is rendered unable by Force Majeure to carry out, in whole or in part, its obligations hereunder, such Party ("Claiming Party") shall give written notice and provide full details of the event to the other Party in writing as soon as practicable after the occurrence of the event. During such Force Majeure, the obligations of the Parties (other than the obligation to make payments then due or becoming due with respect to performance prior to the event) shall be suspended to the extent required; provided, however, that a suspension shall be of no greater scope and of no longer duration than is required by the Force Majeure. The Claiming Party shall make all reasonable attempts to remedy the effects of the Force Majeure and continue performance under this Agreement with all reasonable dispatch; provided, however, that no provision herein shall be interpreted to require Seller to deliver, or Buyer to receive, Energy at points other than the relevant Delivery Point(s).

"Force Majeure" shall mean an event that is beyond the reasonable control of the Claiming Party, prevents the Claiming Party from performing, is not caused by the negligence of the Claiming Party and which by the exercise of due diligence, the Claiming Party is unable to overcome or obtain or cause to be obtained a commercially reasonable substitute therefor. Notwithstanding anything to the contrary in the preceding sentence, Force Majeure shall include: (a) an event affecting a TDU and/or the ERCOT ISO and (b) suspension, curtailment or service interruption by the TDU and/or the ERCOT ISO. In no event shall Force Majeure be based directly or indirectly upon: (a) a decision by Buyer to cease operations at, sell or relocate the Buyer Account(s); or (b) economic loss due to Buyer's loss of Buyer's Account(s), markets, or suppliers, and nothing contained herein shall be construed to require a Claiming Party to settle any strike or labor dispute.

## ARTICLE 6: DEFAULT AND TERMINATION

6.1 **Events of Default.** An "Event of Default" means any of the following actions: (a) the failure by Buyer to make, when due, any payment required under this Agreement if such failure is not remedied within three (3) Business Days after written notice thereof to Buyer, (b) the failure of Buyer to provide to and/or maintain a deposit with Seller to the extent required under this Agreement, (c) any representation or warranty made by Buyer herein shall prove to be false or misleading in any material respect if not cured within five (5) Business Days after written Notice thereof to Buyer; (d) the failure by Buyer to perform any covenant set forth herein if not excused by Force Majeure or cured within five (5) Business Days after written notice thereof to Buyer; (e) the failure by Buyer to provide performance assurance in accordance with Section 3.4; (f) absent agreement to the contrary or Seller's failure to perform, the failure of Buyer to utilize Seller as its sole supplier of Energy for the Service Address(es) in accordance with the terms specified herein; or (g) Buyer (i) makes an assignment or any general arrangement for the benefit of creditors, or (ii) otherwise



becomes Bankrupt. No waiver by Seller of any one or more Events of Default by Buyer shall be construed as a waiver of any other Event of Default, whether of a like or different kind.

6.2 **Remedies.** If an Event of Default occurs, Seller shall have the right to designate a day, no earlier than the day such notice is issued, on which this Agreement shall terminate and accelerate all amounts owing between the Parties ("Early Termination Date"). In addition, upon the designation of an Early Termination Date, Seller shall have the right: (i) to suspend the supply of Energy on the Early Termination Date; and/or (ii) if allowed by law, to disconnect, or cause to be disconnected, each Buyer Account from electric service or allow the switch of each Buyer Account to the applicable REP and/or POLR (but in no event shall such disconnection take place prior to the Early Termination Date). Buyer agrees that it shall remain liable to pay timely to Seller all charges for Energy supplied until a switch or disconnection is effected for each Buyer Account as well as any applicable Termination Payment.

6.3 **Damages.** If an Early Termination Date occurs, the damages to Seller shall be determined in Seller's sole discretion and shall be equal to the positive difference, if any, between the relevant Contract Price(s) and the relevant wholesale electricity "Market Prices" as of the Early Termination Date for the Buyer Service Address(es), multiplied by the estimated volume associated with Buyer's Service Address(es) for the remaining Term, plus all Costs incurred by Seller as a result of the early termination. If an Early Termination Date occurs prior to the commencement of the Term, it shall be assumed that Seller would have commenced making Energy sales to Buyer on the first meter read date on or after the Effective Date of the Term and continued until 23:59 CPT on the End Date of the Term. For the purposes of this Section, the Market Price shall be determined by Seller by taking into consideration, among other things, the load-weighted average of electric energy forward prices in the congestion zones/nodal pricing point or similar locations where the Buyer Service Address(es) are located and Included Charges when calculating the Market Price.

6.4 **Termination Payment.** The Damages calculated pursuant to section 6.3 above shall be considered the "Termination Payment". Seller shall provide Buyer with a written notice stating the Termination Payment and explaining in reasonable detail the calculation of such amount. The Termination Payment shall be made by Buyer within five (5) Business Days after receipt of such notice.

6.5 **Disputes With Respect to Termination Payment.** If Buyer disputes Seller's calculation of the Termination Payment, in whole or in part, Buyer shall, within two (2) Business Days of receipt of Seller's calculation of the Termination Payment, provide to Seller a detailed written explanation of the basis for such dispute and shall first transfer performance assurance in a form acceptable to Seller in an amount equal to the Termination Payment.

## ARTICLE 7: TAXES

**Taxes.** Each Party agrees to use reasonable efforts to implement the provisions herein in order to legally minimize Taxes, so long as neither Party is materially adversely affected by such efforts. Either Party, upon written request of the other, shall provide a certificate of exemption or other reasonably satisfactory evidence of exemption if that Party is exempt from Taxes. With respect to sales and purchases of Energy, Buyer shall be responsible and indemnify Seller for all Taxes that arise from or are measured by Energy sold and supplied, or Seller's receipts therefrom, whether such Taxes are imposed by law on Seller or Buyer. Unless specifically stated herein, the prices quoted by Seller are exclusive of any Taxes for which Buyer may be responsible, and which may be subsequently billed to and collected from Buyer by Seller or by a third party.

## ARTICLE 8: LAW, DISPUTES, WAIVER OF CONSUMER RIGHTS

8.1 **Governing Law.** These provisions shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to the principles of conflicts of law.

8.2 **UCC.** Unless otherwise herein provided, the provisions of the Uniform Commercial Code of Texas shall apply and Energy shall be treated as a "goods" as therein defined.

8.3 **Dispute Resolution.** The exclusive forum for any disputes shall be the State or Federal courts located in Harris County, Texas.

8.4 **LIMITATION OF LIABILITY.** FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED HEREIN, THE LIABILITY OF A PARTY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER DAMAGES OR REMEDIES HEREBY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED, THE LIABILITY OF A PARTY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY AND ALL OTHER DAMAGES AND REMEDIES ARE WAIVED. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR



INDIRECT DAMAGES IN TORT, CONTRACT UNDER ANY INDEMNITY PROVISION OR OTHERWISE. UNLESS EXPRESSLY PROVIDED HEREIN, THE LIMITATIONS HEREIN IMPOSED SHALL BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SOLE, JOINT, CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT, AND THE LIQUIDATED DAMAGES CONSTITUTE A REASONABLE APPROXIMATION OF THE LOSS.

8.5  WAIVER OF CONSUMER RIGHTS. TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT. Buyer hereby waives its rights under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Business & Commerce Code, as amended or any current successor thereto (the "DTPA") a law that gives consumers special rights and protections.  After consultation with an attorney of Buyer's own selection, Buyer voluntarily consents to this waiver. Furthermore, the Parties each individually and separately represent and warrant that it is not a "consumer" within the meaning of the DTPA by virtue of being a "business consumer" (also defined in the DTPA) that has either (i) assets of $25 million or more, or (ii) is owned or controlled by a corporation or entity with assets of $25 million or more. Therefore, the Parties agree that: (a) only Section 17.555 of the DTPA shall be applicable, (b) it has consulted with its own legal counsel in seeking or acquiring the goods or services to the extent it has deemed it necessary, and (c) it shall defend and indemnify the other Party from and against any and all claims of or by the indemnifying Party or any of its successors and assigns or any of its or their Affiliates or subsidiaries based in whole or in part on the DTPA arising out of or in connection herewith and/or arising from any breach by the indemnifying Party of its representations in this section.

8.6  ADDITIONAL WAIVERS. BUYER HEREBY WAIVES THE CUSTOMER PROTECTIONS SPECIFIED IN THE PUCT SUBSTANTIVE RULES, SECTION 25.471, et seq.

8.7  TRANSFER TO POLR OR OTHER RETAIL ELECTRICITY PROVIDER. FOR THE AVOIDANCE OF DOUBT, IF BUYER DEFAULTS UNDER THIS AGREEMENT, BUYER WAIVES ANY RIGHT IT MAY HAVE UNDER THE PUCT RULES REGARDING ANY PRIOR NOTIFICATION BEFORE SELLER MAY TRANSFER BUYER TO THE APPLICABLE POLR OR OTHER DESIGNATED DEFAULT REP SERVICE IN BUYER'S TERRITORY.

## ARTICLE 9: REPRESENTATIONS AND WARRANTIES

Representations and Warranties.  As a material inducement to entering into this Agreement, each Party represents and warrants continuing throughout the Term unless otherwise stated as follows: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and is qualified to conduct its business in those jurisdictions necessary to perform its obligations; (b) it has all regulatory authorizations, permits and licenses necessary for it to legally perform its obligations; (c) as of the Effective Date, the execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action; (d) this Agreement and any document executed and delivered in accordance therewith constitutes its legally valid and binding obligation enforceable against it in accordance with its terms, subject to any equitable defenses; and (e) it is not Bankrupt and there are no reorganization, receivership or other arrangement proceedings pending or being contemplated by it, or to its knowledge threatened against it.

The Parties acknowledge and agree that this Agreement constitutes a "forward contract" within the meaning of the U.S. Bankruptcy Code, 11 U.S.C. Section 101 et seq.  The Parties agree that nothing in this Agreement: (i) shall be construed to constitute or imply a joint venture, partnership, or association or the creation or existence of any fiduciary or similar obligation or liability between the Parties or (ii) shall provide any benefit to any third party or entitle any third party to any claim, cause of action, remedy, or right of any kind, other than in connection with an assignment to a permitted assignee.  Seller shall not provide, and nothing herein shall be construed as the provision of, advice regarding the value or advisability of trading in commodities that would cause Seller or any of its Affiliates to be considered a commodity-trading advisor under applicable law.

WITH THE EXCEPTION OF ANY WARRANTY THAT IS EXPRESSLY SET FORTH HEREIN, SELLER AND ITS AFFILIATES, SUCCESSORS, ASSIGNS AND DELEGATEES MAKE NO WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH REGARD TO THE SERVICES THAT SELLER PROVIDES, OR THE ACTIVITIES SELLER UNDERTAKES.

In connection with the negotiation and execution of this Agreement, each Party represents to the other Party that: (i) the other Party is not acting as a fiduciary or financial or investment advisor for it; (ii) it is not relying upon any advice, statements, recommendations, or representations of the other Party other than the written representations expressly set forth herein; (iii) it has made its own decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary, and not upon any view expressed by



---



direct or indirect ownership of fifty percent or more of the outstanding capital stock or other equity interests having ordinary voting power.

**"Ancillary Services"** shall have the meaning specified in the ERCOT Protocols.

**"Bankrupt"** means with respect to any entity, such entity (i) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under a bankruptcy, reorganization or similar law, (ii) has a petition filed or commenced against it for a proceeding or cause of action under a bankruptcy, reorganization or similar law which is not dismissed within 30 calendar days, (iii) makes an assignment or any general arrangement for the benefit of creditors, (iv) otherwise becomes bankrupt or insolvent (however evidenced), (v) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (vi) is generally unable to pay liabilities or debts as they mature, or (vi) admits in writing its inability to pay its debts generally as they become due.

**"Buyer Account(s)"** means with Buyer's premises or facilities set forth in the relevant PSA.

**"Buyer Account Information"** means information regarding Buyer's business, Buyer Account(s), with meter or account numbers, historical and projected Energy usage, hours of operation, and other information reasonably required to substantiate the Energy Requirements of the Buyer's Accounts.

**"Business Day"** means any day except a Saturday, Sunday, or a Federal Reserve Bank holiday. A Business Day shall open at 8:00 a.m. and close at 5:00 p.m. local time in Houston, Texas.

**"Congestion Zone"** shall have the meaning specified in the ERCOT Protocols.

**"Costs"** means, with respect to a Party, brokerage fees, commissions and other costs and expenses reasonably incurred by such Party entering into new arrangements either in terminating any arrangement pursuant to which it has hedged its obligations under, or in entering into new arrangements that replace, this Agreement, and any commercially reasonable attorneys' fees incurred in connection with enforcing its rights hereunder.

**"CPT"** means Central Prevailing Time.

**"Delivery Point"** means the point of interconnection between the TDU facilities and the Buyer's facilities.

**"Discretionary Service Fees"** means all non-routine fees and charges including, but not limited to the following: deposits, connection fees, metering charges, installation costs, assessments by the TDU in respect of any Power Factor at any Buyer Account meter, or any similar amounts that are assessed by and payable to the TDU related to the purchase and installation of meters and associated equipment and the Buyer's use of such equipment to establish or maintain electric service at a Buyer Account or to maintain TDU system requirements, or other charges for equipment or services requested by Buyer or required by the TDU.

**"Energy"** means electric energy of the character commonly known as three phase, sixty-hertz electric energy.

**"Energy Requirements"** means an amount of Energy equal to 100% of the actual amount of energy required to supply Buyer's Account, as measured by the TDU during the Term; provided, in no event shall the amount of Energy required to be supplied hereunder exceed the physical capabilities of the TDU's facilities or contravene applicable utility service rules, tariffs or law.

**"ERCOT"** means the Electric Reliability Council of Texas, or any successor thereto.

**"ERCOT Nodal Intra-Zonal Basis Charge"** means a charge associated with the Texas Nodal Market based on the difference(s), if any, between the applicable Real Time Load Zone Settlement Point Price(s) (applicable to Buyer's ESI ID(s)) as determined by ERCOT, less the applicable Real Time Trading Hub Settlement Point Price(s) (applicable to Buyer's ESI ID(s)) as determined by ERCOT. As used herein, the terms "Hub", Settlement Point Price and Load Zone have the meaning set forth in the ERCOT Nodal Protocols, as amended from time to time.

**"ERCOT Uplift Charges"** includes the following costs charged by ERCOT (each as defined in the Protocols, ERCOT Operating Guides or by the PUCT): Energy Loss Charges; ERCOT Fees; UFE Charges; Renewable Energy Credit Costs.

**"ERCOT Operating Guides"** means ERCOT's operating guides dated February 2001 as amended from time to time.

**"ERCOT Protocols"** or **"Protocols"** means the protocols published by ERCOT, as amended from time to time.

**"Interest Rate"** means, for any date, the lesser of (a) the per annum rate of interest equal to the prime lending rate as may from time to time be published in The Wall Street Journal under "Money Rates" on such day (or if not published on such day on the most recent preceding day on which published), plus four percent and (b) the maximum rate permitted by applicable law.

**"kW"** means kilowatt.

**"kWh"** means kilowatt-hours.

**"Power Factor"** means the ratio of kW to kilovolt amperes expressed as a percentage, calculated by <u>dividing</u> kW by kilovolt amperes.

**"Provider of Last Resort"** or **"POLR"** shall have the meaning set forth in the ERCOT Protocols, as amended from time to time.



"**PUCT**" means the Public Utility Commission of Texas, or any successor thereto.

"**PURA**" means the Public Utility Regulatory Act, as amended from time to time.

"**REP**" shall have the definition set forth under "Retail Electric Provider" in the ERCOT Protocols, as amended from time to time.

"**Schedule/Scheduling**" means the actions of Seller, Buyer and/or designated representatives, including the relevant TDU, if applicable, of notifying, requesting and confirming to each other the quantity and type of Energy to be delivered on any given day(s) during Term at specified Delivery Point.

"**Switch Date**" means the time and date on which the applicable TDU has completed the process necessary to permit Seller to commence or discontinue providing the services hereunder to the Buyer Account(s). The process may include, as necessary and without limitation, recognizing Seller as Buyer's electric supplier and /or limited agent; processing and acting on direct access service requests; installation of meters and the final meter read date.

"**System Benefit Fee**" means the non-bypassable fee set by the PUCT to finance the system benefit account. The fee is to be charged to electric retail Buyers based on the amount of kWh of Energy used as measured at the individual meter and adjusted for voltage level losses.

"**T&D Charges**" means, for each Buyer Account, all transmission and distribution charges and other cost recovery charges and fees outlined in the applicable TDU's tariff and billed to Seller for TDU's services to deliver Energy to the applicable Buyer Account(s) including but not limited to municipal franchise fees, non-metered service fees; nuclear generation facility decommissioning charges; transmission cost recovery factor charges; excess mitigation credits; provided, such charges and fees will not include any Transition Charges.

"**Taxes**" means all utility, gross receipts, sales, use, excise and other taxes, governmental charges, emission allowance costs, licenses, permits and assessments, and any other similar charge imposed as a result of this Agreement, other than taxes based on net income or net worth.

"**TDU**" means transmission and distribution utility, or any entity or entities transmitting or transporting Energy on behalf of Seller or Buyer to or from the Delivery Point.

"**Transition Charges**" means, for each Buyer Account, any or all of the following charges: competition transition charges; transition charges as defined in the PURA; and/or substantially similar charges associated with, or resulting from, the opening of the electric market in the State of Texas to REPs, including the recovery of stranded costs as defined by PURA and increases in transmission and distribution rates charged by the TDU that result from, or are otherwise attributable to, the redirection of depreciation expenses.

"**UFE Charges**" shall mean any charges attributable to "Unaccounted For Energy" as such term is defined in the ERCOT Protocols, as amended from time to time.

**Schedule 3.12**

**Environmental Permits**

None known to Sellers

**Schedule 3.16**

**Material Customers or Suppliers Who Have Terminated or Reduced Its Business with Sellers**

 None known to Sellers

**Schedule 4.4**

**801 Houston Ave Lease**

See attached lease

# TRIPLE NET LEASE AGREEMENT

***THIS LEASE*** is made as of 01/02/2017, by and between 801Houston Ave Properties LLC ("Lessor"), whose address is 801 Houston Avenue, Pasadena, Texas 77502, and Bendco Inc. ("Lessee"), whose address is 801 Houston Avenue, Pasadena, Texas 77502.

***WITNESSETH, THAT FOR AND IN CONSIDERATION*** of the covenants and agreements herein contained to be observed, kept and performed by the aforementioned respective parties hereto, the Lessor does hereby lease, let and demise unto the Lessee and the Lessee does hereby lease and hire for the Lessor the premises located and situated at 801 ,807,805 Houston Ave., Pasadena, Texas 77502 (the "Premises") in the County of Harris, County Tax Map # 441, Parcel # 50,51,64,65 containing approximately 4.8567 acre parcel of real estate being the same real estate by deed dated 10/31/1988 and recorded in the office of the Clerk of the County of Harris, in the State of Texas, in the Deed Book , on page . The description of the premises is as follows:

land aprox.4.8567 Acres. 3 high bay buildings.

## USE OF PREMISES
The premises shall be used only as or for the purpose of:
Pipe Bending and Pipe Fabrication..

## LEASE TERM
The term of this lease shall begin on 01/01/2027 and will end on at 11:59 PM (the "Term"). If the Lessee vacated the premises prior to the end of the lease term, the Lessee shall be liable for the balance amount of the lease for the remainder of the lease term.

In the event that the Lessee desires to vacate the premises, the Lessee shall provide the Lessor with 90 Days days advance written notice of intent to vacate. Advance notice shall be provided to ensure termination ensues at the end of the month. Prior to vacating the premises, the Lessee shall make sure that the premises are clean and free and clear of any dirt, trash, waste and/or debris, with the exception of normal wear and tear. The Lessor shall have the right to perform a walk through prior to the Lessee vacating to ensure premise complies with the aforementioned requirements.

## RENT/LEASE PAYMENT
The Lessee agrees to and shall pay monthly installment payments to the Lessor at 801 Houston Avenue, Pasadena, Texas 77502, or at such other address that the Lessor shall designate in writing, as rent or lease payment for the leased premises.

Lessee shall pay to the Lessor the annual base amount of $180,000.00 payable in twelve (12) equal monthly installment payments of $15,000.00, due and payable on the fifth of each month.

Any payments received after the aforementioned day shall be deemed late and delinquent.

## RENEWAL TERM
If the Lessee is not in default under the terms and conditions of this Agreement, the Lessee shall have the options to renew this Agreement for the extended term of 10yrs ("Renewal Term"). If the Lessee chooses to exercise this renewal option, the Lessee shall provide to the Lessor written notice of Lessee's intention to renew at least 30 Days days prior to the expiration of the initial Lease Term. The Renewal Term shall continue upon the same terms and conditions in this Agreement, except the new annual base rate for the first year of the Renewal Term shall be $0.00 payable in twelve (12) equal monthly installment payments

of $0.00 per month.

## HOLDING OVER

Failure of the Lessee to surrender the leased premises at expiration of the lease constitutes a holding over which shall be construed as a "tenancy-at-will" or a month to month lease at the rate of $15,000.00 per month, until such time as the Lessee completes a renewal or provides notice of intent to vacate.

## TRIPLE NET LEASE

This Lease is what is generally referred to as a "net net net lease" ("triple net lease"), and it is understood that the Lessor shall receive all rent or lease payments free and clear of any and all impositions, encumbrances, charges, obligations or expenses of any nature whatsoever in connection with the ownership and operation of the Premises. In addition, the Lessee shall pay to the parties respectively entitled thereto all impositions, insurance premiums, operating charges, maintenance charges, construction costs and any other charges, cost, and expenses which arise or may be contemplated under any provisions of this Lease during the Term hereof. All of the said charges, costs and expenses shall constitute Rent or Lease payment, and upon the failure of the Lessee to pay any such costs, charges or expenses, the Lessor shall have the same rights and remedies as otherwise provided in this Lease for the failure of Lessee to pay rent or make lease payments. The Lessee shall at no time be entitled to any abatement or reduction in Rent or Lease payments that are payable under this Lease except as otherwise expressly provided. Any present or future law to the contrary shall not alter this agreement of the parties.

## SECURITY DEPOST

Concurrently with the execution of this Lease, the Lessee shall deliver to the Lessor the amount of $0.00 as security for the performance of the Lessee of every covenant and conditions of this Lease (the "Security Deposit"). Said Security Deposit .

In the event that the Lessee defaults with respect to any covenant or condition of this Lease, including, but not limited to the payment of rent, the Lessor reserves the option and right to apply some or all of the paid Security Deposit to the payment of any sum in default or any sum which the Lessor may be required to spend by reason of 'Lessee's' damage or default. If any portion of the Security Deposit is so applied, the Lessee, upon demand by the Lessor, shall deposit cash with the Lessor in an amount sufficient to restore the Security Deposit to its original amount.

Lessee's compliance with all the covenants and conditions of this Lease shall ensure the return of the Security Deposit, or any balance thereof, to the Lessee promptly after expiration of the term of the Lease Agreement.

## POSSESSION

The Lessee shall take possession of the premises on 1/10/2017, unless otherwise stipulated. The Lessor shall use due diligence to ensure Lessee is provided possession of the premises at the beginning of the Term of this Lease Agreement. The first month's rent shall be prorated for the period of any delay in providing or turning over possession of the premises to the Lessee; however, the length of the term of this Agreement shall not be extended as a result of any such delay. The Lessee shall bring no claim against the Lessor for any delay in obtaining possession.

In the event that the Lessee fails to take possession of the premises within 10 days after the beginning of this Lease, then the Lessor retains the right to terminate this Agreement.

## INSURANCE ON PREMISE

The Lessee shall obtain and pay for, at his/her own cost and expense, fire and extended coverage casualty insurance for the building and other improvements on the leased premises, with such comprehensive or so

called "all-risk" endorsements and in such amounts as the Lessor may, from time to time, deem reasonably necessary, and showing the Lessee, the Lessor and the Lessor's Lender or Lien Holder, if any, as the insured parties. Lessee shall also obtain and pay for loss of rent coverage. The Lessee shall at all times keep said insurance in force and effect and shall provide to the Lessor copies of said policies or certificates evidencing said coverage. The policies shall be in form and content reasonably required by the Lessor, shall be issued by an insurance company approved by the Lessor and shall contain a clause that the Lessee will not cancel, materially modify or fail to renew said insurance in effect without first providing to the Lessor 60 days advance written notice. If the Lessee fails to keep said insurance in effect, the Lessee shall be in default hereunder, and the Lessor may, at his/her option, immediately obtain insurance coverage as provided for herein and charge the Lessee for the cost thereof.

## LESSEE INDEMNITY & LIABILITY INSURANCE

The Lessee shall at all times indemnify, defend and hold the Lessor harmless from all loss, liability, costs, damage and expenses that may occur or be claimed with respect to any person or persons, property on or about the Premises or to the Premises resulting from any act done or omission by or through the Lessee, the Lessee's agents, employees, staff, invitees or any person on the Premises by reason of the Lessee's use or occupancy or resulting from the Lessee's non-use or possession of said property and any and all loss, cost, liability or expense resulting therefrom. Lessee shall maintain at all times during the lease term comprehensive general liability insurance with an insurance company that is licensed to do business in the state in which the Premises are located and is satisfactory to Lessor, properly protecting and indemnifying Lessor with single limit coverage of not less than $0.00 for injury or $0.00 for death of persons and $0.00 for property damage. During the lease term, Lessee shall furnish the Lessor with a certificate or certificates of insurance, in a form acceptable to the Lessor, covering such insurance so maintained by the Lessee and naming the Lessor and Lessor's mortgagees, if any, as additional insureds.

## LESSOR INDEMNITY & LIABILITY INSURANCE

Lessor shall at all times indemnify, defend and hold the Lessee harmless from all loss, liability, costs, damages and expenses that may occur or be claimed with respect to any person or persons, property on, about or to any Common Areas resulting from any act done or omission by or through the Lessor, Lessor's agents, employees, staff, invitees or any person in or on the Common Areas. The Lessor shall maintain at all time during the lease term comprehensive general liability insurance with an insurance company satisfactory to the Lessee, properly protecting and indemnifying the Lessee with single limit coverage of not less than $100,000.00 for any injury or $100,000.00 for death of persons and $100,000.00 for property damage.

## TAXES

Lessee shall pay during the term of this Lease the real estate taxes and special taxes and assessments (collectively, the "taxes") attributable to the premises and accruing during such term. Lessee, at Lessor's option, shall pay to the Lessor said taxes on a monthly basis, based on one-twelfth (1/12) of the estimated annual amount for taxes. Taxes for any fractional calendar year during the term hereof shall be prorated. In the event the Lessee does not make any tax payment required hereunder, Lessee shall be in default of this Lease.

## TAXES ON LEASEHOLD

Lessee shall be responsible for and shall pay before delinquency all municipal, county, or state taxes assessed during the term of this Lease against any leasehold interest or personal property of any kind owned by or placed in, upon, or about the premises by the Lessee.

## OPERATING EXPENSES

It is the intention of the parties, and they hereby agree, that this shall be a triple net Lease, and the Lessor shall have no obligation to provide any services, perform any acts or pay any expenses, charges, obligations

or costs of any kind whatsoever with respect to the Premises, and Lessee hereby agrees to pay one hundred percent (100%) of any and all Operating Expenses as hereafter defined for the entire term of the Lease and any thereof in accordance with specific provisions hereinafter set forth. The term Operating Expenses shall include all costs to Lessee of operating and maintaining the Premises and related parking areas, and shall include, without limitation, real estate and personal property  taxes and assessments, management fee, heating, electricity, water, waste disposal, sewage, operating materials and supplies, service agreements and charges, lawn care, snow removal, restriping, repairs, repaving, cleaning and custodial, security, insurance, the cost of contesting the validity or applicability of any governmental acts which may affect operating expenses, and all other direct operating costs of operating and maintaining the Premises and related parking areas, unless expressly excluded from the operating expenses.

Notwithstanding the foregoing operating costs, and Lessee's obligations in relation thereto, shall not include (i) any expense chargeable to a capital account or capital improvement, ground leases; principal or interest payments on any mortgage or deed of trust on the premises; (ii) any amount for which Lessor is reimbursed through insurance, or by third persons, (iii) repair costs occasioned by fire, windstorm or other casualty, (iv) any construction, repair or maintenance expenses or obligations that are the sole responsibility of the Lessor (not to be reimbursed by the Lessee), (v) leasing commissions and other expenses incurred in connection with leasing any other area located on the premises to any other party, (vi) any expense representing an amount paid to an affiliate or subsidiary of the Lessor which is in excess of the amount which would be paid in the absence of such relationship, and (vii) costs of items and services for which the Lessee reimburses or pay any third persons directly.

## ASSIGNMENT AND SUBLETTING
The Lessee shall not assign, transfer or encumber this Lease and shall not sublease the Premises or any part thereof or allow any other person to be in possession thereof without prior written consent of the Lessor, in each and every instance. Said consent shall not be unreasonably withheld by the Lessor. For the purpose of this provision, any transfer of a majority or controlling interest in Lessee (whether in one or more related or unrelated transactions), whether by transfer of stock, consolidation, merger, transfer of a partnership interest or transfer of any or all of Lessee's assets or otherwise, or by operation of law, shall be deemed an assignment of this lease. Notwithstanding any permitted assignment or subletting, Lessee shall at all times remain directly, primarily and fully responsible and liable for the payment of the rent herein specified and for compliance with all of its other obligations under the terms and provisions of this Lease.

## CONDITION OF PREMISES
Lessee acknowledges that it has had the opportunity to inspect the Premises and, with the exception of any notations or provisions herein provided otherwise in this Lease, the Lessee accepts the Premises in its present condition. At the end of the lease term, except for any damages caused by fire or other perils, Lessee, at its expense shall (i) surrender the Premises in the same or similar condition as existed at the time the Premises were accepted and possession taken by the Lessee, subject to reasonable wear resulting from uses permitted hereunder, and further subject to Lessee's obligations; (ii) have removed all of the Lessee's property from the Premises; (iii) have repaired any damages to the Premises caused by the removal of the Lessee's Property; and (iv) leave the Premises free of trash, waste, dirty and debris and the Premises in good and reasonable condition.

## LESSOR'S RIGHT OF ENTRY
The Lessor or Lessor's agent shall have the right of entry at reasonable hours to inspect or show the Premises to prospective Lender or Lien Holders and purchasers, and to perform or provide anything that the Lessor may be required to perform or provide hereunder, or which the Lessor may deem necessary for the good or benefit of the Premises or any building of which they are a part. As of and during the last ninety (90) days of this Lease, the Lessor shall have the right to post and/or display a "For Rent" sign on the Premises.

## EXCLUSION OF LESSEE

Lessor may not intentionally prevent the Lessee from entering the leased Premises except by judicial process unless the exclusion results from: (i) bona fide repairs, construction, or an emergency; (ii) removing the contents of Premises abandoned by Lessee; or (iii) changing door locks of Lessee in the event the Lessee is delinquent in paying rent; Lessor or Lessor's agent must then place a written notice on Lessee's front door stating the name and address or telephone number of company or the individual from whom the key may be obtained. The new key is required to be provided only during Lessee's regular business hours.

## SIGNS AND ADVERTISEMENTS

The Lessee shall not place upon nor permit to be placed upon any part of the Premises, any signs, billboards or advertisements whatsoever, or paint the exterior walls of the building without the advance prior written consent of the Lessor. The Lessor shall have the right to remove any sign(s) which have not been approved in order to maintain the leased premises or to make any repairs or alterations thereto. All permitted signage placement and/or removal shall be at the Lessee's sole cost and expense.

## FORCE MAJEURE

In the event that the Lessor or Lessee is unable to reasonably perform its obligations under this Agreement as a result of a natural disaster, war, terrorist activities, strike, lockout, labor issues, civil commotion, and act of God, or any other event beyond the control of the Lessor or Lessee, with the exception for non-availability of funds, the party shall not be in breach of this Agreement if the party diligently performs the obligations after the end of the force majeure event. The non-performing party shall give written notice to the other party as soon as reasonably practicable in the event of non-performance due to a force majeure event.

In the event, during the Term or previous Term thereto, the premises shall be destroyed or so damaged by fire or other casualty as to become uninhabitable or unusable, then in such event, at the option of the Lessor, this Lease shall terminate from the date of such damage and/or destruction. The Lessor shall exercise this option to terminate this Lease by delivering written notice to the Lessee within 60 days after the occurrence of such damage and/or destruction. Upon such notice, the Lessee shall immediately surrender said Premises and all interest therein to the Lessor, and the Lessee shall pay rent only to such time that damages and/or destruction occurred. In the event that the Lessors does not elect to terminate this Lease, this Lease shall therefore continue in full force and effect, and the Lessor shall expeditiously make any and all necessary repairs to the Premises as needed, placing the same in as good condition as it was prior to the occurrence of damage or destruction.

## PERSONAL PROPERTY

The Lessor shall not be liable for any loss or damage to any merchandise inventory, goods, fixtures, improvements or personal property of the Lessee in or about said Premises.

## ALTERATIONS

Any and all alterations, additions and/or improvements, except trade fixtures, installed at the expense of the Lessee shall become the property of the Lessor and shall remain upon and shall be surrendered with the leased Premises as a part thereof on the termination of this lease. Such alterations, additions, and improvements may only be made with the prior written consent and approval of the Lessor, which shall not be unreasonably withhold said consent. If consent is granted by the Lessor for the making of improvements, alterations or additions to the leased Premises, such improvements, alterations or additions shall not commence until such time as the Lessee has furnished to the Lessor a copy of all plans and a certificate of insurance showing coverage in an amount satisfactory to the Lessor protecting the Lessor from liability for injury to any person and damage to any personal property, on or off the leased Premises,

in connection with the making of such improvements, alterations or additions. No cooling tower, equipment, or structure of any kind shall be placed on the roof or elsewhere on the leased premises by the Lessee without prior written permission of the Lessor. If such permission is granted, such work or installation shall be done at the Lessee's expense and in such a manner that the roof shall not be damaged thereby. If it becomes necessary to remove such cooling tower, equipment or structure temporarily so that repairs to the roof can be made, Lessee shall promptly remove and reinstall the cooling tower, equipment or structure at the Lessee's expense and repair at the Lessee's expense any damage which may result from such removal or reinstallation. Upon termination of this lease, Lessee shall remove or cause to be removed from the roof any such cooling tower, equipment or structure if directed to do so by the Lessor. Lessee shall promptly repair, at its expense, any damages resulting from such removal. At the termination of this lease, Lessee shall deliver the leased Premises in good order and condition, natural deterioration only excepted. Any damage caused by the installation of trade fixtures shall be repaired at the Lessee's expense prior to the expiration of the lease term. All alterations, improvements, additions and repairs made by the Lessee shall be made in good and workmanlike manner.

## UTILITIES & SERVICES
The Lessee shall furnish and pay for all of the following and any other utilities deemed necessary by the Lessee at the Premises:
Electric, Water, Gas, Trash, Phone.

## INTERRUPTION OF UTILITIES
Lessor or Lessor's agent may not interrupt or cause the interruption of utility services paid directly to the utility company by the Lessee unless interruption results from bona fide repairs, construction, or an emergency. If any utility services furnished by the Lessor are interrupted and continue to be interrupted despite the good faith efforts of Lessor to remedy the same, Lessor shall not be liable in any respect for damages to the person or property of Lessee or Lessee's employees, agents, or guests and same shall not be construed as grounds for constructive eviction or abatement of rent. Lessor shall use reasonable diligence to repair and remedy such interruption promptly.

## LEGAL REQUIREMENTS
The Lessee shall comply with all laws, orders, ordinances and other public requirements now and hereafter affecting the Premises or the use thereof, and the Lessee shall indemnify, defend and hold harmless the Lessor from any expense or damage resulting from the failure to do so.

## FIXTURES
With the exception for Lessee's personal property and trade fixtures, all buildings, repairs, alterations, additions, improvements, installation and other non-trade fixtures installed or erected on the Premises, whether by or at the expense of the Lessor or Lessee, shall belong to the Lessor and shall remain on and be surrendered with the Premises at the expiration or termination of this Lease. However, the Lessor shall retain the option to permit the Lessee to remove their alterations or improvements prior to the expiration of this Lease and return the Premise to its original condition.

## REPAIRS AND MAINTENANCE
The Lessor shall maintain the foundation, exterior walls (with the exception of glass; windows; doors; door closure devices; window and door frames; molding; locks and hardware) and exterior painting or other treatment of exterior walls, and the roof of the leased Premises in good repair except that the Lessor shall not be required to make any repairs resulting from the negligence or acts of negligence on the behalf of the Lessee, its staff, employees, sublessees, licensees and concessionaires. The Lessee shall be responsible for maintenance of the common areas and common area equipment and furnishings. Any such repairs and/or maintenance in which the Lessor would be responsible, the Lessee agrees to provide Lessor with written notice of the needed repairs and/or maintenance, and Lessor shall ensure that any repairs and/or

maintenance shall be made and completed within a reasonable time frame. Lessee shall notify the Lessor of any emergency repairs to be made. Lessee shall keep the interior of the leased Premises in good, clean and workable condition and shall, at its sole expense, make all needed repairs and replacements, including replacement of cracked or broken glass, windows, doors, door closure devices, door and window frames, molding, locks and hardware, except for repairs and replacements required to be made by the Lessor under this section.

In the event that any repairs required to be made by the Lessee hereunder are not made within 60 days after written notice delivered to the Lessee by the Lessor, the Lessor shall reserve the right and option to make or have said repairs made without liability to the Lessor for any loss or damage which may result by reason of such repairs, and that Lessee shall pay to the Lessor, upon demand as additional rent hereunder, the cost of such repairs plus. At the termination of this Lease, Lessee shall deliver the leased premises in good order and condition, normal wear and tear excepted. Normal wear and tear meaning the deterioration which results from normal use and not as an act of carelessness, neglect, accident or abuse.

## EMINENT DOMAIN

In the event that the Premises are taken under the power of eminent domain or a conveyance in lieu thereof by any authority having the right of condemnation, or if a portion thereof is taken so that the Premises are unsuitable, in the Lessee's reasonable opinion, for Lessee's use, then the term of this lease shall terminate as of the date that title shall vest in the acquiring authority, and the rent and other charges shall be adjusted as of the date of such taking. In such case, the Lessor shall be entitled to the proceeds of the condemnation award made to the Lessor. Nothing herein shall be construed to prevent the Lessee from separately pursuing a claim against the condemning authority for its independent loss or damages to the extent available, provided however, that no award made to or on behalf of the Lessee shall reduce, limit, or restrict the award to the Lessor, and no allocation of the Lessor's award in condemnation shall occur. The Lessee shall have no claim against the Lessor for the value of the unexpired term of this Lease. Should any part of the Premises be taken in the exercise of eminent domain or a conveyance in lieu thereof or in connection therewith, but not such as to render the Premises unsuitable for the operation of Lessee's business, this Lease shall continue on the same terms and conditions except that the description of the Premises or the real estate taken by right of eminent domain or conveyance in lieu thereof or in connection therewith shall be modified to reflect such taking. In the event this Lease does not terminate by reason of such taking, the condemnation proceeds from the 'Demised Premises' will first be used to restore the Premises to a position of occupancy by the Lessee. The balance of such condemnation proceeds from the Premises, if any, shall belong to the Lessor.

## WAIVER OF SUBROGATION

As part of the consideration for this Lease, each of the parties hereby releases the other party from all liability for damage due to any act or neglect of the other party occasioned to the property owned by said parties which is or might be incident to or the result of fire or other casualty against loss for which either of the parties is now carrying or hereafter carry insurance; provided however, that the releases herein contained shall not apply to any loss or damage occasioned by intentional acts of either of the parties, and the parties further covenant that any insurance they obtain on their respective properties shall contain an appropriate provision whereby the insurance company, or companies, consent to the mutual release of liability contain in this paragraph.

## DEFAULT & REMEDIES

Lessor shall have the following remedies if Lessee commits a default. These remedies are not exclusive; they are cumulative and in addition to any remedies now or later allowed by law:

*RE-ENTRY:* Upon the happening of any such event of default, Lessor, at any time thereafter may:

(a)  Either with or without notice of demand, declare the Lease term ended and re-enter the Premises or any part thereof, either with or without process of law, and expel or remove therefrom Lessee and all parties occupying the same or any of them, using force as may be necessary so to do, and again repossess and enjoy the same without prejudice to any remedies that Lessor may otherwise have by reason of the breach hereof. Or

(b)  Re-enter the Premises at its option without declaring the Lease Term ended and relet the whole or any part therefor for the account of Lessee on such terms and conditions and at such rent as Lessor may deem proper, collecting such rent and applying it on the amount due from Lessee hereunder. And on the expense of such reletting (including expense of alteration and special inducements to Lessee) and on any other damage or expense so sustained by Lessor, or on any such item or items, Lessor will recover from Lessee the difference between the proceeds of such reletting and the amount of rentals reserved hereunder and any such damage or expense from time to time which said sum Lessee agrees to pay upon demand.

### *LESSEE DEFAULT AND REMOVAL OF ABANDONED PROPERTY*
In the event that the Lessee abandons the Premises or otherwise defaults in the performance of any obligations or covenants herein, the Lessor may enforce the performance of the lease in any manner provided by law. This lease may be terminated at the Lessor's discretion if such abandonment or default continues for a period of 90 days after the Lessor notifies the Lessee of such abandonment or default and of Lessor's intention to declare this lease terminated. Such notice shall be sent by the Lessor to the Lessee at the Lessee's last known address by certified mail. If Lessee has not completely removed or cured the default within the 90 day period, this lease shall terminate. Thereafter, Lessor or its agents shall have the right without further notice or demand to enter the leased Premises and remove all property without being deemed guilty of trespass and without waiving any other remedies for arrears of rent or breach of covenant. Upon abandonment or default by the Lessee, the remaining unpaid portion of any rent shall become due and payable. For the sole purpose of this section, Lessee is presumed to have abandoned the Premises if goods, equipment, or other property, in an amount substantial enough to indicate a probable intent to abandon the Premises, is being or has been removed from the Premises and the removal is not within the normal course of Lessee's business. Lessor shall have the right to store any property of Lessee that remains on the abandoned Premises and, in addition to Lessor's other rights, may dispose of the stored property if the Lessee does not claim the property within 90 days after the date that the property is stored, provided Lessor delivers notice by certified mail to Lessee.

### *DAMAGES*
Should Lessor terminate this Lease by reason of any breach thereof by Lessee, Lessor may thereupon recover from Lessee the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved herein for the balance of said Term over the then reasonable rental value of the Premises for the same period. Lessor shall not by any re-entry or other act be deemed to have terminated this Lease or the liability of Lessee for the total rent hereunder or any installment thereof then due or thereafter accruing or for damages unless Lessor shall notify Lessee in writing that Lessor has so elected to terminate the Lease.

### *LESSOR'S RIGHT TO CURE LESSEE'S DEFAULT*
Lessor, at any time after Lessee commits a default, can cure the default at Lessee's cost. If Lessor at any time, by reason of Lessee's default, pays any sum or does any act that requires the payment of any sum, the sum paid by Lessor shall be due immediately from Lessee to Lessor at the time the sum is paid.

### *WAIVER*
The rights and remedies of the Lessor under this Lease, as well as those provided by law, shall be cumulative, and none shall be exclusive of any other rights or remedies. A waiver by the Lessor of any breach or default of the Lessee shall not be deemed or construed to be a continuing waiver of such breach or

default nor as a waiver of or permission, expressed or implied, for any subsequent breach or default. It is agreed that the acceptance by the Lessor of any installment of rent subsequent to the date the same should have been paid shall not alter the covenant and obligation of Lessee to pay subsequent installments of rent promptly upon the due date. Receipt by Lessor of partial payment after Lessee's default shall not be construed to be or constitute a cure of any such default. No receipt of money by Lessor before or after the termination of this Lease shall in any way reinstate, continue or extend the term above demised.

## TOXIC OR HAZARDOUS MATERIALS

Lessee shall not store, use or dispose of any toxic or hazardous materials in, on or about the Premises without the prior written consent of Lessor. Lessee, at its sole cost, shall comply with all laws relating to Tenant's storage, use and disposal of hazardous or toxic materials. Lessee shall be solely responsible for and shall defend, indemnify and hold Lessor, its agents and employees, harmless from and against all claims, costs and liabilities, including attorney's fees and costs, arising out of or in connection with the Lessee's storage, use or disposal of any toxic or hazardous material in, on or about the Premises including, but not limited to, removal, clean-up and restoration work and materials necessary to return the Premises, and any other property of whatever nature located on the Premises, to their condition existing prior to the appearance of toxic or hazardous materials on the Premises. Lessee's obligations under this paragraph shall survive the termination of this Lease.

## GOVENING LAWS

This Agreement shall be construed under and in accordance with the laws of the State of Texas.

## COMPLIANCE WITH LAWS AND REGULATIONS

Lessee shall, at its own expense, comply with all laws, orders, codes and requirements of all government entities with reference to the use and occupancy of the leased Premises. Lessee and Lessee's agents, employees, and invitees shall fully comply with any rules and regulations governing the use of the buildings or other improvements to the leased premises as required by the Lessor. Lessor may make reasonable changes in such rules and regulations from time to time as deemed advisable for the safety, care and cleanliness of the leased Premises, provided same are in writing and are not in conflict with this lease.

## NOTICES

Any notice hereunder shall be sufficient if sent by certified mail, addressed to the Lessee at the Premises, and to the Lessor where rent is payable.

## SUBORDINATION OF LEASE TO MORTGAGES

This Lease shall be subject and subordinate at all times to the lien of existing mortgages and of mortgages which hereafter may be made a lien on the Premises; provided however, that with regard to any pledge or mortgage executed by the Lessor, Lessor shall use its best efforts to provide to the Lessee a non-disturbance agreement from any mortgagee or other lien holder of Lessor's interest in the Premises. Such non-disturbance agreement shall be in form and content reasonably acceptable to Lessee and Lessor's mortgagee or other lien holder, together with a representation that the Lessor is not in default of any of the terms of any such mortgage or security agreement as of the date thereof. Although no instrument or act on the part of the Lessee shall be necessary to effectuate such subordination, the Lessee will nevertheless execute and deliver such further instruments subordinating this Lease to the lien of any such mortgages as may be desired by the mortgagee. The Lessee hereby irrevocably appoints the Lessor as Lessee's attorney-in-fact to execute and deliver such instrument for the Lessee. Provided however, and notwithstanding the foregoing provisions hereof, upon foreclosure of the mortgage with the mortgagee succeeding to the rights of the Lessor, the Lessee shall, at the option of said mortgagee, be bound to the mortgagee under all of the terms of the Lease for the balance of the term hereof remaining with the same force and effect as if the mortgagee were the Lessor under the Lease, and the Lessee hereby attorns to the mortgagee as its Lessor, such attornment to be effective and self-operative if the mortgagee so elects. In no event, however, shall the

mortgagee be liable for any act or omission of any prior Lessor, be subject to any offsets or defenses which Lessee might have against any prior Lessor, or be bound by any rent or additional rent which the Lessee might have paid to any prior Lessor for more than the current month.

*SUCCESSORS*
The provisions, covenants and conditions of this Lease shall bind and inure to the benefit of the legal representatives, heirs, successors and assigns of each of the parties hereto, except that no assignment or subletting by Lessee without the written consent of Lessor shall vest any rights in the assignee or subtenant of Lessee.

*QUIET POSSESSION*
Lessor agrees, so long as Lessee fully complies with all of the terms, covenants and conditions herein contained on the Lessee's part to be kept and performed, Lessee shall and may peaceably and quietly have, hold and enjoy the Premises for the term aforementioned, it being expressly understood and agreed that the aforementioned covenant of quiet enjoyment shall binding upon the Lessor, its heirs, successors or assigns, but only during such party's ownership of the Premises. Lessor and Lessee further covenant and represent that each has full right, title, power and authority to make, execute and deliver this Lease.

*BANKRUPTCY*
Neither this Lease nor any interest therein nor any estate hereby created shall pass to any trustee or receiver in bankruptcy or to any other receiver or assignee for the benefit of creditors by operation of law or otherwise during the Term or any renewal thereof.

*PRIOR AGREEMENTS SUPERSEDED*
This agreement constitutes the sole and only agreement of the parties to this lease and supersedes any prior understandings, whether written or oral agreement, between the parties respecting the subject matter of this lease.

*AMENDMENT*
No amendment, modification, or alteration of the terms hereof shall be binding unless it is in writing, dated subsequent to the date hereof and duly executed by all parties to this agreement.

*ADDITONAL INSTRUMENTS*
The parties hereto will execute any and all additional document or instruments that may be necessary or convenient to carry out the intent and purposes of the parties to this agreement.

*ENTIRE AGREEMENT*
This Lease contains the entire agreement between the parties and no modification of this Lease shall be binding upon the parties unless evidenced by an agreement in writing and signed by the Lessor and Lessee after the date hereof. If there be more than one Lessee name herein, the provisions of this Lease shall be applicable to and binding upon such Lessees, jointly and severally.

*IN WITNESS WHEREOF*, said parties hereunto subscribe their names.

*LESSOR*

By: _____
(Lessor Signature)
*Lessor Telephone:* 7134731357

_____
(Date)

*Lessor Email:* bendco@bendco.com

*LESSEE*

By: _____     _____
(Lessee Signature)                                          (Date)
*Lessee Telephone:* 7134731557
*Lessee Email:* bendco@bendco.com